# R. E. GINNA NUCLEAR POWER PLANT

# ASSET PURCHASE AGREEMENT

BY AND AMONG

ROCHESTER GAS AND ELECTRIC CORPORATION, AS SELLER

CONSTELLATION GENERATION GROUP, LLC, AS BUYER

AND

CONSTELLATION ENERGY GROUP, INC., AS BUYER'S PARENT

DATED AS OF NOVEMBER 24, 2003

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE 1 DEFINITIONS | | 1 |
| Section 1.1 | Definitions. | 1 |
| Section 1.2 | Certain Interpretive Matters. | 20 |
| ARTICLE 2 PURCHASE AND SALE | | 20 |
| Section 2.1 | Purchased Assets. | 20 |
| Section 2.2 | Excluded Assets. | 23 |
| Section 2.3 | Assumed Liabilities and Obligations. | 24 |
| Section 2.4 | Excluded Liabilities. | 26 |
| Section 2.5 | Control of Litigation. | 29 |
| ARTICLE 3 THE CLOSING | | 29 |
| Section 3.1 | Closing. | 29 |
| Section 3.2 | Payment of Purchase Price. | 30 |
| Section 3.3 | Adjustment to Purchase Price. | 30 |
| Section 3.4 | Allocation of Purchase Price. | 33 |
| Section 3.5 | Prorations. | 33 |
| Section 3.6 | Deliveries by Seller. | 34 |
| Section 3.7 | Deliveries by Buyer. | 36 |
| Section 3.8 | Delivery of DOE Credit Support | 37 |
| ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER | | 37 |
| Section 4.1 | Organization. | 37 |
| Section 4.2 | Authority Relative to this Agreement. | 37 |
| Section 4.3 | Consents and Approvals; No Violation. | 38 |
| Section 4.4 | Reports. | 38 |
| Section 4.5 | Undisclosed Liabilities. | 39 |
| Section 4.6 | Absence of Certain Changes or Events. | 39 |
| Section 4.7 | Title and Related Matters. | 39 |
| Section 4.8 | Real Property Agreements. | 39 |
| Section 4.9 | Insurance. | 40 |
| Section 4.10 | Environmental Matters. | 40 |
| Section 4.11 | Labor Matters. | 41 |

foregoing, the term "Nuclear Insurance Policies" includes all policies issued or administered by ANI or NEIL.

(108) "Nuclear Laws" means all Laws relating to the regulation of nuclear power plants, Source Material, Byproduct Material and Special Nuclear Materials; the regulation of Low Level Waste and High Level Waste; the transportation and storage of Nuclear Materials; the regulation of Safeguards Information; the regulation of Nuclear Fuel; the enrichment of uranium; the disposal and storage of High Level Waste and Spent Nuclear Fuel; contracts for and payments into the Nuclear Waste Fund; and as applicable, the antitrust laws and the Federal Trade Commission Act to specified activities or proposed activities of certain licensees of commercial nuclear reactors, but shall not include Environmental Laws. "Nuclear Laws" include the Atomic Energy Act of 1954, as amended (42 U.S.C. Section 2011 et seq.), the Price-Anderson Act (Section 170 of the Atomic Energy Act of 1954, as amended); the Energy Reorganization Act of 1974 (42 U.S.C. Section 5801 et seq.); Convention on the Physical Protection of Nuclear Material Implementation Act of 1982 (Public Law 97 -351; 96 Stat. 1663); the Foreign Assistance Act of 1961 (22 U.S.C. Section 2429 et seq.); the Nuclear Non-Proliferation Act of 1978 (22 U.S.C. Section 3201); the Low-Level Radioactive Waste Policy Act (42 U.S.C. Section 2021b et seq.); the Nuclear Waste Policy Act (42 U.S.C. Section 10101 *et seq.* as amended); the Low-Level Radioactive Waste Policy Amendments Act of 1985 (42 U.S.C. Section 2021d, 471); and the Energy Policy Act of 1992 (4 U.S.C. Section 13201 et seq.); and any state or local Laws analogous to the foregoing.

(109) "Nuclear Material or Materials" means Source Material, Special Nuclear Material, Low Level Waste, High Level Waste, Byproduct Material and Spent Nuclear Fuel.

