# R. E. GINNA NUCLEAR POWER PLANT

# ASSET PURCHASE AGREEMENT

BY AND AMONG

ROCHESTER GAS AND ELECTRIC CORPORATION, AS SELLER

CONSTELLATION GENERATION GROUP, LLC, AS BUYER

AND

CONSTELLATION ENERGY GROUP, INC., AS BUYER'S PARENT

DATED AS OF NOVEMBER 24, 2003

# TABLE OF CONTENTS


Page

ARTICLE 1 DEFINITIONS ........ 1

Section 1.1 Definitions. ........ 1

Section 1.2 Certain Interpretive Matters. ........ 20

ARTICLE 2 PURCHASE AND SALE ........ 20

Section 2.1 Purchased Assets. ........ 20

Section 2.2 Excluded Assets. ........ 23

Section 2.3 Assumed Liabilities and Obligations. ........ 24

Section 2.4 Excluded Liabilities. ........ 26

Section 2.5 Control of Litigation. ........ 29

ARTICLE 3 THE CLOSING ........ 29

Section 3.1 Closing. ........ 29

Section 3.2 Payment of Purchase Price. ........ 30

Section 3.3 Adjustment to Purchase Price. ........ 30

Section 3.4 Allocation of Purchase Price. ........ 33

Section 3.5 Prorations. ........ 33

Section 3.6 Deliveries by Seller. ........ 34

Section 3.7 Deliveries by Buyer ........ 36

Section 3.8 Delivery of DOE Credit Support ........ 37

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ........ 37

Section 4.1 Organization. ........ 37

Section 4.2 Authority Relative to this Agreement. ........ 37

Section 4.3 Consents and Approvals; No Violation ........ 38

Section 4.4 Reports. ........ 38

Section 4.5 Undisclosed Liabilities. ........ 39

Section 4.6 Absence of Certain Changes or Events. ........ 39

Section 4.7 Title and Related Matters. ........ 39

Section 4.8 Real Property Agreements. ........ 39

Section 4.9 Insurance. ........ 40

Section 4.10 Environmental Matters. ........ 40

Section 4.11 Labor Matters. ........ 41

Section 4.12 ERISA; Benefit Plans. 42
Section 4.13 Real Property; Plant and Equipment. 44
Section 4.14 Condemnation. 44
Section 4.15 Certain Contracts and Arrangements. 44
Section 4.16 Legal Proceedings, etc. 45
Section 4.17 Permits. 46
Section 4.18 NRC Licenses 46
Section 4.19 Regulation as a Utility. 46
Section 4.20 Taxes. 47
Section 4.21 Qualified Decommissioning Funds. 47
Section 4.22 Nonqualified Decommissioning Fund. 49
Section 4.23 WARN Act 49
Section 4.24 Intellectual Property 50
Section 4.25 Zoning Classification 50
Section 4.26 Utilities 50
ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER AND BUYER'S PARENT 51
Section 5.1 Organization; Qualification. 51
Section 5.2 Authority Relative to this Agreement. 51
Section 5.3 Consents and Approvals; No Violation 51
Section 5.4 Availability of Funds. 52
Section 5.5 Legal Proceedings. 52
Section 5.6 WARN Act. 52
Section 5.7 Transfer of Decommissioning Funds. 52
Section 5.8 Foreign Ownership or Control. 53
Section 5.9 Seller's Representations and Warranties. 53
Section 5.10 Permit Qualifications. 53
ARTICLE 6 COVENANTS OF THE PARTIES 53
Section 6.1 Conduct of Business Relating to the Purchased Assets. 53
Section 6.2 Access to Information. 57
Section 6.3 Expenses 59
Section 6.4 Further Assurances; Cooperation. 60
Section 6.5 Public Statements. 62

Section 6.6 Consents and Approvals. 62
Section 6.7 Brokerage Fees and Commissions. 65
Section 6.8 Tax Matters. 65
Section 6.9 Advice of Changes. 67
Section 6.10 Employees. 67
Section 6.11 Risk of Loss. 74
Section 6.12 Decommissioning Funds. 74
Section 6.13 Spent Nuclear Fuel Fees. 75
Section 6.14 Department of Energy Decontamination and Decommissioning Fees. 77
Section 6.15 Cooperation Relating to Insurance and Price-Anderson Act. 77
Section 6.16 Tax Clearance Certificates. 77
Section 6.17 Release of Seller. 77
Section 6.18 Private Letter Ruling. 77
Section 6.19 NRC Commitments. 78
Section 6.20 Decommissioning. 78
Section 6.21 Uprate. 79
Section 6.22 Right of First Refusal. 80
ARTICLE 7 CONDITIONS 80
Section 7.1 Conditions to Obligations of Buyer. 80
Section 7.2 Conditions to Obligations of Seller. 82
ARTICLE 8 INDEMNIFICATION 84
Section 8.1 Indemnification. 84
Section 8.2 Defense of Claims. 86
ARTICLE 9 TERMINATION 88
Section 9.1 Termination. 88
Section 9.2 Procedure and Effect of No Default Termination. 89
ARTICLE 10 MISCELLANEOUS PROVISIONS 89
Section 10.1 Amendment and Modification. 89
Section 10.2 Waiver of Compliance; Consents. 90
Section 10.3 Survival of Representations, Warranties, Covenants and Obligations. 90
Section 10.4 Notices. 90

Section 10.5 Assignment.....92
Section 10.6 Governing Law.....92
Section 10.7 Counterparts.....93
Section 10.8 Interpretation.....93
Section 10.9 Schedules and Exhibits.....93
Section 10.10 Entire Agreement.....93
Section 10.11 Bulk Sales Laws.....93
Section 10.12 No Joint Venture.....94
Section 10.13 Change in Law.....94
Section 10.14 Buyer's Parent Support.....94
Section 10.15 Severability.....94

LIST OF EXHIBITS AND SCHEDULES

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Reciprocal Easement Agreement |
| Exhibit D | Form of Interconnection Agreement |
| Exhibit E | Form of Bargain and Sale Deed for Seller |
| Exhibit F | Form of Power Purchase Agreement for Seller |
| Exhibit G | Form of Seller's Parent Guaranty |
| Exhibit H | Form of Opinion from Counsel for Seller and Seller's Parent |
| Exhibit I | Form of Opinion from Counsel for Buyer and Buyer's Parent |
| Exhibit J | Form of Emergency and Environmental Equipment Easements |

SCHEDULES

| | |
|---|---|
| 1.1(173) | Transferable Permits |
| 2.1(j) | Intellectual Property |
| 2.1(n) | Radio Licenses |
| 2.1(t) | Emergency Assets and Agreements |
| 2.2(a) | Excluded Assets |
| 2.2(l) | Excluded Contracts |
| 3.3(a)(vi) | Low Level Waste and Disposal Criteria |
| 3.3(a)(viii) | Purchase Price Adjustment |
| 4.3(a) | Seller's Third Party Consents |
| 4.3(b) | Seller's Required Regulatory Approvals |
| 4.5 | Liabilities |
| 4.6 | Absence of Certain Changes or Events |
| 4.7 | Exceptions to Title to Real Property |

| | |
|---|---|
| 4.8 | Real Property Agreements |
| 4.9 | Insurance Exceptions |
| 4.10 | Environmental Matters |
| 4.11 | Employment Matters |
| 4.12(a) | ERISA; Benefit Plans |
| 4.12(b) | Benefit Plan Exceptions |
| 4.13(a) | Description of Real Property |
| 4.13(b) | Description of Major Equipment Components and Personal Property |
| 4.13(c) | FSAR Exceptions |
| 4.14 | Notices of Condemnation |
| 4.15(a)(i) | List of Seller's Agreements (other than Fuel Contracts) |
| 4.15(a)(ii) | List of Fuel Contracts |
| 4.15(b) | Agreement Exceptions |
| 4.15(c) | Agreement Defaults |
| 4.16 | List of Legal Proceedings |
| 4.17(a) | List of Permit Violations |
| 4.17(b) | List of Material Permits (other than Transferable Permits) |
| 4.18(a) | List of NRC License Violations |
| 4.18(b) | List of Material NRC Licenses |
| 4.20 | General Tax Matters |
| 4.20(a) | Tax Matters: Notice of Deficiency or Assessment |
| 4.20(b) | Tax Matters: Extensions of Applicable Statutory Periods of Limitations |
| 4.21 | Tax and Financial Matters Relating to Qualified Decommissioning Funds |
| 4.25 | Zoning Classification |
| 5.3(a) | Buyer's Third Party Consents |
| 5.3(b) | Buyer's Required Regulatory Approvals |
| 5.5 | List of Buyer's Legal Proceedings |
| 6.1(a) | Capital Budget |
| 6.10(a) | Transferred Employees |
| 6.10(o) | Assumed Plans and Agreements |

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of November 24, 2003, (the "Agreement") by and among Rochester Gas and Electric Corporation, a New York corporation ("RG&E" or "Seller"), Constellation Generation Group, LLC, a limited liability company formed under the laws of the state of Maryland ("Buyer"), and Constellation Energy Group, Inc., a Maryland corporation as parent of the Buyer ("Buyer's Parent"). Seller, Buyer and Buyer's Parent are referred to individually as a "Party," and collectively as the "Parties."

## WITNESSETH:

WHEREAS, Seller owns R. E. Ginna Nuclear Power Plant ("Ginna"), NRC Operating License No. DPR-18, located in Ontario, New York, and certain facilities and other assets associated therewith and ancillary thereto;

WHEREAS, Buyer desires to purchase and assume, and Seller desires to sell and assign the Purchased Assets (as defined in Section 2.1 below) and certain associated liabilities, upon the terms and conditions hereinafter set forth in this Agreement; and

WHEREAS, the Parties desire that Buyer's Parent support the obligations of Buyer hereunder from the time of execution of this Agreement to the Closing Date.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1 Definitions. As used in this Agreement, the following terms have the meanings specified in this Section 1.1.

(1) "Actual Amount" has the meaning set forth in Section 6.10(h).

(2) "Affiliate" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(3) "Agreement" means this Asset Purchase Agreement together with the Schedules and Exhibits hereto, as the same may be from time to time amended.

(4) "Allocation" has the meaning set forth in Section 3.4(b).

(5) "Ancillary Agreements" means the Bill of Sale, Assignment and Assumption Agreement, the Deed, the Easement Agreement, the Interconnection Agreement, the Emergency and Environmental Equipment Easements, the Seller

Parent Guaranty, and the Power Purchase Agreement, as the same may be amended from time to time.

(6) "ANI" means American Nuclear Insurers, or any successor thereto.

(7) "Assignment and Assumption Agreement" means the Assignment and Assumption Agreement between Seller and Buyer substantially in the form of Exhibit "A" hereto, by which Seller, subject to the terms and conditions hereof, shall assign Seller's interest in and rights under the Seller's Agreements, the Fuel Contracts, the Non-material Contracts, the Real Property Agreements, the Transferable Permits, certain intangible assets and other Purchased Assets to Buyer and whereby Buyer shall assume the Assumed Liabilities and Obligations.

(8) "Assumed Liabilities and Obligations" has the meaning set forth in Section 2.3.

(9) "Atomic Energy Act" means the Atomic Energy Act of 1954, as amended, 42 U.S.C. Section 2011 et seq.

(10) "Benefit Plans" has the meaning set forth in Section 4.12(a).

(11) "Bill of Sale" means the Bill of Sale, substantially in the form of Exhibit "B" hereto, to be delivered at the Closing, with respect to Seller's interests in the Tangible Personal Property included in the Purchased Assets to be transferred to Buyer at the Closing.

(12) "Business Books and Records" has the meaning set forth in Section 2.1(g).

(13) "Business Day" shall mean any day other than Saturday, Sunday and any day on which banking institutions in the State of New York are authorized by law or other governmental action to close.

(14) "Buyer" has the meaning set forth in the preamble.

(15) "Buyer Indemnitee" has the meaning set forth in Section 8.1(b).

(16) "Buyer Material Adverse Effect" has the meaning set forth in Section 5.3(a).

(17) "Buyer's Parent" has the meaning set forth in the preamble.

(18) "Buyer's Parent Guaranty" shall mean a guaranty executed by the Buyer's Parent sufficient to satisfy the regulations of the NRC, found at 10 C.F.R. Part 30, Appendix A, regarding guarantees of nuclear decommissioning obligations.

(19) "Buyer's Required Regulatory Approvals" has the meaning set forth in Section 5.3(b).

(20) "Byproduct Material" means any radioactive material (except Special Nuclear Material) yielded in, or made radioactive by, exposure to the radiation incident to the process of producing or utilizing Special Nuclear Material.

(21) "Capital Budget" means the budget established for capital projects for the Purchased Assets as set forth in Schedule 6.1(a), as such budget may be amended by agreement of the Parties.

(22) "Capital Expenditures" has the meaning set forth in Section 3.3(a)(iv).

(23) "Closing" has the meaning set forth in Section 3.1.

(24) "Closing Adjustment" has the meaning set forth in Section 3.3(b).

(25) "Closing Date" has the meaning set forth in Section 3.1.

(26) "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the rules and regulations promulgated thereunder.

(27) "Code" means the Internal Revenue Code of 1986, as amended.

(28) "Commercially Reasonable Efforts" means efforts which are designed to enable a Party, directly or indirectly, to expeditiously satisfy a condition to, or otherwise assist in the consummation of, the transactions contemplated by this Agreement and which do not require the performing Party to expend any funds or assume Liabilities other than expenditures and Liability assumptions which are customary and reasonable in nature and amount in the context of the transactions contemplated by this Agreement.

(29) "Confidentiality Agreement" means the letter agreement, dated July 8, 2003, between Seller and Buyer's Parent.

(30) "Cooling Tunnel Easement" means the Indenture between The People of the State of New York and Seller dated September 12, 1974 and recorded in the Wayne County Clerk's Office at Liber 677, Page 317.

(31) "Cooling Tunnel Easement Amendment" has the meaning set forth in Section 6.1(a)(7).