(110) "Nuclear Waste Fund" means the fund established by the Department of Energy under the Nuclear Waste Policy Act in which the Spent Nuclear Fuel Fees to be used for the design, construction and operation of a High Level Waste Repository and other activities related to the storage and disposal of Spent Nuclear Fuel and/or High Level Waste are deposited.

(111) "Nuclear Waste Policy Act" means the Nuclear Waste Policy Act of 1982, as amended.

(112) "NYDEC" means the New York State Department of Environmental Conservation and any successor agency thereto.

(113) "NYPSC" means the Public Service Commission of the State of New York and any successor agency thereto.

(114) "Observers" has the meaning set forth in Section 6.1(c).

(115) "One-Time DOE Pre-1983 Fee" means the one-time fee, including any interest, late fees and/or penalties accruing thereon from time to time, payable by

Seller pursuant to Article VIII (B)(2)(b) of the Standard Spent Fuel Disposal Contract.

(116) "Other Plant Personnel" has the meaning set forth in Section 4.11.

(117) "Party" (and the corresponding term "Parties") has the meaning set forth in the preamble.

(118) "PBGC" means the Pension Benefit Guaranty Corporation established by ERISA.

(119) "Permits" has the meaning set forth in Section 4.17(a).

(120) "Permitted Encumbrances" means: (i) the Easements; (ii) those exceptions to title to the Purchased Assets listed in Schedule 4.7 with respect to Real Property; (iii) with respect to any date before the Closing Date, Encumbrances created by the Mortgage Indenture; (iv) statutory liens for Taxes or other governmental charges or assessments not yet due or delinquent or the validity of which are being contested in good faith by appropriate proceedings provided that the aggregate amount being so contested does not exceed $200,000; (v) mechanics', materialmen's, carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of Seller or the validity of which are being contested in good faith, and which do not, individually or in the aggregate, exceed $200,000; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations imposed by Governmental Authorities which do not materially, individually or in the aggregate, detract from the value of the Purchased Assets as such assets are currently used or interfere with the present use or operation of the Purchased Assets and neither secure indebtedness, nor, individually or in the aggregate, result in a Material Adverse Effect; (vii) the covenants and restrictions set forth in this Agreement or in any of the Ancillary Agreements; and (viii) such other liens, imperfections in or failures of title, easements, leases, licenses, restrictions, activity and use limitations, conservation easements, encumbrances and encroachments, as do not, individually or in the aggregate, materially detract from the value of the Purchased Assets as such assets are currently used or materially interfere with the present use or operation of the Purchased Assets and neither secure indebtedness, nor, individually or in the aggregate, result in a Material Adverse Effect.

(121) "Person" means any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, association, or governmental entity or any political subdivision, department or agency thereof.

(122) "PIMS Agreement" means the agreement between Seller and Pooled Equipment Inventory Company, effective July 1, 2002, as amended, with respect to pooled inventory management.

(180) "Uprate" has the meaning set forth in Section 6.21(a).

(181) "Uprate Reports" has the meaning set forth in Section 6.21(a).

(182) "USEPA" means the United States Environmental Protection Agency and any successor agency thereto.

(183) "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

(184) "WARN Certificate" has the meaning set forth in Section 6.10(i).

Section 1.2 Certain Interpretive Matters. In this Agreement, unless the context otherwise requires, the singular shall include the plural, the masculine shall include the feminine and neuter, and vice versa. The term "includes" or "including" shall mean "including without limitation." References to a Section, Article, Exhibit or Schedule shall mean a Section, Article, Exhibit or Schedule of this Agreement, and reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented and restated through the date as of which such reference is made.

## ARTICLE 2

## PURCHASE AND SALE

Section 2.1 Purchased Assets. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller will sell, assign, convey, transfer and deliver to Buyer, and Buyer will purchase, assume and acquire from Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), all of Seller's right, title and interest in and to the following assets, wherever located (collectively, the "Purchased Assets"): (i) all of the assets used in, held for use, constituting, or necessary in the ordinary course of business to operate and maintain Ginna (but excluding such assets that are not necessary for the operation of Ginna as a generating station and are used predominantly elsewhere in the operation of Seller's business), including, without limitation, those assets identified in Schedule 2.1(j) and Schedules 4.13(a) and (b), and (ii) those assets described below (but excluding the Excluded Assets):