(32) "Decommission" or "Decommissioning" means to completely retire and remove the Facilities from service and to restore the Site, as well as any planning and administrative activities incidental thereto, including but not limited to (a) the dismantlement, decontamination and/or storage of the Facilities, in whole or in part, and any reduction or removal of radioactivity at the Site to a level that permits termination of the NRC License, (b) all other activities necessary for the retirement, dismantlement, decontamination and/or storage of the Facilities to comply with all applicable Nuclear Laws and Environmental Laws, including the applicable requirements of the Atomic Energy Act and the NRC's rules, regulations, orders and

pronouncements thereunder, the NRC License for the Facilities and any related decommissioning or license termination plan, and (c) once the Site is no longer utilized either for power generation of any kind or for any storage of Spent Nuclear Fuel or High Level Waste, restoration of the Site to an appropriately graded and vegetated condition, including, but not limited to, the replacement of locally-indigenous trees, plants, shrubs, and grasses to conform substantially with the surrounding environs, as appropriate for the intended use of the Site and the property located thereon. Site restoration shall include, as appropriate, removal and disposal of components and materials meeting NRC release criteria, demolition and removal of decontaminated structures to an approximate depth of three feet below grade, and backfilling of the Site with clean material, grading and landscaping. The Parties understand and agree that SAFSTOR is a permissible method of decommissioning, provided that decommissioning is completed in accordance with the applicable NRC regulations.

(33) "Decommissioning Funds" means the Qualified Decommissioning Funds and the Nonqualified Decommissioning Funds.

(34) "Decommissioning Target" means an amount in dollars equal to (x) $179,900,000 times (y) 1.0002085 raised to the power of number "Z", where "Z" represents the actual number of days that have elapsed since December 31, 2002 until the Closing Date.

(35) "Deed" has the meaning set forth in Section 3.6(d).

(36) "Department of Energy" or "DOE" means the United States Department of Energy and any successor agency thereto.

(37) "Department of Energy Decommissioning and Decontamination Fees" means all fees related to the Department of Energy's Special Assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Funds pursuant to Sections 1801, 1802 and 1803 of the Atomic Energy Act and the Department of Energy's implementing regulations at 10 C.F.R. Part 766, applicable to separative work units purchased from the Department of Energy in order to decontaminate and decommission the Department of Energy's gaseous diffusion enrichment facilities.

(38) "Department of Justice" means the United States Department of Justice and any successor agency thereto.

(39) "Direct Claim" has the meaning set forth in Section 8.2(c).

(40) "DOE Credit Support" shall mean (a) the Seller's Parent Guaranty, (b) an irrevocable and unconditional standby letter of credit by a banking or other financial institution that is reasonably acceptable to Buyer, for the benefit of the Buyer, having a drawing amount which is equal to the One-Time DOE Pre-1983 Fee, and payable at the offices of a bank reasonably acceptable to the Buyer, or (c) such

other means of providing assurance of payment of the One-Time DOE Pre-1983 Fee agreeable to Buyer, in Buyer's reasonable discretion.

(41) "DOE Litigation" shall have the meaning set forth in Section 6.13(b).

(42) "Easement Agreement" means the Reciprocal Easement Agreement between Seller and Buyer in substantially the form of Exhibit "C".

(43) "Easements" means, with respect to the Purchased Assets, the easements, licenses and access rights to be granted by the appropriate party by or pursuant to the Interconnection Agreement, the Deed, the Emergency and Environmental Equipment Easements or the Easement Agreement, including, without limitation, easements authorizing access, use, maintenance, construction, repair, replacement and other activities by the parties thereto.

(44) "Emergency and Environmental Equipment Easements" means the easements, leases or other occupancy agreements between Seller and Buyer, each substantially in the form of Exhibit "J" or of Seller's standard form of pole attachment agreement, with respect to each siren, environmental air sampler or environmental or post-accident thermoluminescent dosimeter (a) constituting part of the Purchased Assets, (b) located on property owned or co-owned by Seller immediately after the Closing Date and (c) not located on land that is subject to the Easement Agreement, which Emergency and Environmental Equipment Easements shall be granted by Seller without any rent charge unless such charge is required by Law.

(45) "Emission Reduction Credits" means credits, in units that are established by an applicable Governmental Authority with jurisdiction over the Purchased Assets, resulting from the reduction in the emissions or air pollutants from an emitting source or facility, whether obtained prior to or after the Closing Date, and other air emissions reduction credits whether or not such credits are designated as "emission reduction credits."

(46) "Encumbrances" means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, deed restrictions, easements, encumbrances and charges of any kind.

(47) "Energy Reorganization Act" means the Energy Reorganization Act of 1974, as amended.

(48) "Environment" means all soil, real property, air, water (including surface waters, streams, ponds, drainage basins and wetlands), groundwater, water body sediments, drinking water supply, stream sediments or land, including land surface or subsurface strata, including all fish, plant, wildlife, and other biota and any other environmental medium or natural resource.

(49) "Environmental Claim" means any and all written claims alleging potential Liability, administrative or judicial actions, suits, orders, liens, notices

alleging Liability, notices of violation, investigations which have been disclosed in writing to Seller, complaints, requests for information relating to the Release or threatened Release into the Environment of Hazardous Substances, proceedings, or other written communication, whether criminal or civil, pursuant to or relating to any applicable Environmental Law by any Governmental Authority based upon, alleging, asserting, or claiming any actual or potential (a) violation of, or Liability under any Environmental Law, (b) violation of any Environmental Permit, or (c) Liability for investigatory costs, cleanup costs, removal costs, remedial costs, response costs, natural resource damages, property damage, personal injury, fines, or penalties arising out of, based on, resulting from, or related to the presence, Release, or threatened Release into the Environment of any Hazardous Substances at any location related to the Purchased Assets, including, but not limited to, any off-Site location to which Hazardous Substances, or materials containing Hazardous Substances, were sent.

(50) "Environmental Clean-up Site" means any location which is listed or formally proposed for listing on the National Priorities List, the Comprehensive Environmental Response, Compensation and Liability Information System, or on any similar state list of sites requiring investigation or cleanup, or which is the subject of any action, suit, proceeding or investigation which has been disclosed in writing to Seller for any alleged violation of any Environmental Law, or at which there has been a Release, or, to the Knowledge of Seller, a threatened or suspected Release, of a Hazardous Substance.

(51) "Environmental Condition" means the presence or Release to the Environment, whether at the Site or at an off-Site location, of Hazardous Substances, including any migration of those Hazardous Substances through air, soil or groundwater to or from the Site or any off-Site location regardless of when such presence or Release occurred or is discovered.

(52) "Environmental Laws" means all Laws regarding pollution or protection of the Environment, the conservation and management of land, natural resources and wildlife or human health and safety or the Occupational Safety and Health Act (only as it relates to Hazardous Substances), including, without limitation, Laws regarding Releases or threatened Releases of Hazardous Substances (including, without limitation, Releases to ambient air, surface water, groundwater, land, surface and subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, transport, disposal or handling of Hazardous Substances. "Environmental Laws" include, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Oil Pollution Act (33 U.S.C. §§ 2701 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. §§ 11001 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.) only as it relates to

Hazardous Substances, Articles 17, 19, 24, 27 (Titles 9, 11 and 13), 29, 37 and 40 of the New York Environmental Conservation Law and all other Laws analogous to any of the above. Notwithstanding the foregoing, Environmental Laws do not include Nuclear Laws.

(53) "Environmental Permit" means any federal, state or local permits, licenses, approvals, consents, registrations or authorizations required by any Governmental Authority under or in connection with any Environmental Law including any and all orders, consent orders or binding agreements issued or entered into by a Governmental Authority under any applicable Environmental Law.

(54) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the applicable rules and regulations promulgated thereunder.

(55) "ERISA Affiliate" has the meaning set forth in Section 2.4(k).

(56) "Estimated Adjustment" has the meaning set forth in Section 3.3(b).

(57) "Estimated Allocation" has the meaning set forth in Section 3.4(a).

(58) "Estimated Closing Statement" has the meaning set forth in Section 3.3(b).

(59) "Excess Decommissioning Funds" means the estimated cost savings to Buyer as a result of not completing any Decommissioning activities necessary or appropriate to restore the Site to an appropriately graded and vegetated condition as appropriate for the intended use of the Site and the property located thereon. For purposes of this definition, the Excess Decommissioning Funds will be calculated by Buyer in good faith and subject to concurrence by the NYPSC.

(60) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(61) "Excluded Assets" has the meaning set forth in Section 2.2.

(62) "Excluded Liabilities" has the meaning set forth in Section 2.4.

(63) "Exempt Wholesale Generator" means an exempt wholesale generator as defined in Section 32 of the Holding Company Act and the regulations promulgated thereunder.

(64) "Facilities" means the plant, facilities, equipment, supplies and improvements, including, but not limited to, the cooling water intake tunnel and discharge canal, in which Seller has an ownership interest and which are included in the Purchased Assets, constituting the nuclear power plant known as the R.E. Ginna Nuclear Power Plant.

(65) "Federal Power Act" means the Federal Power Act, as amended.

(66) "Federal Trade Commission" means the United States Federal Trade Commission or any successor agency thereto.

(67) "FERC" means the United States Federal Energy Regulatory Commission or any successor agency thereto.

(68) "Final Safety Analysis Report" or "FSAR" means the report, as updated, that is required to be maintained for Ginna in accordance with the requirements of 10 C.F.R. § 50.71(e).

(69) "Fuel Contracts" has the meaning set forth in Section 4.15(a)

(70) "Ginna" has the meaning set forth in the recitals.

(71) "Ginna Employee" means an hourly-paid or salaried employee of Seller or an Affiliate, who receives an Internal Revenue Service Form W-2 from Seller or an Affiliate, employed as of the Closing Date who is employed at Ginna, or whose work responsibilities involve principally the operation of any of the Purchased Assets, which employees shall be set forth in Schedule 6.10(a) (which shall be updated as of the Closing Date as provided for herein). "Ginna Employee" does not mean or include any worker, working at or on the Facilities or the Purchased Assets, who is compensated directly by an entity other than Seller or an Affiliate and/or for whom Seller or an Affiliate issues an Internal Revenue Service Form 1099.

(72) "Good Utility Practices" means any of the practices, methods and activities generally accepted in the electric utility industry in the United States of America as good practices applicable to nuclear generating facilities of similar design, size and capacity and consistent with past practice at the Facilities or any of the practices, methods or activities which, in the exercise of reasonable judgment by a prudent nuclear operator in light of the facts known at the time the decision was made (other than the fact that such operator is in the process of selling the facility), could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety, expedition and applicable Laws including Nuclear Laws and Laws relating to the protection of public health and safety. Good Utility Practices are not intended to be limited to the optimal practices, methods or acts to the exclusion of all others, but rather to be practices, methods or acts generally accepted in the electric utility industry.

(73) "Governmental Authority" means any federal, state, local, provincial, foreign, international or other governmental, regulatory or administrative agency, taxing authority, commission, department, board, or other governmental subdivision, court, tribunal, arbitrating body or other governmental authority.

(74) "GUST" means: (a) the Uruguay Round Agreements Act, Pub. L. 103-465; (b) the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353; (c) the Small Business Job Protection Act of 1996, Pub. L. 104-188; (d) the Taxpayer Relief Act of 1997, Pub. L. 105-34; (e) the Internal

Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206; and (f) the Community Renewal Tax Relief Act of 2000, Pub. L. 106-554.

(75) "Hazardous Substances" means (a) any petroleum, asbestos, and urea formaldehyde foam insulation and transformers or other equipment that contains polychlorinated biphenyls; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," "hazardous air pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any applicable Environmental Law; excluding, however, any Nuclear Material.

(76) "High Level Waste" means (a) Spent Nuclear Fuel, (b) liquid wastes resulting from the operation of the first cycle solvent extraction system, or its equivalent, and the concentrated wastes from subsequent extraction cycles, or their equivalent, in a facility for reprocessing irradiated reactor fuel, (c) solids into which such liquid wastes have been converted, and (d) any other material containing radionuclides in concentrations or quantities that exceed NRC requirements for classification as Low Level Waste.

(77) "High Level Waste Repository" means a facility which is designed, constructed and operated by or on behalf of the Department of Energy for the storage and disposal of Spent Nuclear Fuel and other High Level Waste in accordance with the requirements set forth in the Nuclear Waste Policy Act.

(78) "Holding Company Act" means the Public Utility Holding Company Act of 1935, as amended.

(79) "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(80) "Income Tax" means any federal, state, local or foreign Tax (a) based upon, measured by or calculated with respect to net income, profits or receipts (including, without limitation, capital gains Taxes and minimum Taxes), or (b) based upon, measured by or calculated with respect to multiple bases (including, without limitation, corporate franchise taxes) if one or more of the bases on which such Tax may be based, measured by or calculated with respect to, is described in clause (a), in each case together with any interest, penalties or additions to such Tax.

(81) "Indemnifiable Loss" has the meaning set forth in Section 8.1(a).

(82) "Indemnifying Party" has the meaning set forth in Section 8.1(c).

(83) "Indemnitee" means either a Seller Indemnitee or a Buyer Indemnitee.

(84) "Independent Accounting Firm" means such independent accounting firm of national reputation as is mutually appointed by Seller and Buyer.

(85) "Initial Transfer" has the meaning set forth in Section 6.10(h).

(86) "Intellectual Property" means all patents and patent rights, trademarks and trademark rights, service marks and service mark rights, inventions, trade names, copyrights and copyright rights owned or licensed by Seller and necessary for the operation and maintenance of the Purchased Assets, and all pending applications for registrations of patents, trademarks, service marks and copyrights, as set forth in Schedule 2.1(j).

(87) "Interconnection Agreement" means the Interconnection Agreement, in the form of Exhibit "D" hereto, under which Ginna will be provided after the Closing Date with interconnection services consistent with FERC regulations and precedent and NRC requirements relating to offsite power availability and grid reliability and access to Seller's transmission facilities for the transmission of power from Ginna.

(88) "Inventory of Major Spare Parts" means the spare reactor coolant pump motor, spare low pressure turbine rotor, spare main transformer and their respective replacements, if any.