(a) Except as otherwise constituting part of the Excluded Assets, the land described on Schedule 4.13(a) (which land comprises the Site) together with all buildings, facilities and other improvements thereon including the Facilities (but excluding any personal property thereon) and all appurtenances thereto, including, without limitation, all related rights of ingress and egress (collectively, the "Real Property");

(b) All Nuclear Materials and Inventories owned by Seller, or in which the Seller has any right, title or interest, on the Closing Date, wherever located;

plan (other than refunds that relate to premiums paid for time periods prior to the Closing Date);

(n) Subject to the receipt of approval from the Wireless Bureau of the Federal Communications Commission, certain radio licenses set forth on Schedule 2.1(n);

(o) Subject to Buyer's written commitment to satisfy its indemnification obligations under Section 8.1(a), the right to proceeds from insurance policies for coverage of Assumed Liabilities and Obligations;

(p) Subject to Buyer's written commitment to satisfy its indemnification obligations under Section 8.1(a), the rights of Seller in and to any causes of action, claims and defenses against third parties (including indemnification and contribution) relating to any Assumed Liabilities and Obligations, including, but not limited to, all rights of Seller in and to any cause of action or claim pending or hereafter initiated with respect to damages incurred prior to, on or after the Closing Date relating to the DOE Litigation; provided that the prosecution of any cause of action or claim related to the DOE Litigation shall be conducted as specified in Section 6.13 and any recovery of damages, costs, attorneys' fees, interest and penalties, or any other expenses awarded shall be shared between Seller and Buyer in accordance with Section 6.13;

(q) The Transferred Employee Records, subject to the right of Seller to retain copies of such records for its reasonable and lawful use and subject to the obligation of Buyer to preserve such records and make such records available to Seller as reasonably necessary for Seller's reasonable and lawful purposes following the Closing Date as provided in Section 6.2(c);

(r) Any rights of Seller with respect to prior assessments of licensees of operating nuclear power plants to support disposal facility development activities by the NYDEC, and the former Commission for Siting Low-Level Radioactive Waste Disposal Facilities, which ceased operation in August 1995;

(s) All assignable right, title and interest of the Seller to the NRC License;

(t) All rights of the Seller in property, assets, leases and agreements used or usable in providing emergency warning or associated with emergency preparedness as set forth on Schedule 2.1(t);

(u) All Emission Reduction Credits or emission allowances that relate to the operation of the Facilities prior to, on or after the Closing Date; and

(v) The assets required to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan or paid from Seller to Buyer as set forth in Section 6.10(h).

Section 2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed as conferring on Buyer, and Buyer is not acquiring, any right, title or interest in or to the following specific assets which are associated with the Purchased Assets, but which are hereby specifically excluded from the sale and the definition of Purchased Assets herein (the "Excluded Assets"):

(a) Except as expressly identified in Schedule 4.13(b) or the Interconnection Agreement or the Easement Agreement, the electrical transmission or distribution facilities (as opposed to generation facilities) of Seller or any of its Affiliates, as well as all permits, contracts and warranties, to the extent they relate to such transmission and distribution assets (collectively, the "Transmission Assets"), and those assets and facilities identified on Schedule 2.2(a);

(b) Certificates of deposit, shares of stock, securities, bonds, debentures, evidences of indebtedness, and interests in joint ventures, partnerships, limited liability companies and other entities (including, without limitation, Seller's member account balances with NEIL), except such assets comprising the portion of the Decommissioning Funds which is required to be transferred to the Buyer pursuant to Section 6.12 hereof and except such assets required to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan or paid from Seller to Buyer as set forth in Section 6.10(h);

(c) All rights to collect premium refunds and distributions made after the Closing Date under Nuclear Insurance Policies to the extent that such refunds and distributions relate to premiums paid prior to the Closing Date;

(d) All cash, cash equivalents, bank deposits, accounts and notes receivable (trade or otherwise), and any income, sales, payroll or other tax receivables, except to the extent such assets are included in the portion of the Decommissioning Funds transferred to Buyer pursuant to Section 6.12 hereof and except such assets required to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan or paid from Seller to Buyer as set forth in Section 6.10(h);