(89) "Inventories" means Nuclear Fuel or alternative fuel inventories, materials, spare parts (including Inventory of Major Spare Parts), consumable supplies and chemical and gas inventories relating to the operation of the Facilities located at, or in transit to, the Facilities and the interests of the Seller in spare parts located off-Site which are subject to the PIMS Agreement.

(90) "IRS" means the United States Internal Revenue Service or any successor agency thereto.

(91) "Knowledge" means the actual knowledge of the corporate officers of the specified Party charged with responsibility for the particular function relating to the specific matter of the inquiry.

(92) "LAR" has the meaning set forth in Section 6.21(a).

(93) "Law or Laws" means all laws, rules, regulations, codes, statutes, ordinances, decrees, treaties, and/or administrative orders of any Governmental Authority.

(94) "Liability" or "Liabilities" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due). Without limiting the generality of the foregoing, in the case of the NRC License, "Liabilities" shall include the NRC Commitments.

(95) "License Renewal Application" means the application submitted by Seller to the NRC, as amended and supplemented, seeking renewal of the NRC License.

(96) "Loss" or "Losses" means any and all damages, fines, fees, penalties, deficiencies, losses and expenses (including without limitation all Remediation costs, fees of attorneys, accountants and other experts, or other expenses of litigation or proceedings or of any claim, default or assessment).

(97) "Low Level Waste" means radioactive material that: (a) is neither High Level Waste as defined herein, nor byproduct material (as defined in Section 11e.(2) of the Atomic Energy Act (42 U.S.C. 2014(e)(2)); and (b) the NRC, consistent with existing law and in accordance with clause (a), classifies as low-level radioactive waste. For the purposes of the Purchase Price adjustment in Section 3.3(a)(vi) only, the term "Low Level Waste" shall not include the items which are set forth in Schedule 3.3(a)(vi) as being excluded from the definition of "Low Level Waste" for purposes of that Purchase Price adjustment.

(98) "Material Adverse Effect" means any change (or changes taken together) in, or effect on, the Purchased Assets (including the operations or condition (financial or otherwise) thereof) that is materially adverse to the value of the Purchased Assets, taken as a whole, including but not limited to, those that result in (i) shutdown of the Facilities, (ii) a material diminution of the full licensed thermal power or the full rated electrical output of the Facilities, or (iii) any loss, claim or occurrence related to the Purchased Assets which could reasonably be expected to cause a loss and/or the expenditure by the Buyer within one year following the Closing Date in excess of Two and One-Half Million Dollars ($2,500,000) individually, or in excess of Twenty Five Million Dollars ($25,000,000) in the aggregate, other than any change (or changes taken together) generally affecting the international, national, regional or local electric industry as a whole, or the nuclear power industry as a whole, including changes in local wholesale or retail markets for electric power or Nuclear Fuel, national, regional or local electric transmission systems or operations thereof, any change in law generally applicable to similarly situated Persons, any changes resulting from or associated with acts of war or terrorism or changes imposed by a Governmental Authority associated with additional security to address the events of September 11, 2001 and any change or effect resulting from action or inaction by a Governmental Authority with respect to an independent system operator or retail access in New York, but in any such case not affecting the Purchased Assets or the Parties in any manner or degree significantly different than the industry as a whole; and provided further, that any loss, claim, occurrence, change or effect that is cured prior to the Closing Date shall not be considered a Material Adverse Effect.

(99) "Mortgage Indenture" means the Indenture of Mortgage originally granted by Rochester Railway and Light Company to Bankers Trust Company (now Deutsche Bank Trust Company), as Trustee, dated as of September 1, 1918, as supplemented and amended.

(100) "NEIL" means Nuclear Electric Insurance Limited, or any successor thereto.

(101) "Non-material Contracts" means those contracts, agreements, personal property leases or other commitments incidental to the operation or maintenance of the Purchased Assets that have been entered into by Seller in the ordinary course of business prior to the Closing which either (i) are terminable, without penalty or any other termination related Liability, upon notice of 90 days or less by Seller or (ii) require the payment or delivery of goods or services with a value of less than $50,000 per annum in the case of any individual contract or commitment.

(102) "Nonqualified Decommissioning Funds" means the external trust fund that does not meet the requirements of Code Section 468A and Treas. Reg. § 1.468A-5, maintained by Seller with respect to the Facilities prior to the Closing pursuant to the Seller's Decommissioning Trust Agreement, and established and maintained by the Trustee after the Closing pursuant to the Post-Closing Decommissioning Trust Agreement to the extent assets are transferred to such trust pursuant to Section 6.12.

(103) "NRC" means the United States Nuclear Regulatory Commission and any successor agency thereto.

(104) "NRC Commitments" means all written regulatory commitments identified as such by Seller to the NRC, including, without limitation, all written regulatory commitments identified as such by Seller in connection with its License Renewal Application.

(105) "NRC License" means Operating License No. DPR-18 and any renewed license related thereto on the basis of which the Seller is authorized to own, possess and operate the Facilities and Nuclear Material prior to the Closing Date, and on the basis of which the Buyer is authorized to own, possess and operate the Facilities and Nuclear Material after the Closing Date.

(106) "Nuclear Fuel" means all nuclear fuel assemblies in the Facility reactor on the Closing Date and any irradiated fuel assemblies that have been temporarily removed from the Facilities reactor as of the Closing Date and are capable of reinsertion into the Facilities reactor without modification or additional cost, and all unirradiated fuel assemblies awaiting insertion into the Facilities reactor, as well as all nuclear fuel constituents (including uranium in any form and separative work units) in any stage of the fuel cycle that are in process of production, conversion, enrichment or fabrication for use in the Facilities and which are owned by Seller, or in which Seller has any right, title or interest, on the Closing Date.

(107) "Nuclear Insurance Policies" means all nuclear insurance policies carried by or for the benefit of Seller with respect to the ownership, operation or maintenance of the Facilities, including all nuclear liability, property damage and business interruption policies in respect thereof. Without limiting the generality of the

foregoing, the term "Nuclear Insurance Policies" includes all policies issued or administered by ANI or NEIL.

(108) "Nuclear Laws" means all Laws relating to the regulation of nuclear power plants, Source Material, Byproduct Material and Special Nuclear Materials; the regulation of Low Level Waste and High Level Waste; the transportation and storage of Nuclear Materials; the regulation of Safeguards Information; the regulation of Nuclear Fuel; the enrichment of uranium; the disposal and storage of High Level Waste and Spent Nuclear Fuel; contracts for and payments into the Nuclear Waste Fund; and as applicable, the antitrust laws and the Federal Trade Commission Act to specified activities or proposed activities of certain licensees of commercial nuclear reactors, but shall not include Environmental Laws. "Nuclear Laws" include the Atomic Energy Act of 1954, as amended (42 U.S.C. Section 2011 et seq.), the Price-Anderson Act (Section 170 of the Atomic Energy Act of 1954, as amended); the Energy Reorganization Act of 1974 (42 U.S.C. Section 5801 et seq.); Convention on the Physical Protection of Nuclear Material Implementation Act of 1982 (Public Law 97 -351; 96 Stat. 1663); the Foreign Assistance Act of 1961 (22 U.S.C. Section 2429 et seq.); the Nuclear Non-Proliferation Act of 1978 (22 U.S.C. Section 3201); the Low-Level Radioactive Waste Policy Act (42 U.S.C. Section 2021b et seq.); the Nuclear Waste Policy Act (42 U.S.C. Section 10101 *et seq.* as amended); the Low-Level Radioactive Waste Policy Amendments Act of 1985 (42 U.S.C. Section 2021d, 471); and the Energy Policy Act of 1992 (4 U.S.C. Section 13201 et seq.); and any state or local Laws analogous to the foregoing.

(109) "Nuclear Material or Materials" means Source Material, Special Nuclear Material, Low Level Waste, High Level Waste, Byproduct Material and Spent Nuclear Fuel.

(110) "Nuclear Waste Fund" means the fund established by the Department of Energy under the Nuclear Waste Policy Act in which the Spent Nuclear Fuel Fees to be used for the design, construction and operation of a High Level Waste Repository and other activities related to the storage and disposal of Spent Nuclear Fuel and/or High Level Waste are deposited.

(111) "Nuclear Waste Policy Act" means the Nuclear Waste Policy Act of 1982, as amended.

(112) "NYDEC" means the New York State Department of Environmental Conservation and any successor agency thereto.

(113) "NYPSC" means the Public Service Commission of the State of New York and any successor agency thereto.

(114) "Observers" has the meaning set forth in Section 6.1(c).

(115) "One-Time DOE Pre-1983 Fee" means the one-time fee, including any interest, late fees and/or penalties accruing thereon from time to time, payable by

Seller pursuant to Article VIII (B)(2)(b) of the Standard Spent Fuel Disposal Contract.

(116) "Other Plant Personnel" has the meaning set forth in Section 4.11.

(117) "Party" (and the corresponding term "Parties") has the meaning set forth in the preamble.

(118) "PBGC" means the Pension Benefit Guaranty Corporation established by ERISA.

(119) "Permits" has the meaning set forth in Section 4.17(a).

(120) "Permitted Encumbrances" means: (i) the Easements; (ii) those exceptions to title to the Purchased Assets listed in Schedule 4.7 with respect to Real Property; (iii) with respect to any date before the Closing Date, Encumbrances created by the Mortgage Indenture; (iv) statutory liens for Taxes or other governmental charges or assessments not yet due or delinquent or the validity of which are being contested in good faith by appropriate proceedings provided that the aggregate amount being so contested does not exceed $200,000; (v) mechanics', materialmen's, carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of Seller or the validity of which are being contested in good faith, and which do not, individually or in the aggregate, exceed $200,000; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations imposed by Governmental Authorities which do not materially, individually or in the aggregate, detract from the value of the Purchased Assets as such assets are currently used or interfere with the present use or operation of the Purchased Assets and neither secure indebtedness, nor, individually or in the aggregate, result in a Material Adverse Effect; (vii) the covenants and restrictions set forth in this Agreement or in any of the Ancillary Agreements; and (viii) such other liens, imperfections in or failures of title, easements, leases, licenses, restrictions, activity and use limitations, conservation easements, encumbrances and encroachments, as do not, individually or in the aggregate, materially detract from the value of the Purchased Assets as such assets are currently used or materially interfere with the present use or operation of the Purchased Assets and neither secure indebtedness, nor, individually or in the aggregate, result in a Material Adverse Effect.

(121) "Person" means any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, association, or governmental entity or any political subdivision, department or agency thereof.

(122) "PIMS Agreement" means the agreement between Seller and Pooled Equipment Inventory Company, effective July 1, 2002, as amended, with respect to pooled inventory management.

(123) "Plans" has the meaning set forth in Section 2.4(k).

(124) "Post-Closing Adjustment" has the meaning set forth in Section 3.3(c).

(125) "Post-Closing Decommissioning Trust Agreement" means the decommissioning trust agreement between Buyer and the Trustee pursuant to which any assets of any of the Decommissioning Funds to be transferred by Seller at Closing pursuant to Section 6.12 hereof will be held in trust.

(126) "Post-Closing Statement" has the meaning set forth in Section 3.3(c).

(127) "Power Purchase Agreement" means the Power Purchase Agreement between Seller and Buyer, dated as of the date of this Agreement and in the form of Exhibit "F" hereto.

(128) "Price-Anderson Act" means Section 170 of the Atomic Energy Act and related provisions of Section 11 of the Atomic Energy Act.

(129) "Proposed Post-Closing Adjustment" has the meaning set forth in Section 3.3(c).

(130) "Proprietary Information" means (i) with respect to information provided by Seller to Buyer, has the meaning as set forth in the Confidentiality Agreement, and (ii) with respect to information provided by Buyer to Seller, shall mean information relating to the financing or operation and maintenance, actual or proposed, of the Purchased Assets and any financial, operational or other information concerning Buyer or its Affiliates or their respective assets and properties furnished by Buyer or its Representatives to Seller or its Representatives, whether furnished before or after the date hereof, whether oral or written, and regardless of the manner in which it is furnished; but does not include information which (a) is or becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (b) was available to Seller or its Representatives on a non-confidential basis prior to its disclosure by Buyer or its Representatives or (c) becomes available on a non-confidential basis from a person other than Buyer or its Representatives who is not otherwise bound by a confidentiality agreement with Buyer or its Representatives, or is otherwise not under any obligation to Buyer or its Representatives not to transmit the information to Seller or its Representatives.

(131) "Purchased Assets" has the meaning set forth in Section 2.1.

(132) "Purchase Price" has the meaning set forth in Section 3.2.

(133) "Qualified Decommissioning Funds" means the external trust funds that meet the requirements of Code Section 468A and Treas. Reg. § 1.468A-5, maintained by Seller with respect to the Facilities prior to Closing pursuant to Seller's Decommissioning Trust Agreement and maintained by Buyer after the Closing pursuant to the Post-Closing Decommissioning Trust Agreement to the extent assets are transferred to such fund by Seller pursuant to Section 6.12.

(134) "Real Property" has the meaning set forth in Section 2.1(a).

(135) "Real Property Agreements" has the meaning set forth in Section 4.8.

(136) "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the Environment or within any building, structure, facility or fixture.

(137) "Remediation" means action of any kind required by any applicable Law or order of a Governmental Authority to address a Release, the threat of a Release or the presence of Hazardous Substances at the Site or an off-Site location including, without limitation, any or all of the following activities to the extent they relate to or arise from the presence of a Hazardous Substance at the Site or an off-Site location: (a) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, response or restoration work; (b) obtaining any permits, consents, approvals or authorizations of any Governmental Authority necessary to conduct any such activity; (c) preparing and implementing any plans or studies for any such activity; (d) obtaining a written notice from a Governmental Authority with jurisdiction over the Site or an off-Site location under Environmental Laws that no material additional work is required by such Governmental Authority; (e) the use, implementation, application, installation, operation or maintenance of remedial action on the Site or an off-Site location, remedial technologies applied to the surface or subsurface soils, excavation and off-Site treatment or disposal of soils, systems for long term treatment of surface water or ground water, engineering controls or institutional controls; and (f) any other activities required under Environmental Laws to address the presence or Release of Hazardous Substances at the Site or an off-Site location.