(e) The rights of Seller and its Affiliates to the names "Rochester Gas and Electric Corporation" and "RG&E" or any related or similar trade names, trademarks, service marks, corporate names or logos, or any part, derivative or combination thereof;

(f) All tariffs, agreements and arrangements to which Seller is a party for the purchase or sale of electric capacity and/or energy or for the purchase or sale of transmission or ancillary services;

(g) Other than those contemplated by Section 2.1(p), the rights of Seller in and to any causes of action, claims and defenses against third parties (including indemnification and contribution) arising out of or relating to (A) any Real Property

or personal property, Permits, Taxes, Real Property Agreements, Seller's Agreements, Fuel Contracts or the Non-material Contracts, if any, including any claims for refunds (including refunds of previously paid Department of Energy Decommissioning and Decontamination Fees), prepayments, offsets, recoupment, insurance proceeds, condemnation awards, judgments and the like, whether received as payment or credit against future liabilities, relating specifically to the Purchased Assets (including, without limitation, the Facilities and the Site) and relating to any period prior to the Closing Date, (B) the Excluded Assets, or (C) the Excluded Liabilities;

(h) All personnel records of Seller and Affiliates, except the Transferred Employee Records;

(i) Any and all of Seller's rights in any contract representing an intercompany transaction between Seller and an Affiliate of Seller, whether or not such transaction relates to the provision of goods and services, payment arrangements, intercompany charges or balances, or the like;

(j) To the extent not otherwise provided for in this Section 2.2, any refund or credit (i) related to income, real or personal property, excise, sales or use Taxes paid by Seller with respect to periods (or portions thereof) prior to the Closing Date in respect of the Purchased Assets, whether such refund is received as a payment or as a credit against future income, real or personal property, excise, sales or use Taxes payable, or (ii) arising under any agreement which is part of the Purchased Assets and relating to a period prior to the Closing Date;

(k) Any cause of action or claim for damages or other rights that relate to the One-Time DOE Pre-1983 Fee; and

(l) All rights of Seller under those contracts, agreements, purchase orders and personal property leases set forth in Schedule 2.2(l).

Section 2.3 Assumed Liabilities and Obligations. On the Closing Date, Buyer shall deliver to Seller the Assignment and Assumption Agreement pursuant to which Buyer shall assume and agree to discharge when due, all of the following Liabilities of Seller (collectively, "Assumed Liabilities and Obligations"):

(a) All Liabilities of Seller arising on or after the Closing Date with respect to the ownership, operation or maintenance of the Purchased Assets, and all Liabilities of Seller arising on or after the Closing Date under Seller's Agreements, the Standard Spent Fuel Disposal Contract, Fuel Contracts, the Real Property Agreements, the Non-material Contracts and the Transferable Permits in accordance with the terms thereof, including, without limitation, (i) the contracts, licenses, agreements and personal property leases entered into by Seller with respect to the Purchased Assets or under Seller's Agreements or the Fuel Contracts or the Non-material Contracts and disclosed on the relevant schedule and (ii) the contracts, licenses, agreements and personal property leases entered into by Seller with respect

(h) All Liabilities of Seller associated with (i) the Nuclear Fuel consumed, or to be consumed, at Ginna from and after the Closing Date and (ii) the management, storage, removal, transportation and disposal on and after the Closing Date of all Nuclear Materials of Ginna ; provided, however, that Buyer does not assume any Liability for the off-Site disposal of Low Level Waste prior to the Closing Date as required pursuant to Laws in effect as of the Closing Date;

(i) All obligations arising on or after the Closing Date to pay to ANI any additional premiums due to audit assessments for assessments performed on or after the Closing Date;

(j) All Liabilities arising under or relating to Nuclear Laws or relating to any claim in respect of Nuclear Fuel or Nuclear Materials arising out of the ownership or operation of the Purchased Assets on or after the Closing Date, including any and all Liabilities to third parties (including employees) for personal injury, property damage or tort, or similar causes of action arising out of the ownership or operation of the Purchased Assets on or after the Closing Date, including Liabilities arising out of or resulting from a "nuclear incident" or "precautionary evacuation" (as such terms are defined in the Atomic Energy Act) at the Site, or any other licensed nuclear reactor site in the United States, or in the course of the transportation of radioactive materials to or from the Site or any other site on or after the Closing Date, including, without limitation, Liability for any deferred premiums assessed in connection with such a nuclear incident or precautionary evacuation under any applicable NRC or industry retrospective rating plan or insurance policy, including any mutual insurance pools established in compliance with the requirements imposed under Section 170 of the Atomic Energy Act, 10 C.F.R. Part 140, and 10 C.F.R. § 50.54(w);