(138) "Replacement Benefit Plan" has the meaning set forth in Section 6.10(e).

(139) "Replacement Defined Benefit Plan" has the meaning set forth in Section 6.10(h).

(140) "Replacement Retiree Coverages" has the meaning set forth in Section 6.10(m).

(141) "Replacement Welfare Plans" has the meaning set forth in Section 6.10(d).

(142) "Representatives" of a Party means the Party and its Affiliates and their directors, officers, employees, agents, partners, advisors (including, without limitation, accountants, counsel, environmental consultants, financial advisors and other authorized representatives) and parents and other controlling Persons.

(143) "Requested Rulings" has the meaning set forth in Section 6.18.

(144) "RG&E" has the meaning set forth in the preamble.

(145) "RG&E Defined Benefit Plan" has the meaning set forth in Section 6.10(h).

(146) "RG&E Retiree Coverages" has the meaning set forth in Section 6.10(m).

(147) "RG&E Savings Plan" has the meaning set forth in Section 6.10(g).

(148) "Safeguards Information" means information not otherwise classified as national security information or restricted data under NRC's regulations which specifically identifies an NRC licensee's detailed (1) security measures for the physical protection of Special Nuclear Material, or (2) security measures for the physical protection and location of certain plant equipment vital to the safety of production or utilization facilities.

(149) "SEC" means the United States Securities and Exchange Commission and any successor agency thereto.

(150) "Securities Act" means the Securities Act of 1933, as amended.

(151) "Seller" has the meaning set forth in the preamble.

(152) "Seller Indemnitee" has the meaning set forth in Section 8.1(a).

(153) "Seller's Agreements" means those contracts, agreements, licenses and leases relating to the ownership, operation and maintenance of the Purchased Assets, as more particularly described on Schedule 4.15(a)(i), as such schedule is supplemented and amended in accordance with the provisions of this Agreement.

(154) "Seller's Decommissioning Trust Agreement" means the Master Decommissioning Trust Agreement, made as of March 9, 1990, as amended, between RG&E and Mellon Bank, N.A., regarding the Qualified Decommissioning Fund and the Nonqualified Decommissioning Fund of Seller.

(155) "Seller's Parent" shall mean Energy East Corporation.

(156) "Seller's Parent Guaranty" means the Guaranty executed by Seller's Parent, dated the Closing Date and in the form attached hereto as Exhibit "G".

(157) "Seller's Required Regulatory Approvals" has the meaning set forth in Section 4.3(b).

(158) "Site" means the parcels of land included in the Real Property. Any reference to the Site shall include, by definition, the surface and subsurface elements, including the soils and groundwater present at the Site and any references to items "at

the Site" shall include all items "at, in, on, upon, over, across, under, and within" the Site.

(159) "Source Material" means: (1) uranium or thorium; or any combination thereof, in any physical or chemical form, or (2) ores which contain by weight one-twentieth of one percent (0.05%) or more of (i) uranium, (ii) thorium, or (iii) any combination thereof. Source Material does not include Special Nuclear Material.

(160) "Special Nuclear Material" means plutonium, uranium enriched in the isotope-233 or in the isotope-235, and any other material that the NRC determines to be "Special Nuclear Material," but does not include Source Material. Special Nuclear Material also refers to any material artificially enriched by any of the above-listed materials or isotopes, but does not include Source Material.

(161) "Spent Nuclear Fuel" means fuel that has been permanently withdrawn from a nuclear reactor following irradiation, and has not been chemically separated into its constituent elements by reprocessing. Spent Nuclear Fuel includes the Special Nuclear Material, Byproduct Material, Source Material greater than Class C waste, and other radioactive materials associated with Nuclear Fuel assemblies.

(162) "Spent Nuclear Fuel Fees" means those fees assessed on electricity generated at Ginna and sold pursuant to the Standard Spent Fuel Disposal Contract, as provided in Section 302 of the Nuclear Waste Policy Act and 10 C.F.R. Part 961, as the same may be amended from time to time, including, but not limited to, the One-Time DOE Pre-1983 Fee.

(163) "Standard Spent Fuel Disposal Contract" means the Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, No. DE-CR01-83NE44419, dated June 30, 1983, entered into between RG&E and the United States of America, represented by the Department of Energy, as amended.

(164) "Subsidiary" when used in reference to any Person means any entity of which outstanding securities having ordinary voting power to elect a majority of the Board of Directors or other Persons performing similar functions of such entity, are owned directly or indirectly, by such Person.

(165) "Tangible Personal Property" has the meaning set forth in Section 2.1(c).

(166) "Tax Basis" means the adjusted tax basis determined for federal income tax purposes under Code Section 1011(a).

(167) "Tax" or "Taxes" means, all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state or local or foreign taxing authority, including but not limited to, income, excise, real or personal property, sales, transfer, franchise, payroll, withholding, social security, receipts, license, stamp, occupation, employment or other taxes, including any interest, penalties or additions attributable

thereto, and any payments to any state, local or foreign taxing authorities in lieu of any such taxes, charges, fees, levies or assessments.

(168) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) required to be supplied to any taxing authority with respect to Taxes including amendments thereto.

(169) "Termination Date" has the meaning set forth in Section 9.1(b).

(170) "Third Party Claim" has the meaning set forth in Section 8.2(a).

(171) "Title Company" has the meaning set forth in Section 7.1(j).

(172) "Total Compensation" has the meaning set forth in Section 6.10(c).

(173) "Transferable Permits" means those Permits and Environmental Permits identified in Schedule 1.1(173), which are transferable to Buyer without application to, a filing with, notice to, consent or approval of any Governmental Authority.

(174) "Transferred Employee Records" means all records related to Transferred Employees, including but not limited to the following information: (i) skill and development training, (ii) seniority histories, (iii) salary and benefit information, (iv) Occupational, Safety and Health Administration reports, (v) active medical restriction forms, (vi) fitness for duty, (vii) disciplinary actions, (viii) job performance appraisals and/or evaluations, (ix) employment applications, (x) bonuses, (xi) job history, (xii) access authorization records, and (xiii) radiation exposure records.

(175) "Transferred Employees" has the meaning set forth in Section 6.10(b).

(176) "Transfer Taxes" means all state or local real property transfer, sales, use, value added, stamp, recording, registration, conveyance and other like Taxes and other fees, including without limitation any payments made in lieu of such Taxes which become payable in connection with the transactions contemplated by this Agreement.

(177) "Transition Committee" has the meaning set forth in Section 6.1(b).

(178) "Transmission Assets" has the meaning set forth in Section 2.2(a).

(179) "Trustee" means with respect to Seller prior to the Closing the trustee of the Decommissioning Funds appointed by Seller pursuant to Seller's Decommissioning Trust Agreement and after the Closing to the extent any assets of the Decommissioning Funds are transferred by Seller pursuant to Section 6.12 hereof, the trustees appointed pursuant to the Post-Closing Decommissioning Trust Agreement.

(180) "Uprate" has the meaning set forth in Section 6.21(a).

(181) "Uprate Reports" has the meaning set forth in Section 6.21(a).

(182) "USEPA" means the United States Environmental Protection Agency and any successor agency thereto.

(183) "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

(184) "WARN Certificate" has the meaning set forth in Section 6.10(i).

Section 1.2 Certain Interpretive Matters. In this Agreement, unless the context otherwise requires, the singular shall include the plural, the masculine shall include the feminine and neuter, and vice versa. The term "includes" or "including" shall mean "including without limitation." References to a Section, Article, Exhibit or Schedule shall mean a Section, Article, Exhibit or Schedule of this Agreement, and reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented and restated through the date as of which such reference is made.

ARTICLE 2

PURCHASE AND SALE

Section 2.1 Purchased Assets. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller will sell, assign, convey, transfer and deliver to Buyer, and Buyer will purchase, assume and acquire from Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), all of Seller's right, title and interest in and to the following assets, wherever located (collectively, the "Purchased Assets"): (i) all of the assets used in, held for use, constituting, or necessary in the ordinary course of business to operate and maintain Ginna (but excluding such assets that are not necessary for the operation of Ginna as a generating station and are used predominantly elsewhere in the operation of Seller's business), including, without limitation, those assets identified in Schedule 2.1(j) and Schedules 4.13(a) and (b), and (ii) those assets described below (but excluding the Excluded Assets):

(a) Except as otherwise constituting part of the Excluded Assets, the land described on Schedule 4.13(a) (which land comprises the Site) together with all buildings, facilities and other improvements thereon including the Facilities (but excluding any personal property thereon) and all appurtenances thereto, including, without limitation, all related rights of ingress and egress (collectively, the "Real Property");

(b) All Nuclear Materials and Inventories owned by Seller, or in which the Seller has any right, title or interest, on the Closing Date, wherever located;

(c) All machinery, mobile or otherwise, equipment (including computer hardware and software and transferable rights thereto and communications equipment), vehicles, tools, spare parts, materials, works in progress, fixtures, furniture and furnishings and other personal property relating to or used in the ordinary course of business to operate and maintain the Facilities, including, without limitation, the items of personal property included in Schedule 4.13(b), other than property used primarily as part of the Transmission Assets or otherwise constituting part of the Excluded Assets (collectively, "Tangible Personal Property");

(d) Subject to the provisions of Sections 2.1(p) and 6.4(d), all rights of Seller under the Fuel Contracts, Non-material Contracts and the Seller's Agreements which have not been identified in Schedule 2.2(l) as Excluded Assets;

(e) All Real Property Agreements;

(f) All Transferable Permits;

(g) To the extent permitted by Law, all books, operating records, licensing records, quality assurance records, purchasing records, and equipment repair, maintenance or service records of Seller relating to the design, construction, licensing or operation of the Facilities, operating, safety and maintenance manuals, inspection reports, environmental assessments, engineering design plans, documents, blueprints and as built plans, specifications, procedures and other similar items of Seller, wherever located, relating to the Facilities and the other Purchased Assets, whether existing in hard copy or magnetic or electronic form (subject to the right of Seller to retain copies of same for its use) (collectively, the "Business Books and Records");

(h) All unexpired, transferable warranties and guarantees from third parties with respect to any item of Real Property or Tangible Personal Property constituting part of the Purchased Assets;

(i) The name "R. E. Ginna" or "Ginna" as used as a designation attached to or associated with the Facilities and any related logos;

(j) The Intellectual Property described on Schedule 2.1(j);

(k) The substation equipment, if any, designated in the Interconnection Agreement or the Easement Agreement as being transferred to Buyer;

(l) The assets comprising that portion of the Decommissioning Funds that is transferred to Buyer pursuant to Section 6.12 of this Agreement, together with all related tax accounting and other records for such assets, including all decommissioning studies, analyses and cost estimates;

(m) To the extent transferable, all Nuclear Insurance Policies with ANI, including all rights to collect premium refunds made after the Closing Date, including, but not limited to, those pursuant to the ANI nuclear industry credit rating

plan (other than refunds that relate to premiums paid for time periods prior to the Closing Date);

(n) Subject to the receipt of approval from the Wireless Bureau of the Federal Communications Commission, certain radio licenses set forth on Schedule 2.1(n);

(o) Subject to Buyer's written commitment to satisfy its indemnification obligations under Section 8.1(a), the right to proceeds from insurance policies for coverage of Assumed Liabilities and Obligations;

(p) Subject to Buyer's written commitment to satisfy its indemnification obligations under Section 8.1(a), the rights of Seller in and to any causes of action, claims and defenses against third parties (including indemnification and contribution) relating to any Assumed Liabilities and Obligations, including, but not limited to, all rights of Seller in and to any cause of action or claim pending or hereafter initiated with respect to damages incurred prior to, on or after the Closing Date relating to the DOE Litigation; provided that the prosecution of any cause of action or claim related to the DOE Litigation shall be conducted as specified in Section 6.13 and any recovery of damages, costs, attorneys' fees, interest and penalties, or any other expenses awarded shall be shared between Seller and Buyer in accordance with Section 6.13;

(q) The Transferred Employee Records, subject to the right of Seller to retain copies of such records for its reasonable and lawful use and subject to the obligation of Buyer to preserve such records and make such records available to Seller as reasonably necessary for Seller's reasonable and lawful purposes following the Closing Date as provided in Section 6.2(c);

(r) Any rights of Seller with respect to prior assessments of licensees of operating nuclear power plants to support disposal facility development activities by the NYDEC, and the former Commission for Siting Low-Level Radioactive Waste Disposal Facilities, which ceased operation in August 1995;

(s) All assignable right, title and interest of the Seller to the NRC License;

(t) All rights of the Seller in property, assets, leases and agreements used or usable in providing emergency warning or associated with emergency preparedness as set forth on Schedule 2.1(t);

(u) All Emission Reduction Credits or emission allowances that relate to the operation of the Facilities prior to, on or after the Closing Date; and

(v) The assets required to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan or paid from Seller to Buyer as set forth in Section 6.10(h).