(k) Any Liability for any Price-Anderson Act secondary financial protection retrospective premium obligations for (i) nuclear worker Liability attributable to employment on or after the Closing Date or (ii) any third-party Liability arising out of any nuclear incident on or after the Closing Date;

(l) Except as otherwise expressly provided herein, Liabilities of Buyer to the extent arising from the execution, delivery or performance of this Agreement and the transactions contemplated hereby; and

(m) All other Liabilities expressly allocated to or assumed by Buyer in this Agreement.

Section 2.4 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed to impose on Buyer, and Buyer shall not assume or be obligated to pay, perform or otherwise discharge, the following Liabilities (the "Excluded Liabilities"), with all of such Excluded Liabilities remaining as obligations of Seller:

a court or by a Governmental Authority to have been applicants or employees of the Seller or any of its Affiliates (including, but not limited to, any Liability related to the matter disclosed on Schedule 4.11), or that are filed with or pending before any court, administrative agency or arbitrator prior to the Closing Date, including, but not limited to, the claim set forth on Schedule 4.11, provided Seller will not have any Liability for similar actions or inactions by Buyer or any successor thereto on or after the Closing Date;

(l) All Spent Nuclear Fuel Fees and any other fees associated with electricity generated at Ginna and sold on or prior to the Closing Date, including, but not limited to, the obligation to the Department of Energy under the Standard Spent Fuel Disposal Contract to make the deferred payment of the One-Time DOE Pre-1983 Fee;

(m) All Liabilities for Department of Energy Decommissioning and Decontamination Fees;

(n) Any Encumbrances on the Purchased Assets, except for Permitted Encumbrances and except as consented to by Buyer in accordance with Section 6.1;

(o) Except as otherwise expressly provided herein, Liabilities of Seller to the extent arising from the execution, delivery or performance of this Agreement and the transactions contemplated hereby; and

(p) Any other Liabilities expressly allocated to or assumed by Seller in this Agreement.

Section 2.5 Control of Litigation. (a) The Parties agree and acknowledge that, subject to the provisions of Article 8 and Section 6.13, Seller shall pay for and be entitled exclusively to control, defend and settle any litigation, administrative or regulatory proceeding, and any investigation or other activities arising out of or related to any Excluded Liabilities and Buyer agrees to reasonably cooperate, at Seller's expense, with Seller in connection therewith.

(b) The Parties agree and acknowledge that, subject to the provisions of Article 8 and Section 6.13, Buyer shall pay for and be entitled exclusively to control, defend and settle any litigation, administrative or regulatory proceeding, and any investigation or other activities arising out of or related to any Assumed Liabilities and Obligations, and Seller agrees to reasonably cooperate, at Buyer's expense, with Buyer in connection therewith.

ARTICLE 3

THE CLOSING

Section 3.1 <u>Closing</u>. Upon the terms and subject to the satisfaction of the conditions contained in Article 7 of this Agreement, the sale, assignment,

Seller's Nonqualified Decommissioning Fund, in each case, consisting solely of cash or cash equivalents; provided that in no event shall the aggregate amount of the transferred assets of the Seller's Decommissioning Funds be less than the Decommissioning Target. Seller shall retain all assets of the Seller's Nonqualified Decommissioning Fund not required to be transferred under clause (2) above.

(b) In the event that the NRC requires the Buyer to provide Decommissioning funding assurance in an amount in excess of the Decommissioning Target (the "Excess Decommissioning Funds"), Buyer agrees to cause Buyer's Parent to post a Buyer's Parent Guaranty in an amount sufficient to cover the Excess Decommissioning Funds and in such form as required by the NRC. If Buyer's Parent Guaranty is not accepted by the NRC, or in all events if Seller is required to transfer Excess Decommissioning Funds to the Buyer, the Buyer shall earmark such Excess Decommissioning Funds and, upon completion of Decommissioning and termination or conversion of the NRC License by the NRC, pay to Seller an amount in dollars equal to the Excess Decommissioning Funds, together with allocated earnings on such Excess Decommissioning Funds from the Closing Date through the date such payment is made.