Section 2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed as conferring on Buyer, and Buyer is not acquiring, any right, title or interest in or to the following specific assets which are associated with the Purchased Assets, but which are hereby specifically excluded from the sale and the definition of Purchased Assets herein (the "Excluded Assets"):

(a) Except as expressly identified in Schedule 4.13(b) or the Interconnection Agreement or the Easement Agreement, the electrical transmission or distribution facilities (as opposed to generation facilities) of Seller or any of its Affiliates, as well as all permits, contracts and warranties, to the extent they relate to such transmission and distribution assets (collectively, the "Transmission Assets"), and those assets and facilities identified on Schedule 2.2(a);

(b) Certificates of deposit, shares of stock, securities, bonds, debentures, evidences of indebtedness, and interests in joint ventures, partnerships, limited liability companies and other entities (including, without limitation, Seller's member account balances with NEIL), except such assets comprising the portion of the Decommissioning Funds which is required to be transferred to the Buyer pursuant to Section 6.12 hereof and except such assets required to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan or paid from Seller to Buyer as set forth in Section 6.10(h);

(c) All rights to collect premium refunds and distributions made after the Closing Date under Nuclear Insurance Policies to the extent that such refunds and distributions relate to premiums paid prior to the Closing Date;

(d) All cash, cash equivalents, bank deposits, accounts and notes receivable (trade or otherwise), and any income, sales, payroll or other tax receivables, except to the extent such assets are included in the portion of the Decommissioning Funds transferred to Buyer pursuant to Section 6.12 hereof and except such assets required to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan or paid from Seller to Buyer as set forth in Section 6.10(h);

(e) The rights of Seller and its Affiliates to the names "Rochester Gas and Electric Corporation" and "RG&E" or any related or similar trade names, trademarks, service marks, corporate names or logos, or any part, derivative or combination thereof;

(f) All tariffs, agreements and arrangements to which Seller is a party for the purchase or sale of electric capacity and/or energy or for the purchase or sale of transmission or ancillary services;

(g) Other than those contemplated by Section 2.1(p), the rights of Seller in and to any causes of action, claims and defenses against third parties (including indemnification and contribution) arising out of or relating to (A) any Real Property

or personal property, Permits, Taxes, Real Property Agreements, Seller's Agreements, Fuel Contracts or the Non-material Contracts, if any, including any claims for refunds (including refunds of previously paid Department of Energy Decommissioning and Decontamination Fees), prepayments, offsets, recoupment, insurance proceeds, condemnation awards, judgments and the like, whether received as payment or credit against future liabilities, relating specifically to the Purchased Assets (including, without limitation, the Facilities and the Site) and relating to any period prior to the Closing Date, (B) the Excluded Assets, or (C) the Excluded Liabilities;

(h) All personnel records of Seller and Affiliates, except the Transferred Employee Records;

(i) Any and all of Seller's rights in any contract representing an intercompany transaction between Seller and an Affiliate of Seller, whether or not such transaction relates to the provision of goods and services, payment arrangements, intercompany charges or balances, or the like;

(j) To the extent not otherwise provided for in this Section 2.2, any refund or credit (i) related to income, real or personal property, excise, sales or use Taxes paid by Seller with respect to periods (or portions thereof) prior to the Closing Date in respect of the Purchased Assets, whether such refund is received as a payment or as a credit against future income, real or personal property, excise, sales or use Taxes payable, or (ii) arising under any agreement which is part of the Purchased Assets and relating to a period prior to the Closing Date;

(k) Any cause of action or claim for damages or other rights that relate to the One-Time DOE Pre-1983 Fee; and

(l) All rights of Seller under those contracts, agreements, purchase orders and personal property leases set forth in Schedule 2.2(l).

Section 2.3 Assumed Liabilities and Obligations. On the Closing Date, Buyer shall deliver to Seller the Assignment and Assumption Agreement pursuant to which Buyer shall assume and agree to discharge when due, all of the following Liabilities of Seller (collectively, "Assumed Liabilities and Obligations"):

(a) All Liabilities of Seller arising on or after the Closing Date with respect to the ownership, operation or maintenance of the Purchased Assets, and all Liabilities of Seller arising on or after the Closing Date under Seller's Agreements, the Standard Spent Fuel Disposal Contract, Fuel Contracts, the Real Property Agreements, the Non-material Contracts and the Transferable Permits in accordance with the terms thereof, including, without limitation, (i) the contracts, licenses, agreements and personal property leases entered into by Seller with respect to the Purchased Assets or under Seller's Agreements or the Fuel Contracts or the Non-material Contracts and disclosed on the relevant schedule and (ii) the contracts, licenses, agreements and personal property leases entered into by Seller with respect

to the Purchased Assets after the date hereof consistent with the terms of this Agreement, except in each case to the extent such Liabilities, but for a breach or default by Seller or a related waiver or extension, would have been paid, performed or otherwise discharged on or prior to the Closing Date or to the extent the same arise out of any such breach or default or out of any event which after the giving of notice or the passage of time would constitute a default by Seller

(b) All Liabilities or obligations with respect to the Transferred Employees relating to personal injury, discrimination, wrongful discharge, unfair labor practice, or constructive termination of any individual, or similar claim or cause of action attributable to any actions or inactions on or after the Closing Date;

(c) All Liabilities (except for Excluded Liabilities) of Seller under or related to Environmental Laws, whether past, current or future, or the common law, with respect to the Site; provided however, that Buyer does not assume any Liability for the off-Site disposal or Release of Hazardous Substances or the arrangement for such activities prior to the Closing Date, as provided in Section 2.4(f) hereof, except that for the purposes of Section 2.3 and 2.4 "off-Site" does not include any location adjoining the Site to which Hazardous Substances Released at the Site have migrated;

(d) All Liabilities of Seller associated with or arising from the Purchased Assets in respect of Taxes for which Buyer is liable pursuant to Sections 3.5 or 6.8(a) hereof;

(e) All Liabilities with respect to Transferred Employees for which Buyer is responsible pursuant to Section 6.10. Moreover, for employees of the Seller who become Transferred Employees as of the Closing Date or who are listed on Schedule 4.11 (as updated as of the Closing Date to include former employees of the Seller whose work assignments principally involved the operation of any of the Purchased Assets and whose employment has been terminated by Seller between the date hereof and the Closing Date) to the extent required by a court of competent jurisdiction, administrative agency or arbitrator, Buyer shall implement any prospective changes (as opposed to compensatory costs, damages or other Liabilities relating to any periods prior to the Closing) in the terms of the employment of any such employee whose position no longer exists at Seller, whose position exists at Buyer and who is subsequently ordered to be reinstated following the resolution of any claims or causes of action, irrespective of when such claim or cause of action is filed or threatened;

(f) With respect to the Purchased Assets, any Tax that may be imposed by any federal, state or local government on the ownership, sale, operation or use of the Purchased Assets on or after the Closing Date or that relates to or arises from the Purchased Assets with respect to taxable periods (or portions thereof) beginning on or after the Closing Date (except for any Income Taxes attributable to income actually received by Seller);

(g) All Liabilities of Seller to Decommission the Facilities and the Site;

(h) All Liabilities of Seller associated with (i) the Nuclear Fuel consumed, or to be consumed, at Ginna from and after the Closing Date and (ii) the management, storage, removal, transportation and disposal on and after the Closing Date of all Nuclear Materials of Ginna ; provided, however, that Buyer does not assume any Liability for the off-Site disposal of Low Level Waste prior to the Closing Date as required pursuant to Laws in effect as of the Closing Date;

(i) All obligations arising on or after the Closing Date to pay to ANI any additional premiums due to audit assessments for assessments performed on or after the Closing Date;

(j) All Liabilities arising under or relating to Nuclear Laws or relating to any claim in respect of Nuclear Fuel or Nuclear Materials arising out of the ownership or operation of the Purchased Assets on or after the Closing Date, including any and all Liabilities to third parties (including employees) for personal injury, property damage or tort, or similar causes of action arising out of the ownership or operation of the Purchased Assets on or after the Closing Date, including Liabilities arising out of or resulting from a "nuclear incident" or "precautionary evacuation" (as such terms are defined in the Atomic Energy Act) at the Site, or any other licensed nuclear reactor site in the United States, or in the course of the transportation of radioactive materials to or from the Site or any other site on or after the Closing Date, including, without limitation, Liability for any deferred premiums assessed in connection with such a nuclear incident or precautionary evacuation under any applicable NRC or industry retrospective rating plan or insurance policy, including any mutual insurance pools established in compliance with the requirements imposed under Section 170 of the Atomic Energy Act, 10 C.F.R. Part 140, and 10 C.F.R. § 50.54(w);

(k) Any Liability for any Price-Anderson Act secondary financial protection retrospective premium obligations for (i) nuclear worker Liability attributable to employment on or after the Closing Date or (ii) any third-party Liability arising out of any nuclear incident on or after the Closing Date;

(l) Except as otherwise expressly provided herein, Liabilities of Buyer to the extent arising from the execution, delivery or performance of this Agreement and the transactions contemplated hereby; and

(m) All other Liabilities expressly allocated to or assumed by Buyer in this Agreement.

Section 2.4 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed to impose on Buyer, and Buyer shall not assume or be obligated to pay, perform or otherwise discharge, the following Liabilities (the "Excluded Liabilities"), with all of such Excluded Liabilities remaining as obligations of Seller:

(a) Any Liabilities of Seller in respect of any Excluded Assets or other assets of Seller which are not Purchased Assets;

(b) Any Liabilities in respect of Taxes attributable to the ownership, operation or use of the Purchased Assets for taxable periods, or portions thereof, ending before the Closing Date, except for Taxes for which Buyer is liable pursuant to Sections 3.5 or 6.8(a) hereof;

(c) Any Liabilities of Seller arising under any of Seller's Agreements, Fuel Contracts, Real Property Agreements, Transferable Permits or any of the Non-material Contracts prior to the Closing Date;

(d) Any monetary fines or penalties (including investigatory or similar costs) imposed by a Governmental Authority with respect to the Purchased Assets resulting from (i) an investigation, proceeding, request for information or inspection before or by a Governmental Authority that commenced prior to the Closing Date, or (ii) criminal acts, willful misconduct or gross negligence of Seller;

(e) Subject to Section 3.5, any payment obligations of Seller for goods delivered or services rendered prior to the Closing Date, including, but not limited to, rental or lease payments due and owing prior to the Closing Date pursuant to the Real Property Agreements and any leases relating to Tangible Personal Property;

(f) Any Liability under or related to Environmental Laws or the common law (whether or not arising or made manifest before the Closing Date or on or after the Closing Date), arising as a result of, in connection with or allegedly caused by the disposal, storage, transportation, discharge, Release, or recycling of Hazardous Substances off-Site, or the arrangement for such activities, in connection with the ownership or operation of the Purchased Assets prior to the Closing Date except that for the purpose of Sections 2.3 and 2.4, "off-Site" does not include any location adjoining the Site to which Hazardous Substances disposed of or Released at the Site have migrated;

(g) Third party Liability for any claims arising as a result of or in connection with loss of life or injury to persons or damages to property prior to the Closing Date (whether or not such loss or injury was made manifest on or after the Closing Date) caused (or allegedly caused) by the presence or Release of Hazardous Substances at, on, in, under, adjacent to or migrating from the Purchased Assets prior to the Closing Date; provided Seller will not have any Liability to third parties for any claims arising as a result of or in connection with loss of life or injury to persons or damages to property caused (or allegedly caused) by the Release by Buyer of Hazardous Substances at, on, in, or under, the Purchased Assets on or after the Closing Date;

(h) All Liabilities arising under or relating to Nuclear Laws or relating to any claim in respect of Nuclear Fuel or Nuclear Materials arising out of the ownership or operation of the Purchased Assets prior to the Closing Date (except for

Liabilities associated with the management, storage, removal, transportation and disposal of Nuclear Fuel and Nuclear Material), including any and all Liabilities to third parties (including employees) for personal injury, property damage or tort, or similar causes of action arising out of the ownership or operation of the Purchased Assets prior to the Closing Date, including Liabilities arising out of or resulting from a "nuclear incident" or "precautionary evacuation" (as such terms are defined in the Atomic Energy Act) at the Site, or any other licensed nuclear reactor site in the United States, or in the course of the transportation of radioactive materials to or from the Site or any other site prior to the Closing Date, including, without limitation, Liability for any deferred premiums assessed in connection with such a nuclear incident or precautionary evacuation under any applicable NRC or industry retrospective rating plan or insurance policy, including any mutual insurance pools established in compliance with the requirements imposed under Section 170 of the Atomic Energy Act, 10 C.F.R. Part 140, and 10 C.F.R. § 50.54(w);

(i) Any Liabilities relating to Seller's operations on, or usage of, the Easements, including, without limitation, Liabilities arising as a result of or in connection with (1) any violation or alleged violation of Environmental Law and (2) loss of life, injury to persons or property or damage to natural resources, but only to the extent caused by Seller;

(j) Subject to Section 6.10(h) and 6.10(o), any Liabilities relating to any Benefit Plan, any employee benefit plan as defined in Section 3(3) of ERISA, or any other plan, program, arrangement or policy established or maintained in whole or in part by Seller or by any trade or business (whether or not incorporated) which is or ever has been under common control, or which is or ever has been treated as a single employer, with Seller under Section 414(b), (c), (m) or (o) of the Code ("ERISA Affiliate") or to which Seller or any ERISA Affiliate contributes or contributed, including any multiemployer plan contributed to by Seller or any ERISA Affiliate or to which Seller or any ERISA Affiliate is or was obligated to contribute (the "Plans"), including, but not limited to any such Liability (i) for the termination or discontinuance of, or the Seller's or an ERISA Affiliate's withdrawal from, any such Plan, (ii) relating to benefits payable under any Plans, (iii) relating to the PBGC under Title IV of ERISA, (iv) relating to a multi-employer plan, (v) with respect to noncompliance with the notice requirements of COBRA, (vi) with respect to any noncompliance with ERISA or any other applicable Laws, and (vii) with respect to any suit, proceeding or claim which is brought against Buyer, any Plan or any fiduciary or former fiduciary of, any of the Plans;

(k) Any Liabilities relating to the failure to hire, the employment or services or termination of employment or services of any individual, including wages, compensation, benefits, affirmative action, personal injury, discrimination, harassment, retaliation, constructive termination, wrongful discharge, unfair labor practices, or constructive termination by the Seller of any individual, or any similar or related claim or cause of action attributable to any actions or inactions by Seller prior to the Closing Date with respect to the Purchased Assets, the Transferred Employees, independent contractors, applicants, and any other individuals who are determined by

a court or by a Governmental Authority to have been applicants or employees of the Seller or any of its Affiliates (including, but not limited to, any Liability related to the matter disclosed on Schedule 4.11), or that are filed with or pending before any court, administrative agency or arbitrator prior to the Closing Date, including, but not limited to, the claim set forth on Schedule 4.11, provided Seller will not have any Liability for similar actions or inactions by Buyer or any successor thereto on or after the Closing Date;

(l) All Spent Nuclear Fuel Fees and any other fees associated with electricity generated at Ginna and sold on or prior to the Closing Date, including, but not limited to, the obligation to the Department of Energy under the Standard Spent Fuel Disposal Contract to make the deferred payment of the One-Time DOE Pre-1983 Fee;

(m) All Liabilities for Department of Energy Decommissioning and Decontamination Fees;

(n) Any Encumbrances on the Purchased Assets, except for Permitted Encumbrances and except as consented to by Buyer in accordance with Section 6.1;

(o) Except as otherwise expressly provided herein, Liabilities of Seller to the extent arising from the execution, delivery or performance of this Agreement and the transactions contemplated hereby; and

(p) Any other Liabilities expressly allocated to or assumed by Seller in this Agreement.