(c) To the extent (i) requested by Buyer, (ii) permitted by Law and (iii) that no adverse consequences result to the Seller, immediately prior to Closing, Seller shall cause to be transferred into Seller's Qualified Decommissioning Fund either (1) all of the assets in Seller's Nonqualified Decommissioning Fund, or (2) if Seller is permitted to transfer to the Trustee under the Post-Closing Decommissioning Trust Agreement only that portion of the assets of Seller's Decommissioning Funds such that the aggregate amount of the transferred assets of Seller's Decommissioning Funds equals the Decommissioning Target, that portion of the assets in Seller's Nonqualified Decommissioning Fund necessary so that the assets of Seller's Qualified Decommissioning Fund equals the Decommissioning Target. All fees in connection with implementing this Section 6.12(c), including all fees and external costs incurred for Seller to obtain a revised schedule of ruling amounts in a private letter ruling from the IRS to permit such transfer, shall be borne by Buyer.

(d) The Parties shall not take any actions that would cause the actual Tax consequences of the transactions contemplated by this Agreement to differ from or be inconsistent with the Requested Rulings set forth in Section 6.18.

Section 6.13 Spent Nuclear Fuel Fees.

(a) Except as provided in the third sentence of this paragraph and Sections 2.1(b) and 2.3(h), between the date hereof and the Closing Date, and at all times thereafter, Seller will remain liable for all Spent Nuclear Fuel Fees and any other fees associated with electricity generated at Ginna and sold prior to the Closing Date, and the One-Time DOE Pre-1983 Fee, and Buyer shall have no Liability or responsibility therefore. Buyer shall pay and discharge all Spent Nuclear Fuel Fees and any other fees associated with electricity generated at Ginna and sold from and after the Closing Date, and Seller shall have no Liability or responsibility therefore. On the

Closing Date, Buyer shall assume title to, and responsibility for the management, storage, removal, transportation and disposal of all Spent Nuclear Fuel and High Level Waste of Ginna as of the Closing Date. Seller shall assign to Buyer its undivided right, title and interest in and to the Standard Spent Fuel Disposal Contract, including, without limitation, any and all damage claims arising under such contract subject to Sections 2.1(p), 2.2(k), 6.13(b) and 6.13(d) hereof concerning the rights of Seller with respect to the One-Time DOE Pre-1983 Fee, and shall provide the required notice to the Department of Energy of the assignment of the Standard Spent Fuel Disposal Contract to Buyer within ninety (90) days of Closing, such notice to be in a form reasonably acceptable to Seller and Buyer.

(b) Prior to January 31, 2004, Seller shall commence an action in the United States Court of Federal Claims for damages resulting from the Department of Energy's failure to commence the removal, transportation, acceptance or any delay in accepting Spent Nuclear Fuel and High Level Waste for disposal pursuant to the Standard Spent Fuel Disposal Contract (the "DOE Litigation"). All rights relating to the DOE Litigation shall be exercised in good faith and such claims shall be preserved for the benefit of the Buyer. Buyer shall assume all of the rights and obligations under the Standard Spent Fuel Disposal Contract as of the Closing Date, including but not limited to the right to pursue and recover damages resulting from the DOE Litigation, subject to Seller's rights relating to the One-Time DOE Pre-1983 Fee, and provided that, in the event that Buyer shall recover any form of monetary relief (including but not limited to monetary damages or relief which is reasonably calculable from economic obligations, as a direct or indirect result of the DOE Litigation) Buyer shall pay to Seller an amount equal to the amount of the economic value received by Buyer as a result of such litigation up to a maximum payment to Seller of Ten Million Dollars ($10,000,000). Seller shall submit the complaint to be filed in the action to Buyer for prompt review, comment and approval (such approval to be in Buyer's reasonable discretion). Consistent with the obligations of this Section 6.13, Seller shall take no additional actions with respect to the DOE Litigation that may affect Buyer's interests in the suit, including but not limited to filing damages estimates or entering into any settlement discussions, without Buyer's express prior written consent; provided that Seller may take any action necessary to preserve the rights of Seller and Buyer in the DOE Litigation, or to respond to an order or request of the court or other procedural requirement, if expeditious action is required and Seller has been unable to contact or obtain a response from Buyer despite reasonable efforts to do so.