Section 2.5 Control of Litigation. (a) The Parties agree and acknowledge that, subject to the provisions of Article 8 and Section 6.13, Seller shall pay for and be entitled exclusively to control, defend and settle any litigation, administrative or regulatory proceeding, and any investigation or other activities arising out of or related to any Excluded Liabilities and Buyer agrees to reasonably cooperate, at Seller's expense, with Seller in connection therewith.

(b) The Parties agree and acknowledge that, subject to the provisions of Article 8 and Section 6.13, Buyer shall pay for and be entitled exclusively to control, defend and settle any litigation, administrative or regulatory proceeding, and any investigation or other activities arising out of or related to any Assumed Liabilities and Obligations, and Seller agrees to reasonably cooperate, at Buyer's expense, with Buyer in connection therewith.

## ARTICLE 3

## THE CLOSING

Section 3.1 <u>Closing</u>. Upon the terms and subject to the satisfaction of the conditions contained in Article 7 of this Agreement, the sale, assignment,

conveyance, transfer and delivery of the Purchased Assets to Buyer, the payment of the Purchase Price to Seller, and the consummation of the other respective obligations of the Parties contemplated by this Agreement shall take place at a closing (the "Closing"), to be held at the offices of LeBoeuf, Lamb, Greene & MacRae, L.L.P., 125 West 55th Street, New York, New York 10019, at 10:00 a.m. local time, or another mutually acceptable time and location, on the date that is twenty (20) Business Days following the date on which the last of the conditions precedent to Closing set forth in Article 7 of this Agreement have been either satisfied or waived by the Party for whose benefit such conditions precedent exist, but in any event not after the Termination Date, unless the Parties mutually agree on another date; provided that, in setting the Closing Date, the matters contemplated by Section 7.1 (g), (h), (i), (j), (l), (m), (n), (p) and (q) and Section 7.2 (g), (h), (i), (j) and (k), shall be assumed to have been satisfied; provided, however, that the actual satisfaction of such provisions shall in all cases be considered to be a condition to Closing. The date of Closing is hereinafter called the "Closing Date." The Closing shall be effective for all purposes as of 12:01 a.m. on the Closing Date.

Section 3.2 Payment of Purchase Price. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, Buyer will pay or cause to be paid to Seller at the Closing in consideration of the Purchased Assets the sum of Four Hundred and Twenty-Two Million, Six Hundred Thousand Dollars ($422,600,000) ("Purchase Price") plus or minus any adjustments to such Purchase Price pursuant to the provisions of Section 3.3 below, by wire transfer of immediately available funds denominated in U.S. dollars or by such other means as are agreed upon by Seller and Buyer.

Section 3.3 Adjustment to Purchase Price.

(a) Subject to Section 3.3(b) and 3.3(c), at the Closing, the Purchase Price shall be adjusted, without duplication, to account for the items set forth in this Section 3.3(a):

(i) The Purchase Price shall be adjusted to account for the items prorated as of the Closing Date pursuant to Section 3.5.

(ii) The Purchase Price shall be (A) increased if and to the extent that the net book value of that portion of Nuclear Fuel which consists of all nuclear fuel assemblies in the Facilities reactor on the Closing Date and any irradiated fuel assemblies that have been temporarily removed from the Facilities reactor as of the Closing Date and are capable of reinsertion without modification or additional cost is greater than $21,600,000, and (B) decreased if and to the extent the net book value of that portion of Nuclear Fuel which consists of all nuclear fuel assemblies in the Facilities reactor on the Closing Date and any irradiated fuel assemblies that have been temporarily removed from the Facilities reactor as of the Closing Date and are capable of

reinsertion without modification or additional cost, is less than $21,600,000 (all calculations are to be consistent with Seller's past practices).

(iii) The Purchase Price shall be (A) increased if and to the extent that the gross book value of the Inventory of Major Spare Parts and the Seller's interest in the Inventory subject to the PIMS Agreement on the Closing Date is greater than $14,000,000, and (B) decreased if and to the extent the gross book value of the Inventory of Major Spare Parts and the Seller's interest in the Inventory subject to the PIMS Agreement on the Closing Date is less than $14,000,000 (all calculations are to be consistent with Seller's past practices).

(iv) The Purchase Price shall be increased by the amount expended by Seller between the date hereof and the Closing Date for capital additions to or replacements of property, plant and equipment included in the Purchased Assets and other expenditures or repairs on property, plant and equipment included in the Purchased Assets that are capitalized by Seller in accordance with its normal accounting policies, provided, that, such expenditures either (1) are described in the Capital Budget, or (2) are necessary to comply with changes in applicable Laws effected after the date of this Agreement, or (3) have been specifically requested or approved by Buyer in writing, or (4) are made in accordance with Good Utility Practices and exceed $3,000,000 in the aggregate (the "Capital Expenditures"). Nothing in this paragraph should be construed to limit Seller's rights and obligations to make all capital expenditures necessary to comply with the NRC License, the NRC Commitments and other Permits.

(v) The Purchase Price shall be adjusted as set forth in Sections 6.10(h) and (k) and Section 6.21(c).

(vi) If the cost to dispose of the Low Level Waste at the Facilities as of the Closing Date is greater than $250,000, based on the disposal criteria set forth in Schedule 3.3(a)(vi), the Purchase Price shall be adjusted downward by every dollar that the cost of such Low Level Waste disposal is greater than $250,000. Conversely, if the cost to dispose of the Low Level Waste at the Facilities as of the Closing Date is less than $250,000, the Purchase Price shall be adjusted upward by every dollar that the cost of such Low Level Waste disposal is less than $250,000.

(vii) The Purchase Price shall be increased for every dollar paid by Seller to a third party for uranium conversion, enrichment or fabrication in connection with Ginna Reload Cycle 32 and/or fuel and fuel design costs required for the Uprate referred to in Section 6.20, including but not limited to, payments made by Seller to third parties with respect to all unirradiated fuel assemblies awaiting insertion into the Facility reactor, as well as all nuclear fuel constituents in any stage of the fuel cycle that are in process of production, conversion, enrichment or fabrication for use in the Facility.

(viii) The Purchase Price shall be adjusted as provided in Schedule 3.3(a)(viii) in the event that the Closing occurs on a date before or after June 30, 2004; provided, however that no such adjustment shall be made, in the event that the Closing occurs after June 30, 2004 as a result of either (i) the failure of Buyer to satisfy its performance obligations under this Agreement or (ii) the failure to receive regulatory approval from the NRC for the transfer of the NRC License to Buyer by June 30, 2004 where there remain unresolved issues in the application related to NRC approval of Buyer's foreign ownership, control or domination, if applicable.

(b) No less than ten (10) Business Days prior to the Closing Date, Seller shall prepare in good faith and deliver to Buyer an estimated closing statement (the "Estimated Closing Statement") that shall set forth Seller's best estimate of all estimated adjustments to the Purchase Price required by Section 3.3(a) (the "Estimated Adjustment"). Within ten (10) days after the delivery of the Estimated Closing Statement by Seller to Buyer, Buyer may object in good faith to the Estimated Adjustment in writing. If Buyer objects to the Estimated Adjustment, the Parties shall attempt to resolve their differences by negotiation. If the Parties are unable to do so prior to the Closing Date (or if Buyer does not object to the Estimated Adjustment), the Purchase Price shall be adjusted (the "Closing Adjustment") for the Closing by the amount of the Estimated Adjustment not in dispute. The disputed portion shall be resolved in accordance with the provisions of Section 3.3(c) and paid as part of any Post-Closing Adjustment to the extent required by Section 3.3(c).

(c) Within sixty (60) days after the Closing Date, Seller shall prepare and deliver to Buyer a final closing statement (the "Post-Closing Statement") that shall set forth all adjustments to the Purchase Price required by Section 3.3(a) (the "Proposed Post-Closing Adjustment") and all work papers detailing such adjustments. The Post-Closing Statement shall be prepared using the same accounting principles, policies and methods as Seller has historically used in connection with the calculation of the items reflected on such Post-Closing Statement. Within thirty (30) days after the delivery of the Post-Closing Statement by Seller to Buyer, Buyer may object to the Proposed Post-Closing Adjustment in writing. Seller agrees to cooperate with Buyer to provide Buyer with the information used to prepare the Post-Closing Statement and information relating thereto. If Buyer objects to the Proposed Post-Closing Adjustment, the Parties shall attempt to resolve such dispute by negotiation. If the Parties are unable to resolve such dispute within thirty (30) days after any objection by Buyer, the Parties shall appoint the Independent Accounting Firm, which shall, at Seller's and Buyer's joint expense, review the Proposed Post-Closing Adjustment and determine the appropriate adjustment to the Purchase Price, if any, within thirty (30) days after such appointment. The Parties agree to cooperate with the Independent Accounting Firm and provide it with such information as it reasonably requests to enable it to make such determination. The finding of such Independent Accounting Firm shall be binding on the Parties hereto. Upon determination of the appropriate adjustment (the "Post-Closing Adjustment") by agreement of the Parties or by binding determination of the Independent Accounting Firm, the Party owing the difference shall deliver such amount to the other Party no later than two (2) Business

Days after such determination, in immediately available funds or in any other manner as reasonably requested by the payee.

Section 3.4 Allocation of Purchase Price.

(a) At least twenty (20) Business Days prior to the Closing Date, Buyer shall determine, with the assistance of an independent engineer or appraiser, and provide to Seller an estimated allocation among the Purchased Assets of the sum of the Purchase Price and the Assumed Liabilities and Obligations that is consistent with the allocation methodology provided by Section 1060 and 338 of the Code and the regulations promulgated thereunder (the "Estimated Allocation"). The Estimated Allocation shall be subject to the approval of the Seller, which approval shall not be unreasonably withheld. The Estimated Allocation will be used for transfer tax, bulk sale filings and for all other Closing document purposes.

(b) Within ninety (90) days after the Closing Date, the Buyer shall determine, with the assistance of an independent engineer or appraiser, and provide to Seller the allocation among the Purchased Assets of the sum of the Purchase Price (including any adjustments thereto) and the Assumed Liabilities and Obligations (together with any other relevant items) that is consistent with the allocation methodology provided by Section 1060 and 338 of the Code and the regulations promulgated thereunder (the "Allocation"). The Allocation shall be subject to the approval of the Seller, which approval shall not be unreasonably withheld.

(c) Except to the extent required to comply with audit determinations of any tax authority with jurisdiction over a Party, Buyer and Seller shall report the transactions contemplated by this Agreement for all required federal income Tax and all other Tax purposes in a manner consistent with the Allocation. Buyer and Seller shall not take any position in any Tax Return, Tax proceeding or audit that is inconsistent with the Allocation without the consent of the other Party. To the extent such filings are required, Buyer and Seller agree to file Internal Revenue Service Form 8594 (Asset Acquisition Statement Under Section 1060), and all federal, state, local and foreign Tax Returns, in accordance with the Allocation. Subsequent to the preparation of the Allocation as provided in Sections 3.4(a) and (b), Buyer and Seller agree to provide the other with any information required to complete Form 8594 within ten (10) days of the request for such information. Buyer and Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding the allocation of the Purchase Price pursuant to this Section 3.4. Buyer and Seller shall treat the transaction contemplated by this Agreement as the acquisition by Buyer of a trade or business for United States federal income Tax purposes and agree that no portion of the consideration shall be treated in whole or in part as the payment for services or future services.

Section 3.5 Prorations.

(a) Buyer and Seller agree that all of the items normally prorated, including those listed below (but not including Income Taxes), relating to the

business and operation of the Purchased Assets shall be prorated as of the Closing Date, with Seller liable to the extent such items relate to any time period prior to the Closing Date, and Buyer liable to the extent such items relate to periods commencing with the Closing Date (measured in the same units used to compute the item in question, otherwise measured by calendar days):

(i) Personal property, real estate, occupancy and water Taxes, assessments and other charges, if any, on or with respect to the business and operation of the Purchased Assets;

(ii) Any prepaid expenses (including security deposits) relating to the Purchased Assets;

(iii) Rent, Taxes and all other items (including prepaid services or goods not included in Inventory) payable by or to Seller under any of Seller's Agreements or the Non-material Contracts;

(iv) Any permit, license, registration, compliance assurance fees or other fees with respect to any Transferable Permit;

(v) Sewer rents and charges for water, telephone, electricity and other utilities; and

(vi) Rent and Taxes and other items payable by Seller under the Real Property Agreements assigned to Buyer.

(b) In connection with the prorations referred to in (a) above, in the event that actual figures are not available at the Closing Date, the proration shall be based upon the actual Taxes or other amounts accrued through the Closing Date or paid for the most recent year (or other appropriate period) for which actual Taxes or other amounts paid are available. Such prorated Taxes or other amounts shall be re-prorated and paid to the appropriate Party within sixty (60) days of the date that the previously unavailable actual figures become available. Prorations measured by calendar days shall be based on the number of days in a year or other appropriate period (i) before the Closing Date and (ii) including and after the Closing Date. Seller and Buyer agree to furnish each other with such documents and other records as may be reasonably requested in order to confirm all adjustment and proration calculations made pursuant to this Section 3.5.