(c) Buyer agrees to provide Seller with a copy within two (2) Business Days of receipt of all notices provided to Buyer from the Department of Energy regarding the date on which the One-Time DOE Pre-1983 Fee is due and payable in accordance with the terms of the Standard Spent Fuel Disposal Contract.

(d) Seller agrees to cause the One-Time DOE Pre-1983 Fee to be duly paid when due, subject to any rights to which Seller may be entitled by reason of the Department of Energy's defaults (or alleged defaults) under the Standard Spent Fuel Disposal Contract.

# Citibank, N.A.

June 10, 2004

COPY

To: R.E. Ginna Nuclear Power Plant, LLC (the "***Beneficiary***")
750 East Pratt Street, 18th Floor
Baltimore, MD 21202

Attention: President

Dear Sirs:

By order and for account of our client Rochester Gas and Electric Corporation (the "***Account Party***"), we, Citibank, N.A. (the "***Bank***"), hereby issue in the Beneficiary's favor this Irrevocable Standby Letter of Credit No. 61615845 (the "***Credit***") in an amount not to exceed in the aggregate ONE HUNDRED NINE MILLION DOLLARS (the "***Stated Amount***") expiring at our counters on the date of May 29, 2007.

This Credit is being issued in relation to a certain Asset Purchase Agreement, dated as of November 24, 2003, among the Account Party, Constellation Energy Group, Inc. and Constellation Generation Group, LLC, whose rights and interests under the Asset Purchase Agreement have been assigned to the Beneficiary.

Funds under this Credit are available to the Beneficiary against presentation of its sight draft drawn on the Bank mentioning thereon "Drawn under Citibank, N.A. Irrevocable Standby Letter of Credit No. 61615845," accompanied by the Beneficiary's signed written certificate, stating either:

A.

1. Unless otherwise defined herein, all terms shall have the meanings given to them in that certain Asset Purchase Agreement, dated as of November 24, 2003 (the "***Purchase Agreement***"), among Rochester Gas and Electric Corporation ("***RG&E***"), Constellation Energy Group, Inc. and Constellation Generation Group, LLC, whose rights and interests under the Purchase Agreement have been assigned to R.E. Ginna Nuclear Power Plant, LLC.

2. The One-Time DOE Pre-1983 Fee has not been paid when due in accordance with the terms of the Standard Spent Fuel Disposal Contract.

3. R.E. Ginna Nuclear Power Plant, LLC has provided RG&E any notice required pursuant to Section 6.13(c) of the Purchase Agreement, in accordance with the terms thereof.

4. The amount being drawn under the sight draft that this certificate accompanies is $________, and R.E. Ginna Nuclear Power Plant, LLC requests that such draw be paid directly to the U.S. Department of Energy ("***DOE***") in satisfaction of the One-Time DOE Pre-1983 Fee in accordance with the following instructions:

______________________________________________
______________________________________________
______________________________________________

The foregoing instructions are in accordance with the instructions for payment specified in the Standard Spent Fuel Disposal Contract and applicable DOE regulations at 10 C.F.R. § 961.11 and Appendix G thereto, as the same may be amended from time to time.

OR

B.

1. Unless otherwise defined herein, all terms shall have the meanings given to them in that certain Asset Purchase Agreement, dated as of November 24, 2003 (the "***Purchase Agreement***"), among Rochester Gas and Electric Corporation ("***RG&E***"), Constellation Energy Group, Inc. and Constellation Generation Group, LLC, whose rights and interests under the Purchase Agreement have been assigned to R.E. Ginna Nuclear Power Plant, LLC.

2. Thirty (30) or fewer days remain prior to the expiration date of the letter of credit under which the sight draft that this certificate accompanies is being drawn, and Rochester Gas and Electric Corporation has failed to provide a substitute DOE Credit Support in an amount reasonably determined by Seller and Buyer to cover the One-Time DOE Pre-1983 Fee to R.E. Ginna Nuclear Power Plant, LLC ("***Beneficiary***"), wherefore, the Beneficiary does hereby demand payment of the entire undrawn amount of the letter of credit.