Section 3.6 Deliveries by Seller. At the Closing (or, in the case of those items contemplated by paragraph (j) below, at the Facilities on or before the Closing Date), Seller will deliver, or cause to be delivered, the following to Buyer:

(a) The Bill of Sale, duly executed by Seller;

(b) Copies of any and all governmental and other third party consents, waivers or approvals obtained by Seller with respect to the transfer of the Purchased Assets, or the consummation of the transactions contemplated by this Agreement;

(c) The opinions of counsel and officer's certificates of Seller contemplated by Sections 7.1(g) and (h);

(d) Bargain and sale deed with covenant provided for by Section 13 of the Lien Law of the State of New York, conveying the Real Property to Buyer, in substantially the form of Exhibit "E" hereto, duly executed and acknowledged by Seller in recordable form (the "Deed"), and any owner's affidavits or similar documents reasonably required by the title company;

(e) All Ancillary Agreements duly executed by Seller (and with respect to any Ancillary Agreement consisting of a pole attachment agreement, if necessary, by any co-owner of the pole), as applicable;

(f) Copies, certified by the Secretary or Assistant Secretary of Seller, of corporate resolutions authorizing the execution and delivery of this Agreement and all of the agreements and instruments to be executed and delivered by Seller in connection herewith, and the consummation of the transactions contemplated hereby;

(g) A certificate of the Secretary or Assistant Secretary of Seller identifying the name and title and bearing the signatures of the officers of Seller authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby;

(h) Certificate of good standing with respect to Seller, issued by the Secretary of the State of New York;

(i) To the extent available, Tax clearance certificates or Tax status certificates dated no more than thirty (30) days prior to the Closing for each jurisdiction identified on Schedule 4.20;

(j) To the extent available, originals of the Seller's Agreements, Fuel Contracts, Non-material Contracts, Real Property Agreements, Transferred Employee Records and Transferable Permits and, if not available, true and correct copies thereof, in all cases together with notices to and, if required by the terms thereof, consents by other Persons which are parties to the Seller's Agreements, Fuel Contracts, Non-material Contracts, Real Property Agreements and Transferable Permits;

(k) The assets of the Decommissioning Funds to be transferred pursuant to Section 6.12 shall be delivered to the Trustee of the Post-Closing Decommissioning Trust Agreement;

(l) All such other instruments of assignment, transfer or conveyance as shall, in the reasonable opinion of Buyer and its counsel, be necessary or desirable to transfer to Buyer the Purchased Assets, in accordance with this Agreement and where necessary or desirable in recordable form;

(m) The WARN Certificate;

(n) An ALTA-ACSM survey certified by the surveyor to Buyer and the Title Company, which survey shall have been updated to a date within thirty (30) days before the Closing and shall mention and show (if of a kind that can reasonably be expected to be shown) all title exceptions included in the then most recent title commitment provided to Seller by Buyer;

(o) The written consent of the Office of General Services of the State of New York to the assignment by Seller to Buyer of the Cooling Tunnel Easement which consent shall be in recordable form, and shall not materially alter the terms of said Cooling Tunnel Easement to Buyer's detriment;

(p) A letter executed by Geomatrix reasonably satisfactory in form and substance to Buyer allowing Buyer to rely on the Phase I and Phase II report as to the Site, the Phase I report as to the Station 13A Parcel (as defined in the Easement Agreement), and the other environmental assessments (and all amendments thereto) issued by Geomatrix on or after January 1, 2003 with respect to the Site; and

(q) Such other agreements, consents, documents, instruments and writings as are required to be delivered by Seller at or prior to the Closing Date pursuant to this Agreement or the Ancillary Agreements or otherwise reasonably required in connection herewith.

Section 3.7 Deliveries by Buyer. At the Closing, Buyer will deliver, or cause to be delivered, the following to Seller:

(a) The Purchase Price, payable pursuant to Section 3.2, as adjusted pursuant to Section 3.3(a);

(b) The opinions of counsel and certificates contemplated by Section 7.2(h) and (j);

(c) Ancillary Agreements, duly executed by Buyer;

(d) Copies, certified by the Secretary or Assistant Secretary of Buyer, of resolutions authorizing the execution and delivery of this Agreement, and all of the agreements and instruments to be executed and delivered by Buyer in connection herewith, and the consummation of the transactions contemplated hereby;

(e) A certificate of the Secretary or Assistant Secretary of Buyer identifying the name and title and bearing the signatures of the officers of Buyer authorized to execute and deliver this Agreement, and the other agreements contemplated hereby;

(f) A certificate of good standing with respect to Buyer, issued by the Secretary of the State of Maryland;

(g) A certificate of authority of Buyer (or its assignee of this Agreement) to do business in New York, issued by the Secretary of State of New York;

(h) All such other instruments of assumption as shall, in the reasonable opinion of Seller and its counsel, be necessary for Buyer to assume the Assumed Liabilities and Obligations in accordance with this Agreement;

(i) Copies of any and all governmental and other third party consents, waivers or approvals obtained by Buyer with respect to the transfer of the Purchased Assets, or the consummation of the transactions contemplated by this Agreement;

(j) A copy of the Post-Closing Decommissioning Trust Agreement; and

(k) Such other agreements, documents, instruments and writings as are required to be delivered by Buyer at or prior to the Closing Date pursuant to this Agreement, or otherwise reasonably required in connection herewith.

Section 3.8 <u>Delivery of DOE Credit Support</u>. At the Closing, Seller will deliver or cause to be delivered, to Buyer, the DOE Credit Support (in any permitted form, as determined by Seller).

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

Section 4.1 <u>Organization</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. Copies of the Certificate of Incorporation and By-laws of Seller, each as amended to date, have heretofore been made available to Buyer.

Section 4.2 <u>Authority Relative to this Agreement</u>. Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action required on the part of Seller and no other corporate proceedings on the part of Seller are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and at Closing, the Ancillary Agreements will be duly and validly executed and delivered by Seller, and assuming that this Agreement and the applicable Ancillary Agreements constitute a valid and binding agreement of Buyer and subject to the receipt of Seller's Required Regulatory Approvals, this Agreement and the Ancillary Agreements constitute the legal, valid and binding agreement of Seller, enforceable against Seller in accordance with their respective terms.

Section 4.3 Consents and Approvals; No Violation.

(a) Subject to the receipt of the third-party consents set forth in Schedule 4.3(a) and the Seller's Required Regulatory Approvals, neither the execution and delivery of this Agreement or the Ancillary Agreements by Seller nor the consummation of the transactions contemplated hereby or thereby will (i) conflict with or result in the breach or violation of any provision of the Certificate or Articles of Incorporation or Bylaws of Seller; (ii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which Seller is a party or by which Seller, or any of the Purchased Assets, may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, create a Material Adverse Effect; or (iii) constitute violations of any order, writ, injunction, decree, statute, rule or regulation applicable to Seller, or any of its assets, which violation, individually or in the aggregate, would create a Material Adverse Effect.

(b) Except as set forth in Schedule 4.3(b) (the filings and approvals referred to in Schedule 4.3(b) are collectively referred to as the "Seller's Required Regulatory Approvals"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any Governmental Authority is necessary for the execution and delivery of this Agreement or the Ancillary Agreements or the consummation by Seller of the transactions contemplated hereby or thereby, other than (i) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, individually or in the aggregate, create a Material Adverse Effect, or (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which become applicable to Seller as a result of the specific regulatory status of Buyer (or any of its Affiliates) or the result of any other facts that specifically relate to the business or activities in which Buyer (or any of its Affiliates) is or proposes to be engaged. Seller has no Knowledge of any facts or circumstances that make it reasonably likely that Seller's Required Regulatory Approvals will not be obtained.

Section 4.4 Reports. Since January 1, 2002, Seller has filed or caused to be filed with the SEC, the applicable state or local utility commissions or regulatory bodies, the NRC, the DOE and the FERC, as the case may be, all material forms, statements, reports and documents (including all exhibits, amendments and supplements thereto) required to be filed by them with respect to the Purchased Assets or the ownership or operation thereof under each of the Securities Act, the Exchange Act, the applicable state public utility laws, the Federal Power Act, the Holding Company Act, the Atomic Energy Act, the Energy Reorganization Act, and the Price-Anderson Act and the respective rules and regulations thereunder, except for such filings the failure of which to make would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. All such filings complied in all material respects with all applicable requirements of the appropriate act and the rules and regulations thereunder in effect on the date each such report was

filed, and there are no material misstatements or omissions relating to the Purchased Assets in any such report; provided, however, Seller shall not be deemed to be making any representation or warranty to Buyer hereunder concerning the financial statements of Seller or any Affiliate of Seller contained in any such reports.

Section 4.5 Undisclosed Liabilities. Except as set forth in Schedule 4.5, the Purchased Assets are not subject to any material Liability that has not been accrued or reserved against in Seller's financial statements as of the end of the most recent fiscal quarter for which such statements are available or disclosed in the notes thereto in accordance with generally accepted accounting principles consistently applied.

Section 4.6 Absence of Certain Changes or Events. Since January 1, 2003, except as set forth in Schedule 4.6 or Schedule 4.15(a)(i), there has not been: (a) any Material Adverse Effect; (b) any damage, destruction or casualty loss, whether or not covered by insurance, which, individually or in the aggregate, created a Material Adverse Effect; or (c) any agreement, commitment or transaction entered into by Seller that is material to the ownership or operation of the Purchased Assets, taken as a whole, and remains in full force and effect on the date hereof.

Section 4.7 Title and Related Matters. Except as set forth in Schedule 4.7, Seller holds title, insurable at regular rates by a nationally recognized title insurance company, to the Real Property to be conveyed by it hereunder free and clear of all Encumbrances, other than the Permitted Encumbrances; provided, however, that Seller makes no representation or warranty with respect to title to groundwater. To the Knowledge of Seller, there are no public or private special assessments threatened against the Purchased Assets. The Real Property, the Cooling Tunnel Easement, and the real property interests to be transferred to Buyer by the Easements constitute all of the real property interests necessary to operate the Facilities as currently operated. Seller has good and valid title to the Purchased Assets not constituting Real Property free and clear of all Encumbrances, except Permitted Encumbrances.

Section 4.8 Real Property Agreements. Schedule 4.8 lists, as of the date of this Agreement, all real property leases, easements, licenses and other rights in real property including all material amendments thereto (exclusive of non-current term extensions) (collectively, the "Real Property Agreements") to which Seller is a party (directly or as a successor or assignee) and which affect all or any part of any Real Property and (i) provide for annual payments of more than $50,000 or (ii) are material to the ownership or operation of the Purchased Assets. Except as set forth in Schedule 4.8, all such Real Property Agreements are valid, binding and enforceable in accordance with their terms, and are in full force and effect; there are no existing material defaults by Seller or any other party thereunder; and no event has occurred which (whether with or without notice, lapse of time or both) would constitute a material default by Seller or any other party thereunder. Except as otherwise set forth in Schedule 4.8, all such Real Property Agreements shall be transferred and assigned by Seller to Buyer on the Closing Date.

Section 4.9 Insurance. Except as set forth in Schedule 4.9, all material policies of property damage, fire, liability, nuclear property damage, worker's compensation and other forms of insurance owned or held by Seller or its Affiliates and insuring the Purchased Assets are in full force and effect, all premiums with respect thereto covering all periods up to and including the date as of which this representation is being made have been paid (other than retroactive premiums which may be payable with respect to the Price Anderson secondary protection plan or NEIL policies), and no written notice of cancellation, non-renewal or termination has been received with respect to any such policy which was not replaced on substantially similar terms prior to the date of such cancellation. Except as described in Schedule 4.9, as of the date of this Agreement, to the Knowledge of Seller, Seller has not been refused any insurance with respect to the Purchased Assets nor has its coverage been limited by any insurance carrier to which it has applied for any such insurance or with which it has carried insurance on or after September 11, 2001, and all required notices have been sent to insurers to preserve all material claims under the aforementioned insurance policies.

Section 4.10 Environmental Matters. With respect to the Purchased Assets and the ownership or operation thereof by Seller, except as disclosed in Schedule 4.10:

(a) Seller has obtained and holds all material Environmental Permits used in or necessary for the ownership and operation of the Facilities and the Purchased Assets as conducted prior to the Closing Date;

(b) Seller is in compliance in all material respects with all terms, conditions and provisions of, and has not received within the past five (5) years any written notice from any Governmental Authority that it is not or has not been in compliance with (i) all applicable Environmental Laws and (ii) all material Environmental Permits except, in each case, with respect to violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect;

(c) There are no Environmental Claims pending against Seller or, to the Knowledge of Seller, threatened, with respect to the Purchased Assets and Seller does not have Knowledge of any facts or circumstances which are reasonably likely to form the basis for any material Environmental Claim against Seller with respect to the Purchased Assets;

(d) No Releases of Hazardous Substances have occurred at, from, on, or under the Site, and no Hazardous Substances are present on or migrating from the Site, that are reasonably likely to give rise to a material Environmental Claim against Seller or require any Remediation, except for such Releases that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect

(e) Neither the Site nor any portion thereof is a current or, to the Knowledge of Seller, proposed Environmental Clean-up Site and Seller has not, to its

Knowledge, transported or arranged for treatment, storage, handling, disposal or transportation of any Hazardous Substances from the Site to any location which is an Environmental Clean-up Site;

(f) There are no Encumbrances arising under or pursuant to any Environmental Law with respect to the Purchased Assets and, to the Knowledge of Seller, there are no facts, circumstances, or conditions that are reasonably likely to restrict, encumber, or result in the imposition of special conditions under any Environmental Law with respect to the ownership, occupancy, development, use, or transferability of the Purchased Assets, except those facts, circumstances or conditions relating to the status of the Purchased Assets as a nuclear facility;

(g) There are no (i) underground storage tanks, active or abandoned, or (ii) polychlorinated-biphenyl-containing equipment;

(h) There have been no environmental audits or assessments with respect to the Purchased Assets conducted in the last five (5) years by, on behalf of, or which are in the possession of Seller or its Affiliates which have not been made available to Buyer prior to execution of this Agreement; and

(i) There have been no claims by Seller against comprehensive general liability or excess insurance carriers for any Loss resulting from, relating to or arising from Environmental Claims with respect to the Purchased Assets.