3. The One-Time DOE Pre-1983 Fee remains unpaid and outstanding.

4. The amount being drawn under the sight draft that this certificate accompanies is $________, and Beneficiary requests that such draw be paid directly to the U.S. Department of Energy ("***DOE***") in satisfaction of the One-Time DOE Pre-1983 Fee in accordance with the following instructions:

______________________________________________
______________________________________________
______________________________________________

The foregoing instructions are in accordance with the instructions for payment specified in the Standard Spent Fuel Disposal Contract and applicable DOE regulations at 10 C.F.R. § 961.11 and Appendix G thereto, as the same may be amended from time to time.

Multiple and partial drawings are allowed under this Credit. The Stated Amount under this Credit shall be reduced upon any drawing by the amount so drawn. Amounts drawn hereunder will not be reinstated. This Credit is transferable in its entirety but not in part. Transfer of this Credit shall be by presentation to us at the address indicated herein of the original of this Credit accompanied by a certificate in the form of Exhibit A hereto with the blanks therein completed in accordance with this Credit. The transferor shall pay a transfer fee as provided in the attached Exhibit A in connection with any such transfer.

We hereby agree with you that your draft(s) and documents presented in accordance with the above stated terms and conditions of this Credit shall be duly honored if presented at the counters of Citibank, N.A.'s Servicer located at Citicorp North America, Inc. 3800 Citibank Center, Bldg. B, 3rd Floor, Tampa, Florida, 33610 on or before the stated expiration date.

This Credit is issued subject to the International Standby Practice ("***ISP98***"), International Chamber of Commerce Publication 590, and as to matters not addressed by the ISP98, shall be governed by and construed in accordance with the laws of the State of New York and applicable U.S. Federal law.

CITIBANK, N.A.

Name: Joseph Chesakis
Title: Vice President

Exhibit A
to Citibank Irrevocable
Letter of Credit No. 61615845

**Request for Full Transfer**
**Relinquishing all Rights as Beneficiary**
(This form is to be used when the Letter of Credit is to be
Transferred in its entirety, and no rights are to be retained by the undersigned)

Date:

Citicorp North America, Inc.
Servicer for Citibank, N.A.
3800 Citibank Center
Bldg. B, 3rd Floor,
Tampa, Florida, 33610

Re: L/C No. ____________________

Gentlemen:

Receipt is acknowledged of the original letter of credit instrument which you issued to us (herein called the "Credit") bearing your reference number as stated above in favor of ourselves. In accordance with Section 10.5 of the Asset Purchase Agreement referred to in the Credit, we hereby request you to transfer the Credit, in its entirety, to:
____________________________________________ (the "Transferee")

whose address is ____________________________________________

We are returning the original instrument to you herewith, properly endorsed to your order by us, in order that you may deliver it to the Transferee together with your customary letter of transfer.

It is understood that any amendments to the Credit which you may receive are to be advised by you directly to the Transferee and that the drafts and documents of the Transferee, if issued in accordance with the conditions of the Credit, are to be forwarded by you directly to the party for whose account the credit was opened (or any intermediary) without our intervention.

We understand that the transfer charge is $5,000.00 and, in addition thereto, we agree to pay to you on demand any reasonable expenses that may be incurred by you in connection with this transfer.

[ ] We enclose our check for $ ____________ to cover your charges, payable to Citibank, N.A.
(Note: Payment of charges must be in the form of a certified check if not drawn on Citibank, N.A.)

[ ] We authorize you to charge our Citibank N.A. account No. ____________

SIGNATURE GUARANTEED
The First Beneficiary's signature(s) with title(s) conforms with that on file with us and such is/are authorized for the execution of this instrument.

Sincerely yours,

____________________________
(Name of Bank)

____________________________
(Bank Address)

____________________________
(City, State, Zip Code)

____________________________
(Telephone Number)

____________________________
(Authorized Name and Title)

____________________________
(Authorized Signature)

____________________________
(Name of First Beneficiary)

____________________________
(Telephone Number)

____________________________
(Authorized Name and Title)

____________________________
(Authorized Signature)

____________________________
(Authorized Name and Title) (If applicable)

____________________________
(Authorized Signature) (If applicable)