The representations and warranties made by Seller in this Section 4.10 are the exclusive representations and warranties made to Buyer relating to environmental matters.

Section 4.11 Labor Matters. As of the date hereof, there is no current collective bargaining agreement which relates to the Ginna Employees. Each Ginna Employee and each other individual that provides services at the Facilities or otherwise in support of the Purchased Assets ("Other Plant Personnel") is performing, and is qualified, licensed, certified or trained, in accordance with applicable government requirements or standards to perform the duties and responsibilities of their current job assignment, and each has the appropriate nuclear power plant access authorizations, where required. For all purposes, including but not limited to the payment of Taxes and coverage under any Benefit Plan, any individual who performs services with respect to the Facilities or the Purchased Assets has been and is currently properly classified by Seller under applicable Laws as either a Ginna Employee or an independent contractor, as the case may be. Except as described in Schedule 4.11: (i) except for such matters as will not, individually or in the aggregate, create a Material Adverse Effect, Seller is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment (including, without limitation, Benefit Plans) and wages (including, without limitation, Laws pertaining to non-discrimination in compensation) and hours relating to the Ginna Employees have been complied with in all material respects; (ii) as of the date hereof, no notice, written or to the

Knowledge of Seller, otherwise, has been received from any Governmental Authority of any unfair labor practice charge or complaint against Seller or any Affiliate thereof pending or, to Seller's Knowledge, threatened, before the National Labor Relations Board or any other Governmental Authority or entity with respect to Ginna Employees; (iii) as of the date hereof, there are no written complaints of discrimination or retaliation pending, or to Seller's Knowledge, threatened, with the U.S. Equal Employment Opportunity Commission or state or local counterpart, the U.S. Department of Labor (including the Office of Federal Contract Compliance Programs), the NRC or any other Governmental Authority or entity related to services performed by Ginna Employees or, to the Knowledge of Seller, Other Plant Personnel; (iv) as of the date hereof, there is no noticed or, to the Knowledge of Seller, threatened or pending audit by the Office of Federal Contract Compliance Programs of the affirmative action plans which would pertain to the Facilities or the Purchased Assets and the Ginna Employees; (v) as of the date hereof, neither Seller nor any Affiliate thereof has any Knowledge of any claim of representation by a third party, organizing drive by a third party seeking to represent all or any portion of the Ginna Employees, or representation petition concerning the workforce at the Purchased Assets; and (vi) as of the date hereof, Seller has not received any written notice or, to Knowledge of the Seller, non-written notice, that any complaint has been filed with or is pending before the United States Department of Labor with regard to wages or compensation offered, paid or otherwise due and owing to any Ginna Employee.

Section 4.12 ERISA; Benefit Plans.

(a) Schedule 4.12(a) lists each employee benefit plan, including each employee benefit plan as defined in Section 3(3) of ERISA, and each other plan, contract, agreement, arrangement or policy, whether written or oral, qualified or non-qualified, providing for (i) compensation, severance benefits, bonuses, profit-sharing or other forms of incentive compensation; (ii) vacation, holiday, sickness or other time-off; (iii) health, medical, dental, disability, life, accidental death and dismemberment, employee assistance, educational assistance, relocation or fringe benefits or perquisites, including post-employment benefits; and (iv) deferred compensation, defined benefit or defined contribution, retirement or pension benefits, or equity grants that covers any Ginna Employee, or that is maintained, administered or with respect to which contributions are made by Seller or an ERISA Affiliate in respect of Ginna Employees ("Benefit Plans"). True, correct, and complete copies of all such Benefit Plans, including all amendments thereto and other information regarding benefit changes that have been previously communicated, have been made available to Buyer, and the Benefit Plans are being administered in accordance with such documents. To Seller's Knowledge, there have been no communications to Ginna Employees concerning any increase to the cap on the employer's shares of the cost for RG&E Retiree Coverages. Contractors and Other Plant Personnel for whom the Seller or any ERISA Affiliate does not furnish a Form W-2 for such services do not participate in or otherwise benefit from any of the Benefit Plans.

(b) Except as set forth in Schedule 4.12(b), Seller and the ERISA Affiliates have fulfilled their respective obligations under the minimum funding requirements of Section 302 of ERISA and Section 412 of the Code with respect to each Benefit Plan that is an "employee pension benefit plan" as defined in Section 3(2) of ERISA and to which Section 302 of ERISA applies. To Seller's Knowledge, except as set forth in Schedule 4.12(b), neither Seller nor any ERISA Affiliate has incurred any Liability under Sections 4062(b), 4063 or 4064 of ERISA to the PBGC in connection with any Benefit Plan that is subject to Title IV of ERISA, nor any withdrawal Liability to any multi-employer pension plan under Section 4201 et. seq. of ERISA or to any multi-employer welfare benefit plan. Each Benefit Plan which is intended to be qualified within the meaning of Code Section 401(a) is so qualified and has received a favorable determination letter as to its qualification under all applicable Laws including GUST (and if no favorable determination letter has yet been issued, such Benefit Plan was timely submitted), has timely adopted the requisite amendments under the Economic Growth and Tax Relief Reconciliation Act of 2001; and nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of IRS qualification; and the most recent IRS determination letters have been furnished by Seller to Buyer. To Knowledge of Seller, there is no reportable event (as described in Section 4043 of ERISA) with respect to any Benefit Plan that is required to be reported to the PBGC and no prohibited transaction (as described in Section 406 of ERISA and Section 4975 of the Code) has occurred with respect to any Benefit Plan, except as set forth in Schedule 4.12(b). With respect to each Benefit Plan from which Buyer will receive assets in a transaction under Section 414(l) of the Code, receive assets in a trustee-to-trustee transfer or participant rollover under Section 401(a)(31) of the Code: (i) such Benefit Plan has been maintained in material compliance with all applicable Laws, including ERISA, the Code, and the Securities Act and the Exchange Act; (ii) such Benefit Plan may be amended, terminated, or otherwise modified by the sponsoring employer to the greatest extent permitted by applicable Laws (including, without limitation, elimination of future accruals under any such Benefit Plan), and, to Knowledge of Seller, no employee communication or provision in any document governing such Benefit Plan has failed to reserve effectively the right of the sponsoring employer (including, after its assumption of such Benefit Plan, Buyer) to terminate, or make any amendment or modification to such Benefit Plan; (iii) Seller has not made any commitment to establish any new Benefit Plan, to modify any Benefit Plan (except as required under applicable Laws), nor has any intention to do so been communicated to any Ginna Employees; (iv) no actions, suits or claims (other than routine claims for benefits in the ordinary course) are pending or, to the Knowledge of the Seller, threatened; (v) no facts or circumstances exist that could give rise to any actions, suits or claims; (vi) no administrative investigation, audit or other administrative proceeding by the Department of Labor, the PBGC, the IRS or other Governmental Authority are pending, in progress or, to the Knowledge of the Seller, threatened; (vii) as of the date hereof, Seller does not have an application pending to the IRS under the Employee Plans Compliance Resolution System; and (viii) if Seller has previously made such application and a compliance statement has been issued, Seller

has signed such statement and made the applicable correction or will make the applicable correction within the requisite time period.

(c) Neither Seller nor any ERISA Affiliate or parent or successor corporation, within the meaning of Section 4069(b) of ERISA, has engaged in any transaction that may be disregarded under Section 4069 or Section 4212(c) of ERISA. No Benefit Plan or ERISA Affiliate Plan is a multi-employer plan.

Section 4.13 Real Property; Plant and Equipment.

(a) Schedule 4.13(a) contains a substantially complete and accurate legal description of the part of the Real Property included in the Purchased Assets that consists of the land that comprises the Site. All Encumbrances on the Real Property (other than Permitted Encumbrances) shall be released on or before the Closing Date. Complete and correct copies of any current surveys in Seller's possession and any policies of title insurance currently in force and in the possession of Seller with respect to the Real Property have heretofore been delivered by Seller to Buyer.

(b) Schedule 4.13(b) contains a description of the major equipment components and personal property included in the Purchased Assets.

(c) Except as set forth in Schedule 4.13(c), the Purchased Assets conform in all material respects to the technical specifications included in the NRC License in accordance with the requirements of 10 C.F.R. 50.36 and the FSAR and are being operated in all material respects in conformance with all material applicable requirements under the Atomic Energy Act, the Energy Reorganization Act, and the rules, regulations, orders and licenses issued thereunder. The Purchased Assets constitute all of the real property and tangible assets necessary to operate the Facilities in substantially the same manner as they have been operated to date.

(d) The Business Books and Records are true, complete and correct in all material respects and have been maintained in accordance with good business practices. The business and operating budget projections provided to the Buyer were prepared in good faith based on assumptions Seller believed to be reasonable as of the date thereof and in light of the circumstances in which they were prepared.

Section 4.14 Condemnation. Except as set forth in Schedule 4.14, neither the whole nor any part of the Real Property, or any other real property or rights leased, licensed, used or occupied by Seller in connection with the ownership or operation of the Purchased Assets is subject to any pending suit for condemnation or other taking by any Governmental Authority, and no such condemnation or other taking has been threatened.

Section 4.15 Certain Contracts and Arrangements.

(a) Except for Seller's interests in and rights under (i) those purchase orders, contracts, agreements, licenses and leases relating to the ownership, operation and maintenance of the Purchased Assets, which are listed in Schedule 4.15(a)(i) or

the other schedules to this Agreement or that are made available to Buyer pursuant to the last sentence of Section 4.12(a), (ii) those contracts, agreements, commitments and understandings of Seller relating to the procurement or fabrication of Nuclear Fuel, a complete list of which is included on Schedule 4.15(a)(ii) ("Fuel Contracts"), (iii) contracts, agreements, personal property leases, commitments, understandings or instruments in which all obligations of Seller will be fully performed or terminated prior to the Closing Date, (iv) Non-material Contracts, and (v) the Ancillary Agreements, Seller is not a party to any written contract, agreement, personal property lease, commitment, understanding or instrument which is material to the ownership or operation of the Purchased Assets or provides for the sale of capacity, energy or ancillary services from any of the Purchased Assets (whether or not entered into in the ordinary course of business).

(b) Except as disclosed in Schedule 4.15(b), each of the agreements listed on Schedules 4.15(a)(i) and 4.15(a)(ii): (i) constitutes the legal, valid and binding obligation of Seller enforceable in accordance with its terms, (ii) is in full force and effect, and (iii) may be transferred or assigned to Buyer at the Closing without consent or approval of the other parties thereto, and will continue in full force and effect thereafter in accordance with its terms, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any material rights thereunder. The Agreements listed in Schedules 4.15(a)(i) and 4.15(a)(ii) constitute the agreements that are necessary collectively to permit Seller to own, use, maintain and operate the Purchased Assets and the Facilities in accordance with Good Utility Practice and applicable Laws.

(c) Except as set forth in Schedule 4.15(c), there is not, under any of the agreements listed on Schedule 4.15(a)(i) and (a)(ii), any breach, violation, default or event which, with notice or lapse of time or both, would constitute a default on the part of Seller, or to the Knowledge of Seller, on the part of any of the parties thereto, except such events of default and other events as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, create a Material Adverse Effect.

Section 4.16 Legal Proceedings, etc. Except as set forth in Schedule 4.16 or in any filing made by Seller or any of its Affiliates prior to the date hereof pursuant to the Securities Act, the Exchange Act or the Atomic Energy Act, there are no claims, actions, proceedings or investigations pending or to the Knowledge of Seller, threatened against or relating to Seller before any court, arbitrator, mediator or Governmental Authority which, individually or in the aggregate, would reasonably be expected to (i) result in a Material Adverse Effect, (ii) prohibit or restrain the performance of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, or (iii) result in a material claim against Buyer for damages as a result of Seller entering into this Agreement or any of the Ancillary Agreements, or of the consummation of the transactions contemplated hereby or thereby. Except as set forth in Schedule 4.16 or in any filing made by Seller or any of its Affiliates prior to the date hereof pursuant to the Securities Act, the Exchange Act or the Atomic Energy Act, Seller is not subject

to any outstanding judgment, rule, order, writ, injunction or decree of any court, arbitrator or Governmental Authority which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 4.17 Permits.

(a) Seller has all permits, licenses, registrations, certificates, franchises and other governmental authorizations, consents and approvals, other than with respect to permits under Environmental Laws referred to in Section 4.10 hereof or licenses issued by the NRC referred to in Section 4.18 hereof (collectively, "Permits"), used in, or necessary for the ownership and operation of, the Purchased Assets as presently conducted or as required by Law, except for such Permits the failure of which to have would not reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 4.17(a), Seller has not received any written notification which remains unresolved that it is in violation of any of such Permits, or any Law applicable to the Purchased Assets, except for notifications of violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller is in compliance with all Permits and Laws of any Governmental Authority applicable to the Purchased Assets, except for violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(b) Schedule 4.17(b) sets forth all material Permits and Environmental Permits other than Transferable Permits (which are set forth on Schedule 1.1(173)) applicable to the Purchased Assets.

Section 4.18 NRC Licenses.

(a) Seller has all licenses, permits, and other consents and approvals applicable to Seller that are issued by the NRC and are necessary to the ownership and operation of the Purchased Assets as presently operated, pursuant to the requirements of all Nuclear Laws and all such licenses are in full force and effect. Except as set forth in Schedule 4.18(a), Seller has not received any written notification which remains unresolved that it is in violation of any of such license, or any order, rule, regulation, or decision of the NRC with respect to the Purchased Assets, except for notifications of violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller is in compliance with all Nuclear Laws and all orders, rules, regulations, or decisions of NRC applicable to it with respect to the Purchased Assets, except for violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(b) Schedule 4.18(b) sets forth all material permits, licenses, and other consents and approvals issued by the NRC applicable to the Purchased Assets.

Section 4.19 Regulation as a Utility. Seller is an electric utility company within the meaning of the Holding Company Act, a public utility within the meaning