of the Federal Power Act and an electric utility within the meaning of the NRC regulations implementing the Atomic Energy Act. Except with respect to local tax and zoning laws, Seller is not, as a result of its ownership or operation of the Purchased Assets, subject to regulation as a public utility or public service company (or similar designation) by any state of the United States other than New York, any foreign country or any municipality or any political subdivision of the foregoing.

Section 4.20 Taxes. With respect to the Purchased Assets, (i) all material Tax Returns of the Seller required to be filed for taxable periods ended prior to the Closing Date regarding the ownership or operation of the Purchased Assets have been filed, and (ii) all material Taxes shown to be due on such Tax Returns have been paid, except where such Taxes are being contested in good faith through appropriate proceedings. Except as provided in Schedule 4.20(a), no notice of deficiency or assessment has been received from any taxing authority with respect to liabilities for Taxes of the Seller in respect of the Purchased Assets which has not been fully paid or finally settled. There are no Encumbrances for Taxes upon the Purchased Assets, except for Encumbrances for Taxes not yet due and payable and Encumbrances for Taxes that are being contested in good faith. There is no unpaid material Tax on Seller's ownership, operation, or use of the Purchased Assets for which the Buyer could become liable. Schedule 4.20 sets forth the Tax jurisdictions in which Seller owns assets or conducts business that require a notification to a taxing authority of the transactions contemplated by this Agreement, if the failure to make such notification, or obtain Tax clearances in connection therewith, would either require Buyer to withhold any portion of the Purchase Price or would subject Buyer to any Liability for any Taxes of Seller. Except as provided in Schedule 4.20(b), there are no outstanding agreements or waivers extending the applicable statutory periods of limitations for Taxes associated with the Purchased Assets for any period.

Section 4.21 Qualified Decommissioning Funds.

(a) With respect to all periods prior to the Closing Date: (i) Seller's Qualified Decommissioning Fund is a trust, validly existing under the laws of the State of New York with all requisite authority to conduct its affairs as it now does; (ii) Seller's Qualified Decommissioning Fund satisfies the requirements necessary for such fund to be treated as a "Nuclear Decommissioning Reserve Fund" within the meaning of Code Section 468A(a) and as a "Nuclear Decommissioning Fund" and a "Qualified Nuclear Decommissioning Fund" within the meaning of Treas. Reg. § 1.468A-1(b)(3); (iii) such Fund is in compliance in all material respects with all applicable rules and regulations of the NRC, the NYPSC and the IRS, and Seller's Qualified Decommissioning Fund has not engaged in any acts of "self-dealing" as defined in Treas. Reg. § 1.468A-5(b)(2); (iv) no "excess contribution," as defined in Treas. Reg. § 1.468A-5(c)(2)(ii), has been made to Seller's Qualified Decommissioning Fund which has not been withdrawn within the period provided under Treas. Reg. § 1.468A-5(c)(2)(i); and (v) Seller has made timely and valid elections to make annual contributions to the Qualified Decommissioning Fund since 1990 and Seller has heretofore delivered copies of such elections to Buyer.

(b) Seller has heretofore delivered to Buyer a copy of Seller's Decommissioning Trust Agreement as in effect on the date of this Agreement. Seller agrees not to amend Seller's Decommissioning Trust Agreement between the date of this Agreement and the Closing Date without Buyer's prior written consent, which shall not be unreasonably withheld, except for any amendment which may be required to be made to the Seller's Decommissioning Trust Agreement by the NRC final rule on decommissioning trust agreements published in the Federal Register on December 24, 2002 or to permit the transfers referred to in Section 6.12 or to permit return to Seller of Decommissioning Funds in excess of the Decommissioning Target.

(c) Subject only to Seller's Required Regulatory Approvals, Seller and the Trustee have, or as of Closing will have, all requisite authority to cause the assets of the Qualified Decommissioning Fund to be transferred to the Trustee of the Post-Closing Decommissioning Trust Agreement.

(d) With respect to all periods prior to the Closing Date, (i) Seller and/or the Trustee of Seller's Qualified Decommissioning Fund has/have filed or caused to be filed with the NRC, the IRS and any state or local authority all material forms, statements, reports, documents (including all exhibits, amendments and supplements thereto) required to be filed by such entities; and (ii) there are no interim rate orders that may be retroactively adjusted or retroactive adjustments to interim rate orders that may affect amounts that Buyer may contribute to the Qualified Decommissioning Fund or may require distributions to be made from the Qualified Decommissioning Fund. Seller has delivered to Buyer a copy of the schedule of ruling amounts most recently issued by the IRS for the Qualified Decommissioning Fund and a complete copy of the request that was filed with the IRS to obtain such schedule of ruling amounts and a copy of any pending request for revised ruling amounts, in each case together with all exhibits, amendments and supplements thereto. Any amounts contributed to the Qualified Decommissioning Fund while such request is pending before the IRS and which turn out to exceed the applicable amounts provided in the schedule of ruling amounts issued by the IRS will be withdrawn from the Qualified Decommissioning Fund within the period provided under Treas. Reg. Section 1.468A-5(c)(2)(i).

(e) Seller has made available to Buyer a statement of assets and liabilities verified by the Trustee for the Seller's Qualified Decommissioning Funds as of December 31, 2002, as of September 30, 2003 and will make such a statement as of the second Business Day before Closing available prior to Closing, and they present fairly as of such dates the financial position of each of the Qualified Decommissioning Funds. Seller has made available to Buyer information from which Buyer can determine the Tax Basis of all assets in the Seller's Qualified Decommissioning Fund as of the second Business Day before Closing.

(f) Seller has made available to Buyer all material contracts and agreements to which the Trustee of Seller's Qualified Decommissioning Fund, in its capacity as such, is a party.

(g) With respect to all taxable periods prior to the Closing Date, Seller's Qualified Decommissioning Fund has filed all material Tax Returns required to be filed, including but not limited to returns for estimated Income Taxes, such Tax Returns are true, correct and complete in all material respects, and all Taxes shown to be due on such Tax Returns have been paid in full. Except as shown in Schedule 4.21, no notice of deficiency or assessment has been received from any taxing authority with respect to any Liability for Taxes of Seller's Qualified Decommissioning Fund which have not been fully paid or finally settled, and any such deficiency shown in such Schedule 4.21 is being contested in good faith through appropriate proceedings. Except as set forth in Schedule 4.21, there are no outstanding agreements or waivers extending the applicable statutory periods of limitations for any Taxes associated with the Qualified Decommissioning Funds for any period.

Section 4.22 Nonqualified Decommissioning Fund.

(a) With respect to all periods prior to the Closing Date, the Seller's Nonqualified Decommissioning Fund is a trust validly existing under the laws of the State of New York with all requisite authority to conduct its affairs as it now does. Seller's Nonqualified Decommissioning Fund is in full compliance in all material respects with all applicable rules and regulations of the NRC and the NYPSC. The Seller's Nonqualified Decommissioning Fund is classified as a grantor trust owned by Seller under Section 671 to 677 of the Code.

(b) Subject only to the Seller's Required Regulatory Approvals, Seller has or as of the Closing will have all requisite authority to cause all or a portion of the assets of the Seller's Nonqualified Decommissioning Fund to be transferred to the Trustee of the Post-Closing Decommissioning Trust Agreement pursuant to Section 6.12 hereof.

(c) With respect to all periods prior to the Closing Date, Seller and the Trustee of the Seller's Nonqualified Decommissioning Fund have filed or caused to be filed with the NRC and any state or local authority all material forms, statements, reports, documents (including all exhibits, amendments and supplements thereto) required to be filed by either of them.

(d) Seller has made available to Buyer a statement of assets and liabilities verified by the Trustee of the Seller's Nonqualified Decommissioning Fund as of December 31, 2002, as of September 30, 2003 and will make available such a statement as of the second Business Day before Closing available prior to Closing, and they represent fairly as of such dates the financial position of the Nonqualified Decommissioning Funds. Seller has made available to Buyer all contracts and agreements to which the Trustee of the Nonqualified Decommissioning Fund, in its capacity as such, is a party.

Section 4.23 WARN Act. Seller has not engaged in a "plant closing" or "mass layoff," as such terms are defined in the WARN Act, prior to the Closing Date.

Section 4.24 Intellectual Property. Seller has not received written notice of any claims or demands of any other Person pertaining to any of the Intellectual Property and no proceedings have been instituted, or are pending or, to Seller's Knowledge, threatened, which challenge the rights of Seller in respect thereof. To the Knowledge of Seller, none of the Intellectual Property infringes any intellectual property of any other Person and Seller is not making unauthorized use of any confidential information or trade secrets of any Person, including without limitation, any former employer of any past or present employee of Seller in connection with the operation of Ginna.

Section 4.25 Zoning Classification. The Real Property is zoned as set forth in Schedule 4.25 and is currently zoned in zoning categories which permit the operation of the Facilities as currently operated, as a matter of right. Seller has not requested, applied for, or given its consent to, and Seller has no Knowledge of, any pending zoning variance or change with respect to the zoning of the Real Property. To Seller's Knowledge, there exist no outstanding covenants or agreements in connection with the zoning of the Real Property or any portion thereof which would bind or require Buyer to perform any actions or pay any monies in connection therewith.

Section 4.26 Utilities. The sewer and water systems and all other utilities that currently service the Real Property are sufficient for the operation of the Facilities as currently operated. To Seller's Knowledge, Seller has no reason to believe that such systems and utilities will not be sufficient to continue to operate the Facilities, and, to Seller's Knowledge, such services shall exist on the Closing Date. Seller has no Knowledge of and has not received any notice of the curtailment of any utility service supplied to the Real Property. To Seller's Knowledge, all water and all gas, electrical, steam, telecommunication, sanitary and storm sewer and drainage lines, systems and hook ups and all other utilities and public and quasi-public improvements located upon, under, at or adjacent to the Real Property required by any applicable Laws or otherwise necessary for the operation of the Facilities as currently operated are installed and connected under valid permits.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE 4, THE PURCHASED ASSETS ARE BEING SOLD AND TRANSFERRED "AS IS, WHERE IS," AND SELLER IS NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE PURCHASED ASSETS, INCLUDING, IN PARTICULAR, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF BUYER AND BUYER'S PARENT

Each of Buyer and Buyer's Parent represents and warrants with respect to itself to Seller as follows:

Section 5.1 Organization; Qualification. Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Maryland. Buyer's Parent is a corporation duly formed, validly existing and in good standing under the laws of the State of Maryland. Each of Buyer and Buyer's Parent has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. Buyer has heretofore delivered to Seller complete and correct copies of its articles of organization as currently in effect. Buyer is, or on the Closing Date will be, qualified to conduct business in the State of New York.

Section 5.2 Authority Relative to this Agreement. Each of Buyer's Parent and Buyer has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby or thereby. The execution and delivery of this Agreement and the Ancillary Agreement and the consummation of the transactions contemplated hereby or thereby, have been duly and validly authorized by all necessary corporate action required on the part of each of Buyer's Parent and Buyer and no other corporate proceedings on the part of Buyer's Parent or Buyer are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by each of Buyer's Parent and Buyer, and assuming that this Agreement constitutes a valid and binding agreement of Seller and subject to the receipt of Buyer's Required Regulatory Approvals, constitutes a valid and binding agreement of each of Buyer's Parent and Buyer, enforceable against each of Buyer's Parent and Buyer in accordance with its terms.

Section 5.3 Consents and Approvals; No Violation.

(a) Subject to the receipt of the third-party consents set forth in Schedule 5.3(a) and the Buyer's Required Regulatory Approvals, neither the execution and delivery of this Agreement and the Ancillary Agreements by Buyer or Buyer's Parent nor the consummation of the transactions contemplated hereby or thereby will (i) conflict with or result in any breach of any provision of the articles of organization or operating agreement of Buyer and Buyer's Parent, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which Buyer or Buyer's Parent is a party or by which any of its assets may be bound, except

for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer or Buyer's Parent to perform its obligations hereunder ("Buyer Material Adverse Effect"), or (iv) violate any Laws applicable to Buyer, which violations, individually or in the aggregate, would create a Buyer Material Adverse Effect. Buyer has no Knowledge of any facts or circumstances that make it reasonably likely that Buyer's Required Regulatory Approvals will not be obtained.

(b) Except as set forth in Schedule 5.3(b) (the filings and approvals referred to in such Schedule are collectively referred to as the "Buyer's Required Regulatory Approvals"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any Governmental Authority is necessary for the consummation by Buyer of the transactions contemplated hereby.

Section 5.4 Availability of Funds. Buyer and/or Buyer's Parent have sufficient funds available to it through corporate funds, credit facilities and access to capital markets to provide sufficient funds to pay the Purchase Price on the Closing Date and to enable Buyer timely to perform all of its obligations under this Agreement.

Section 5.5 Legal Proceedings. Except as set forth in Schedule 5.5, to the Knowledge of Buyer and Buyer's Parent, there are no claims, actions, proceedings or investigations pending or threatened against Buyer or Buyer's Parent before any court, arbitrator, mediator or Governmental Authority which, individually or in the aggregate, could reasonably be expected to (i) result in a Buyer Material Adverse Effect, (ii) prohibit or restrain the performance of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, or (iii) result in a material claim against Seller for damages as a result of Buyer or Buyer's Parent entering into this Agreement or any of the Ancillary Agreements, or of the consummation of the transactions contemplated hereby or thereby. Except as set forth in Schedule 5.5, neither Buyer's Parent nor Buyer is subject to any outstanding judgments, rules, orders, writs, injunctions or decrees of any court, arbitrator or Governmental Authority which, individually or in the aggregate, could reasonably be expected to have a Buyer Material Adverse Effect.

Section 5.6 WARN Act. Buyer does not intend with respect to the Purchased Assets to engage in a "plant closing" or "mass layoff," as such terms are defined in the WARN Act within sixty (60) days after the Closing Date.

Section 5.7 Transfer of Decommissioning Funds. With respect to Seller's transfer of the assets of the Qualified Decommissioning Fund to the Trustee under the Post-Closing Decommissioning Trust Agreement, except for the fact that Ginna in the hands of Buyer may not be treated as a "nuclear power plant" within the meaning of Treasury Regulations Section 1.468A-1(b)(4), Buyer will otherwise acquire and own a "qualifying interest" in Ginna within the meaning of Treasury Regulations Section 1.468A-1 and will, as the transferee, satisfy each of the requirements set forth in

Treasury Regulations Section 1.468A-6(b)(2). The Post-Closing Decommissioning Trust Agreement satisfies the requirements of Section 468A of the Code and the regulations promulgated thereunder.

Section 5.8 Foreign Ownership or Control. Buyer or, if applicable, Buyer's Parent, will conform to the restrictions on foreign ownership, control or domination contained in Sections 103d and 104d of the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2133(d) and 2134(d), as applicable, and the NRC's regulations in 10 C.F.R. § 50.38. Neither Buyer's Parent nor Buyer is currently owned, controlled or dominated by a foreign entity and neither will become owned, controlled, or dominated by a foreign entity before the Closing Date of this transaction.

Section 5.9 Seller's Representations and Warranties. As of the date hereof, neither Buyer nor Buyer's Parent has any Knowledge of any breaches of any of Seller's representations or warranties.

Section 5.10 Permit Qualifications. To the Knowledge of Buyer, Buyer (or its successor or assigns) will be as the owner of Ginna qualified to hold any Permits and Environmental Permits necessary to operate the Purchased Assets.

ARTICLE 6

COVENANTS OF THE PARTIES

Section 6.1 Conduct of Business Relating to the Purchased Assets.

(a) Except as described in Schedule 6.1(a) or to the extent Buyer otherwise consents in writing, during the period from the date hereof to the Closing Date, Seller (1) shall operate and maintain the Purchased Assets in the ordinary course consistent with Good Utility Practices; it being understood that any actions deemed reasonably necessary in the operation of the Purchased Assets in accordance with Good Utility Practices shall be deemed to be in the ordinary course unless such actions materially impair the value, rated capacity, ability to complete the Uprate or operation of the Purchased Assets or the liabilities and obligations of Buyer after the Closing Date, and that the Capital Budget is consistent with this standard; (2) shall use Commercially Reasonable Efforts to preserve intact the Purchased Assets and preserve the goodwill and relationships with customers, suppliers and others having business dealings with them with respect thereto; (3) shall maintain in full force and effect the insurance coverages described in Section 4.9; (4) shall comply in all material respects with all applicable Laws relating to the Purchased Assets, including without limitation, all Nuclear Laws and Environmental Laws; (5) shall maintain the Business Books and Records in the usual, regular and ordinary manner; (6) shall use its Commercially Reasonable Efforts to complete in accordance with Good Utility Practices, and in conformity with all applicable Laws, the Capital Expenditures set forth in Schedule 6.1(a) which are targeted for completion prior to the Closing Date; provided, however, in the case of (A) the submission of a purchase order for a new

fuel design for the new fuel assemblies for the Uprate, such item shall be completed by Seller prior to January 30, 2004 and (B) active vehicle barriers and containment sump design upgrade, Seller shall have taken all reasonable steps necessary to permit timely completion of such items such that Buyer is not materially prejudiced thereby; (7) shall, and Seller shall continue after the Closing Date to, use its Commercially Reasonable Efforts to obtain an amendment of the Cooling Tunnel Easement extending the term thereof through December 31, 2029 (the "Cooling Tunnel Easement Amendment"), from the Office of General Services of the State of New York, which amendment shall be in recordable form; and (8) shall use Commercially Reasonable Efforts to train the applicable number of Transferred Employees required by Law to fill the emergency response positions currently filled by RG&E Employees who are not Transferred Employees; provided, however, in the event the actions required by subsection (8) are not completed prior to the Closing Date, then Seller must provide the existing trained RG&E Employees (at Seller's sole cost and expense) to fill the emergency response positions for a maximum of 60 days after the Closing Date. Notwithstanding the foregoing, except as contemplated in this Agreement or as described in Schedule 6.1(a), or as required under applicable Law or by any Governmental Authority or by any NRC Commitments, prior to the Closing Date, without the written consent of Buyer, which consent shall not be unreasonably withheld, Seller will not with respect to the Purchased Assets:

(i) make any material change in the levels of Inventories customarily maintained by Seller with respect to the Purchased Assets, except for such changes as are consistent with Good Utility Practices;

(ii) except for Permitted Encumbrances, sell, lease (as lessor), pledge, mortgage, encumber, restrict, transfer or otherwise dispose of, or grant any right, or suffer to be imposed any Encumbrance with respect to, any of the Purchased Assets, other than assets used, consumed or replaced in the ordinary course of business consistent with Good Utility Practices;

(iii) materially amend, extend or voluntarily terminate prior to the expiration date thereof any of Seller's Agreements or the Real Property Agreements listed in Schedule 4.8 (or any other agreement to the extent any such extension or amendment thereof would require the agreement to be disclosed on Schedule 4.8 or 4.15(a)(i)) or any material Permit or Environmental Permit or waive any default by, or release, settle or compromise any claim against, any other party thereto, other than (a) in the ordinary course of business, to the extent consistent with Good Utility Practices, (b) with cause, to the extent consistent with Good Utility Practices, or (c) as may be required in connection with Seller's obligations to Buyer under this Agreement;

(iv) enter into any new commitment for the purchase of Nuclear Fuel unless (A) the aggregate payments under all such new commitments would not be expected to exceed $500,000 or (B) the commitment is terminable either (x) automatically on the Closing Date or (y) at the option of

Buyer at any time after the Closing Date without any penalty or cancellation charge;

(v) enter into any power sales agreement having a term that extends beyond June 30, 2004 or such other date that the Parties mutually agree to be the date on which the Closing is expected to occur;

(vi) amend in any material respect or cancel any property, liability or casualty insurance policies related thereto, or fail to maintain by self insurance or with financially responsible insurance companies insurance in such amounts and against such risks and losses as are customary for such assets and businesses;

(vii) enter into any individual requirements contract for goods or any commitment or contract for non-employment related services, in either case not addressed in clauses (i) through (vi) above, that will be delivered or provided after June 30, 2004 or such other date as the Parties mutually agree to be the date on which the Closing is expected to occur that exceeds $100,000 per annum, unless such commitment or contract is terminable by Seller (or after the Closing Date by Buyer) upon not more than 60 days notice without penalty or cancellation charge;

(viii) hire any new Ginna Employees (other than to replace any existing Ginna Employees who have resigned or been terminated and employees hired to perform the duties of Ginna Employees who are on disability leave), materially increase the aggregate wages and benefits payable to Ginna Employees or establish, adopt, enter into or amend the Benefit Plans to the extent applicable to Ginna Employees;

(ix) except as reasonably necessary to complete the integration process for its pending SAP conversion, change, in any material respect, its accounting methods or practices, credit practices or collection policies or any pricing, investment, financial reporting, inventory, allowance or Tax practice or policy to the extent such change would be binding on Buyer;

(x) enter into, amend, make waivers under or otherwise modify any real or personal property Tax agreement, treaty or settlement, or make any new or change any current, election with respect to Taxes affecting the Purchased Assets to the extent such change would be binding on Buyer;

(xi) fail to take commercially reasonable best efforts to pursue currently pending regulatory approvals relating to the Facilities;

(xii) knowingly engage in any practice, take any action, fail to take any action, or enter into any transaction through the Closing Date that will result or may reasonably be anticipated to result in any misrepresentation or breach of any warranty of Seller hereunder as of the Closing Date;

(xiii) settle any claim or litigation that results in any obligation imposed on the Facilities or the Purchased Assets that could reasonably be likely to continue past the Closing Date; and

(xiv) agree to enter into any of the transactions set forth in the foregoing paragraphs (i) through (xiii).

(b) The Parties shall establish, as soon as practicable after the execution of this Agreement, a committee (the "Transition Committee") comprised of at least four (4) persons, including two (2) persons designated by Seller and two (2) persons designated by Buyer. The Transition Committee shall remain in existence until the Closing Date and shall oversee and manage the transition process through the Closing Date. The Transition Committee will be kept fully apprised by Seller of all the Facilities' management and operating developments, including with respect to any pre-closing outage, any repairs to the Facilities and the Capital Expenditures. The Transition Committee shall have reasonable access to the management of Seller. The Transition Committee shall report to the senior management of Seller and Buyer. The Transition Committee shall have no authority to bind or make agreements on behalf of Seller or Buyer or to issue instructions to or direct or exercise authority over Seller or Buyer or any of their respective officers, employees, advisors or agents or to waive or modify any provision hereof.

(c) Between the date of this Agreement and the Closing Date, in the interest of cooperation between Seller and Buyer and to plan for and facilitate an orderly transition of ownership and operation of the Purchased Assets from Seller to Buyer and to permit informed action by Buyer regarding its rights pursuant to Section 6.1(a), the Parties agree that at the sole responsibility and expense of Buyer, and subject to compliance with all applicable NRC rules and regulations, Seller will permit designated Buyer Representatives ("Observers") of Buyer to observe all operations of Seller that relate to the Purchased Assets, and such observation will be permitted on a cooperative basis in the presence of personnel of Seller but not restricted to the normal business hours of Seller; provided, however, that such Observers and their actions shall not interfere with the operation of Ginna. Seller shall use Commercially Reasonable Efforts to provide to the Observers, at no cost to Buyer, interim furnished office space, utilities and HVAC at the Facilities reasonably necessary to allow Buyer to conduct its transition efforts through the Closing Date; provided that Buyer shall be responsible for all other costs relating thereto, including, without limitation telecommunications expenses and the cost of workers' compensation and employer's liability coverage, which will be maintained by Buyer for its employees.

(d) Buyer's representatives on the Transition Committee and/or the Observers may recommend or suggest to Seller that actions be taken or not be taken by Seller to improve or enhance the operation and maintenance of the Purchased Assets from the date hereof through the Closing Date; provided, however, that Seller will not be under any obligation to follow any such recommendations or suggestions and Seller shall be entitled, subject to this Agreement, to conduct its business in

accordance with its own judgment and discretion. Buyer's Observers shall have no authority to bind or make agreements on behalf of Seller; to conduct discussions with or make representations to third parties on behalf of Seller; or to issue instructions to or direct or exercise authority over Seller or any of Seller's officers, employees, advisors or agents.

(e) Between the date hereof and the Closing Date, Seller agrees to meet with representatives of Buyer from time to time and allow Buyer to provide input as to the scheduling, scope, capital expenditures and other activities to be included in the 2005 refueling outage and Seller shall in good faith consider the foregoing and to the extent such requests are in accordance with all applicable Laws, Seller's NRC License and Good Utility Practices and Seller is in agreement with Buyer, Seller shall implement such requests such that the 2005 refueling outage planning would include the Buyer requested activities, it being understood that any such activities by Seller taken at the request of Buyer shall not constitute or result in a breach of this Agreement.

(f) Seller agrees that, except as required by its obligations as a public utility under sections 65 and 66 of the New York Public Service Law, Seller shall not take or cause to be taken any action to reduce the unforced capacity credit assigned by the New York Independent System Operator to the Facilities under regulations or policies in effect on the date hereof; provided, however, that the foregoing shall in no way restrict or prohibit Seller (a) from taking or causing to be taken any action in accordance with Good Utility Practice, (b) from taking or causing to be taken any action that generally affects Seller's generating facilities, or (c) from abstaining from any vote of the New York Independent System Operator or any committee or subcommittee thereof.

Section 6.2 Access to Information.

(a) In addition to the rights granted by Sections 6.1(b) and (d), between the date of this Agreement and the Closing Date, Seller will, during ordinary business hours and upon reasonable notice and subject to compliance with all applicable NRC rules and regulations (i) give Buyer and Buyer's Representatives reasonable access to all management personnel engaged in the operation of the Purchased Assets and all books, documents, records, plants, offices and other facilities and properties constituting the Purchased Assets; (ii) permit Buyer to make such reasonable inspections thereof as Buyer may reasonably request, other than Phase II environmental site assessments (which have been conducted prior to the date hereof); (iii) furnish Buyer with such financial and operating data and other information with respect to the Purchased Assets as Buyer may from time to time reasonably request; (iv) furnish Buyer a copy of each material report, schedule or other document filed or received by it since the date hereof with respect to the Purchased Assets with the SEC, NRC, FERC, NYPSC or any other Governmental Authority having jurisdiction over the Purchased Assets; provided, however, that (A) any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of the Purchased Assets, (B) Seller shall not be required to take any action which would

constitute a waiver of the attorney-client privilege, and (C) Seller need not supply Buyer with any information that Seller is legally prohibited from supplying. Seller will provide Buyer or Buyer's Representatives with access to the Transferred Employee Records that it has, but Seller shall not be required to provide access to other employee records or medical information unless required by law or specifically authorized by the affected employee. Notwithstanding anything in this Section 6.2 to the contrary, Seller will only furnish or provide such access to Transferred Employee Records and personnel and medical records as is permitted by law or required by legal process or subpoena (other than data concerning salaries and benefits, dates of birth, dates of hire and other information used to calculate pension benefits which shall be provided).

(b) Buyer and Seller acknowledge that all information furnished to or obtained by Buyer or Buyer's Representatives pursuant to this Section 6.2 shall be subject to the provisions of the Confidentiality Agreement and shall be treated as "Proprietary Information" (as defined in Section 1.1(130)).

(c) Following the Closing Date and subject to all applicable NRC rules and regulations, each Party and its respective Representatives shall have reasonable access to all of the Business Books and Records, including all Transferred Employee Records or other personnel and medical records required to be made available by Law, legal process or subpoena, in the possession of the other Party or Parties to the extent that such access may reasonably be required by such Party in connection with the Assumed Liabilities and Obligations or the Excluded Liabilities, or other matters relating to or affected by the operation of the Purchased Assets. Such access shall be afforded by the Party or Parties in possession of such books and records upon receipt of reasonable advance notice and during normal business hours. The Party or Parties exercising this right of access shall be solely responsible for any costs or expenses incurred by it or them pursuant to this Section 6.2(c). If the Party or Parties in possession of such books and records shall desire to dispose of any such books and records, such Party or Parties shall, prior to such disposition, give the other Party or Parties a reasonable opportunity at such other Party's or Parties' expense, to segregate and remove such books and records as such other Party or Parties may select. Notwithstanding the foregoing, the right of access to medical records and other confidential employee records shall be subject to all applicable legal requirements.

(d) Seller agrees (i) not to release any Person (other than Buyer) from any confidentiality agreement now existing with respect to the Purchased Assets, or waive or amend any provision thereof, (ii) to promptly after the Closing Date assign any rights arising under any such confidentiality agreement (to the extent assignable) to Buyer, and (iii) to request the destruction or return of all confidential information provided to any other Person who participated in the Ginna sale process and who executed a Confidentiality Agreement in connection therewith.

(e) Notwithstanding the terms of the Confidentiality Agreement and Section 6.2(b) above, the Parties agree that prior to the Closing Buyer may reveal or

disclose Proprietary Information to any other Persons in connection with Buyer's financing and risk management of the Purchased Assets, and, to the extent that Seller consents, which consent shall not be unreasonably withheld, to existing and potential customers and suppliers, and to such Persons with whom Buyer expects it may have business dealings regarding the Purchased Assets from and after the Closing Date; provided, however, that all such Persons agree in writing to maintain the confidentiality of the Proprietary Information on substantially the same terms and conditions of the Confidentiality Agreement.

(f) Except as may be permitted in the Confidentiality Agreement or during the course of Buyer's due diligence investigation of the Purchased Assets prior to the date hereof, Buyer agrees that, prior to the Closing Date, it will not contact any vendors, suppliers, employees, or other contracting parties of Seller or Seller's Affiliates with respect to any aspect of the Purchased Assets or the transactions contemplated hereby, without the prior written consent of Seller, which consent shall not be unreasonably withheld.

(g) Upon Buyer's or Seller's (as the case may be) prior written approval (which approval shall not be unreasonably withheld or delayed), Seller or Buyer (as the case may be) may provide Proprietary Information of the other Party to the SEC, NRC, FERC, NYPSC or any other Governmental Authority having jurisdiction over the Purchased Assets or any stock exchange, as may be necessary to obtain Seller's Required Regulatory Approvals or Buyer's Required Regulatory Approvals, respectively, or to comply generally with any applicable Laws. The disclosing Party shall seek confidential treatment for the Proprietary Information provided to any such Governmental Authority and the disclosing Party shall notify the other Party as far in advance as practical of its intention to release to any Governmental Authority any such Proprietary Information.

(h) The Parties agree that the Confidentiality Agreement shall remain in place until the Closing Date. Thereafter, the Parties agree that any restrictions contained in the Confidentiality Agreement with respect to Buyer's disclosure of Proprietary Information shall terminate, other than with respect to the Proprietary Information of Seller that does not relate to the Purchased Assets. The Parties further agree that after the Closing Date, Seller shall keep confidential all Proprietary Information provided by Buyer or which Seller possesses with respect to the Purchased Assets, to the extent permitted by Law, and to the same extent and under the same conditions applicable to Buyer's obligations with respect to Seller's Proprietary Information as contained in the Confidentiality Agreement between the Parties, but without limitation as to duration.

Section 6.3 Expenses. (a) Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including the cost of legal, technical and financial consultants and the cost of filing for and prosecuting applications for Buyer's and Seller's

Required Regulatory Approvals, shall be borne by the Party incurring such costs and expenses.

(b) Buyer shall be responsible for all reasonable third party vendor costs and expenses incurred and relating to work performed with respect to the Purchased Assets at the request of the Buyer after the date hereof.

Section 6.4 Further Assurances; Cooperation.

(a) Subject to the terms and conditions of this Agreement, each of the Parties hereto will use Commercially Reasonable Efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the sale, transfer conveyance and assignment of the Purchased Assets and the assignment of the Assumed Liabilities and Obligations or the exclusion of the Excluded Liabilities pursuant to this Agreement, including without limitation using Commercially Reasonable Efforts to ensure satisfaction of the conditions precedent to each Party's obligations hereunder, including, without limitation, all regulatory approvals. Notwithstanding anything in the previous sentence to the contrary, Seller and Buyer shall use Commercially Reasonable Efforts to obtain all Permits and Environmental Permits necessary for Buyer to acquire and operate the Purchased Assets. Neither Buyer nor Seller will, without the prior written consent of the other, advocate, take or fail to take any action which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement or which could reasonably be expected to cause, or to contribute to causing, the other to receive less favorable regulatory treatment than that sought by the other. Buyer further agrees that prior to the Closing Date, neither it nor its Affiliates will enter into any other contract to acquire, nor acquire, electric generation facilities or uncommitted generation capacity if the proposed acquisition of such additional electric generation facilities or uncommitted generation capacity which would increase the market power attributable to Buyer in a manner materially adverse to approval of the transactions contemplated hereby or would otherwise prevent or materially interfere with the transactions contemplated by this Agreement.

(b) From time to time after the Closing Date, without further consideration, Seller will execute and deliver such documents to Buyer as Buyer may reasonably request, at Buyer's expense, in order to more effectively consummate the sale and purchase, including the transfer, conveyance and assignment, of the Purchased Assets or to more effectively vest in Buyer such title to the Purchased Assets (or such rights to use, with respect to Purchased Assets not owned by Seller), as is provided for in Section 4.7, subject to the Permitted Encumbrances. Seller shall cooperate with Buyer, at Buyer's expense, in Buyer's efforts to cure or remove any Permitted Encumbrances that Buyer reasonably deems objectionable. From time to time after the Closing Date, without further consideration, Buyer will, at its own expense, execute and deliver such documents to Seller as Seller may reasonably request in order to evidence Buyer's assumption of the Assumed Liabilities and Obligations.

(c) The Parties shall cooperate with each other to facilitate the transition of the information systems, computer applications and processing of data at the Facilities.

(d) To the extent that Seller's rights under any Seller's Agreement may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use Commercially Reasonable Efforts to obtain any such required consent(s) as promptly as possible. Seller and Buyer agree that if any consent to an assignment of any Seller's Agreement shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights and obligations under the applicable Seller's Agreement so that Buyer would not in effect acquire the benefit of all such rights and obligations, Seller, to the maximum extent permitted by law and such Seller's Agreement, shall after the Closing appoint Buyer to be Seller's Representative and agent with respect to such Seller's Agreement, and Seller shall, to the maximum extent permitted by Law and such Seller's Agreement, enter into such reasonable arrangements with Buyer as are necessary to provide Buyer with the benefits and obligations of such Seller's Agreement (the cost of administering which shall be at Seller's expense). Seller and Buyer shall cooperate and shall each use Commercially Reasonable Efforts after the Closing to obtain an assignment of such Seller's Agreement to Buyer.

For a reasonable time after the Closing Date, Buyer and Seller agree to provide such services to each other as are reasonably required to the extent necessary to ensure the continuity of support for Ginna and the Seller's other facilities and the orderly completion of projects or other work in progress that would be adversely affected if those services were interrupted, including mutually acceptable arrangements regarding the lease of the emergency operations facilities from Seller to Buyer for a period of up to three years. Buyer and Seller will agree, as promptly as practicable, following the date hereof, on the nature of such services, which shall be agreed upon in service agreements and other agreements, as necessary, with the Seller or Buyer or their Affiliates. The Party providing the services will be reimbursed for all its costs, including development costs, in accordance with procedures to be mutually agreed upon by Seller and Buyer or on an alternative cost reimbursement basis as mutually agreed by Seller and Buyer. Notwithstanding anything to the contrary contained in this Agreement, the Parties agree and understand that Seller will not be providing transition services on or after the Closing Date to Buyer in the areas of human resources, payroll, accounts receivable, accounts payable and general ledger. Seller agrees to cooperate with Buyer and to reasonably assist Buyer in a safe and adequate transition with respect to the provision of these services by Buyer by the Closing Date; provided, however, that in the event Seller fails to provide to Buyer within a reasonable period of time prior to Closing the information, agreements (including, but not limited to, the Transferred Employee Records and the records required pursuant to Section 6.10(f)) and assistance Buyer reasonably needs in order to transition the areas of human resources, payroll, accounts receivable, accounts payable and general ledger, then Seller shall provide such transition services (at

Seller's sole cost and expense) for 90 days after Closing such that Buyer is able to transition such services.

Section 6.5 Public Statements. Until thirty (30) days following the Closing Date, the Parties shall not issue any press release or other public disclosure with respect to this Agreement or the transactions contemplated hereby without first affording the non-disclosing Party the opportunity to review and comment on such disclosure, except as may be required by applicable Laws or stock exchange rules.

Section 6.6 Consents and Approvals.

(a) Seller and Buyer shall each file or cause to be filed with the Federal Trade Commission and the Department of Justice any notifications required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The Parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings, and respond promptly to any requests for additional information made by either of such agencies. The Parties shall use their Commercially Reasonable Efforts to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. All filing fees under the HSR Act shall be borne 50% by the Seller and 50% by the Buyer and each Party will bear its own costs for the preparation of any such filing.

(b) As promptly as practicable after the date of this Agreement and after the receipt of any findings required to be made by any other Governmental Authority as a condition to Buyer and Seller making the filings contemplated by this paragraph, (i) Buyer shall file with FERC (and if requested by Buyer, Seller shall support) an application requesting Exempt Wholesale Generator status for Buyer, which filing may be made individually by Buyer or jointly with Seller, as reasonably determined by Buyer, (ii) Seller shall file, with Buyer's support, an application with FERC requesting approval of the Interconnection Agreement as an agreement grand-fathered from the effectiveness of the Final Rule interconnection agreement adopted in FERC Docket RM02-1-000 on July 24, 2003, and (iii) Buyer shall file with FERC any necessary applications requesting approval of the Power Purchase Agreement. In fulfilling their respective obligations set forth in the immediately preceding sentence, Buyer and Seller shall each use Commercially Reasonable Efforts to effect the referenced filings with FERC within thirty (30) days of the date of this Agreement. Prior to submitting such applications with FERC, the Party preparing the application shall submit the application to the other Party for review and comment, and the filing Party shall in good faith consider any revisions reasonably requested by the other Party. Each Party shall be solely responsible for its own cost of preparing, reviewing and filing its respective application, responses and any petition(s) for rehearing or any reapplication(s).

(c) As promptly as practicable after the date of this Agreement, Buyer and Seller shall file with NYPSC a Petition for approval of the sale of the Purchased Assets under Section 70 of the New York Public Service Law or Buyer shall join in

the Section 70 Petition Seller has already filed and such Petition shall be amended accordingly. As promptly as practicable after the date of this Agreement, Seller shall file with the NYPSC the Power Purchase Agreement under Section 110 of the New York Public Service Law and Buyer shall file with the NYPSC and any other applicable state Governmental Authority having jurisdiction over Buyer or the Purchased Assets, an application requesting a determination that allowing the Purchased Assets to be an eligible facility under Section 32 of the Holding Company Act, (i) will benefit consumers, (ii) is in the public interest, and (iii) does not violate state law. In fulfilling their respective obligations set forth in the immediately preceding two sentences, Buyer and Seller shall each use Commercially Reasonable Efforts to effect or cause to be effected any such filings within thirty (30) days of the date of this Agreement. Prior to any Party's submission of the applications contemplated by this Section 6.6(c), the submitting Party shall give such application to the other Parties for review and comment and the submitting Party shall in good faith consider any revisions reasonably requested by the reviewing Parties. Each Party will bear its own costs of the preparation and review of any such filings.

(d) As promptly as practicable after the date of this Agreement, Buyer shall file with FERC an application requesting authorization under Section 205 of the Federal Power Act to sell electric generating capacity and energy (and, at Buyer's discretion, other services, including, without limitation, ancillary services) at wholesale at market-based rates. In fulfilling its obligations set forth in the immediately preceding sentence, Buyer shall use its Commercially Reasonable Efforts to file the referenced application with FERC within thirty (30) days of the date of this Agreement. Prior to Buyer's submission of such application with FERC, Buyer shall submit such application to Seller for review and comment and Buyer shall consider any revisions reasonably requested by Seller. Buyer shall be solely responsible for the cost of preparing and filing this application, any petition(s) for rehearing, or any reapplication(s). Each Party will bear its own costs of the preparation and review of any such filings.

(e) As promptly as practicable after the date of this Agreement, Buyer and Seller shall file with NRC an application requesting consent under Section 184 of the Atomic Energy Act and 10 C.F.R. § 50.80 for the transfer of the NRC License from Seller to Buyer, and approval of any conforming license amendments or other related approvals. In fulfilling their respective obligations set forth in the immediately preceding sentence, each of Buyer and Seller shall use its Commercially Reasonable Efforts to effect any such filing within thirty (30) days of the date of this Agreement. Each Party will bear its own costs of the preparation of any such filing and NRC fees shall be borne 50% by Buyer and 50% by Seller. Thereafter, Buyer and Seller shall cooperate with one another to facilitate NRC review of the application by providing the NRC staff with such documents or information that the NRC staff may reasonably request or require any of the Parties to provide or generate.

(f) Seller and Buyer shall cooperate with each other and promptly prepare and file notifications with, and request Tax clearances from, state and local taxing authorities in jurisdictions in which a portion of the Purchase Price may be required

to be withheld or in which Buyer would otherwise be liable for any Tax liabilities of Seller pursuant to such state and local Tax law.

(g) As promptly as practicable after the date of this Agreement, but no later than thirty (30) days after Buyer supplies to Seller all of the information regarding Buyer that is required to be included in the application described in this Section 6.6(g), Seller and Buyer shall jointly prepare as co-applicants, and Seller shall file with FERC, an application for approval of this transaction under Section 203 of the Federal Power Act. In fulfilling their respective obligations set forth in this Section 6.6(g), Seller and Buyer shall use their Commercially Reasonable Efforts. Prior to Seller's submission of such application with FERC, Seller shall submit such application to Buyer for review and comment and Seller shall consider any revisions reasonably requested by Buyer. Seller and Buyer shall respond promptly to all requests from FERC or its staff for additional information regarding such application. Seller shall be solely responsible for the cost of filing this application, any petition(s) for rehearing, or any reapplication(s). Each Party will bear its own costs of the review of such filings.

(h) Seller and Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement, (i) prepare and make with FERC, NYPSC or any other Governmental Authority having jurisdiction over Seller, Buyer or the Purchased Assets, all necessary filings required to be made with respect to the transactions contemplated hereby (including those specified above), (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use Commercially Reasonable Efforts to obtain the transfer or reissuance to Buyer of all necessary Permits, Environmental Permits, consents, approvals and authorizations of all Governmental Authorities, and (iv) use Commercially Reasonable Efforts to obtain all necessary consents, approvals and authorizations of all other parties, in the case of each of the foregoing clauses (i), (ii) and (iii), necessary or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, Seller's Required Regulatory Approvals and Buyer's Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which Seller or Buyer is a party or by which any of them is bound. The Parties shall respond promptly to any requests for additional information made by such agencies, and use their respective Commercially Reasonable Efforts to cause regulatory approval to be obtained at the earliest possible date after the date of filing. Each Party will bear its own costs of the preparation and review of any such filing. Seller and Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(i) Buyer shall have the primary responsibility for securing the transfer, reissuance or procurement of the Permits and Environmental Permits (other than Transferable Permits) effective as of the Closing Date. Seller shall cooperate with

Buyer's efforts in this regard and assist in any transfer or reissuance of a Permit or Environmental Permit held by Seller or the procurement of any other Permit or Environmental Permit when so requested by Buyer. In the event that Buyer is unable, despite its Commercially Reasonable Efforts, to obtain a transfer or reissuance of one or more of the Permits or Environmental Permits as of the Closing Date, Buyer may use the applicable Permit or Environmental Permit issued to Seller, provided (i) such use is not unlawful, (ii) Buyer notifies Seller prior to the Closing Date, (iii) Buyer continues to make Commercially Reasonable Efforts to obtain a transfer or reissuance of such Permit or Environmental Permit after the Closing Date, and (iv) Buyer indemnifies Seller for any losses, claims or penalties suffered by Seller in connection with the Permit or Environmental Permit that is not transferred or reissued as of the Closing Date resulting from Buyer's ownership or operation of the Purchased Assets following the Closing Date. In no event shall Buyer use or otherwise rely on a Permit or Environmental Permit issued to Seller beyond one year after the Closing Date.

Section 6.7 Brokerage Fees and Commissions. Seller and Buyer each represent and warrant to the other that, other than with respect to fees and commissions of J.P. Morgan Securities Inc. and Concentric Energy Advisors Inc., which shall be the sole responsibility of Seller, no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the Party making such representation. Seller and Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees incurred by reason of any action taken by the indemnifying party.

Section 6.8 Tax Matters.

(a) All Transfer Taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by Buyer. Buyer will file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and Seller will be entitled to review such returns in advance and, if required by applicable Law, will join in the execution of any such Tax Returns or other documentation. Prior to the Closing Date, Buyer will provide to Seller, to the extent possible, an appropriate exemption certificate in connection with this Agreement and the transactions contemplated hereby, due from each applicable taxing authority.

(b) With respect to Taxes to be prorated in accordance with Section 3.5 of this Agreement, Buyer shall prepare and timely file all Tax Returns required to be filed after the Closing with respect to the Purchased Assets, if any, and shall duly and timely pay all such Taxes shown to be due on such Tax Returns. Buyer's preparation of any such Tax Returns shall be subject to Seller's approval to the extent that such Returns relate to any period, allocation or other amount for which the Seller is responsible, which approval shall not be unreasonably withheld. Buyer shall make such Tax Returns and all schedules and working papers supporting such Tax Returns available for Seller's review and approval no later than fifteen (15) Business Days

prior to the due date for filing such Tax Return. Subject to Section 6.8(d), not less than five (5) Business Days prior to the due date of any such Tax Return, Seller shall pay to Buyer a portion of the amount shown as due on such Tax Return as determined in accordance with Section 3.5 of this Agreement. In the event Buyer and Seller cannot agree as to the preparation or the reporting of any material item on a Tax Return to be filed by Buyer, the dispute shall be settled in the manner provided by Section 6.8(d) hereof and the cost of such Independent Accounting Firm shall be borne equally by the Parties.

(c) With respect to Seller's Qualified Decommissioning Fund, prior to the Closing Date, the Trustee will cause the Qualified Decommissioning Fund to pay estimated Income Taxes for the taxable period that ends on the Closing Date in an amount equal to the estimated Income Tax Liability of Seller's Qualified Decommissioning Fund for the taxable period that ends on the Closing Date. To the extent the amount of estimated Income Taxes paid pursuant to this section is in excess of the Income Tax Liability of Seller's Qualified Decommissioning Fund for the taxable period that ends on the Closing Date, any such refund will be forwarded to, and deposited in, the Buyer's Qualified Decommissioning Fund. To the extent the amount of estimated Income Taxes paid pursuant to this section is less than the Income Tax Liability of Seller's Qualified Decommissioning Fund for the taxable period that ends on the Closing Date, any such deficiency will be paid by, and from Buyer's Qualified Decommissioning Fund.

(d) Each of the Parties shall provide the other with such assistance as may reasonably be requested by the other Party in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to Liability for Taxes, and each will retain and provide the requesting Party with any records or information which may be relevant to such return, audit or examination, proceedings or determination. Any information obtained pursuant to this Section 6.8(d) or pursuant to any other Section hereof providing for the sharing of information or review of any Tax Return or other schedule relating to Taxes shall be kept confidential by the Parties hereto, except to the extent such information is required to be disclosed by Law. Notwithstanding the preceding sentence, each Party to this transaction (and each employee, representative or agent of any taxpayer) may disclose to any and all Persons, without limitations of any kind, the "structures" and "tax aspects" (as such terms are used in Sections 6011, 6012 and 6112 of the Code and the regulations promulgated thereunder) of the transactions and all materials of any kind (including opinions and other tax analyses) that are provided to the Party relating to such "structures" or "tax aspects", and no Party is subject to any restriction concerning its consulting with its tax adviser regarding the "structure" or "tax aspects" of this transaction at any time. Each Party intends that this transaction will not constitute a "confidential transaction" under the Code or the regulations promulgated thereunder.

(e) In the event that a dispute arises between Seller and Buyer as to the preparation or the reporting of any material item on a Tax Return to be filed by Buyer or the allocation of such Taxes between Seller and Buyer, the Parties shall attempt in

good faith to resolve such dispute, and any agreed amount shall be paid to the appropriate Party within ten (10) Business Days of the date on which the Parties reach agreement. If a dispute is not resolved within thirty (30) days, the Parties shall submit the dispute to the Independent Accounting Firm for resolution, which resolution shall be final, conclusive and binding on the Parties. Notwithstanding anything in this Agreement to the contrary, the fees and expenses of the Independent Accounting Firm in resolving the dispute shall be borne fifty percent (50%) by Seller and fifty percent (50%) by Buyer. Any payment required to be made as a result of the resolution of the dispute by the Independent Accounting Firm shall be made within ten (10) days after such resolution, together with any interest determined by the Independent Accounting Firm to be appropriate. Submission of a dispute to the Independent Accounting Firm shall not relieve any Party from any obligation under this Agreement to timely file a Tax Return or pay a Tax.

Section 6.9 Advice of Changes. Prior to the Closing Date, each Party will promptly advise the other in writing of any change or discovery occurring after the date hereof that would constitute a material breach of any representation, warranty or covenant of the advising or other Party under this Agreement. If a Party advises the other Party of any such matter with respect to a material breach of the advising Party, the other Party shall have the right to terminate this Agreement in accordance with Sections 9.1(e) or (f) as the case may be. If a Party advises the other Party of any such matter with respect to a material breach by the other Party, the advising Party shall have the right to terminate this Agreement in accordance with Sections 9.1(e) or (f) as the case may be. If a Party fails to exercise its termination right, the written notice under this Section 6.9 will be deemed to have amended this Agreement, including the appropriate schedule, or to have qualified the representations and warranties contained in Articles 4 and 5. Seller shall be entitled to amend, substitute or otherwise modify any Seller's Agreement to the extent that such Seller's Agreement expires by its terms prior to the Closing Date or is terminable without Liability to Buyer on or after the Closing Date (other than an amendment that would extend the term thereof for a new term of years in excess of the then current term), or if the terms and conditions of such modified Seller's Agreement constituting the Assumed Liabilities and Obligations are on terms and conditions not less favorable to Buyer than the original Seller's Agreement.

Section 6.10 Employees.

(a) Buyer or a directly or indirectly wholly owned Subsidiary of Buyer will offer employment, commencing as of the Closing Date, to all Ginna Employees employed as of the Closing Date, which Ginna Employees are set forth on Schedule 6.10(a), as amended between the date of this Agreement and the Closing Date to reflect any changes in the identities of work force personnel.

(b) Each Ginna Employee who is offered and accepts continued employment with Buyer will be referred to herein as a "Transferred Employee."

(c) For the period commencing on the Closing Date and ending eighteen (18) months thereafter, and except as Buyer and any Transferred Employee may otherwise mutually agree, Buyer shall provide each Transferred Employee with total compensation including without limitation base pay, authorized overtime, bonuses, incentive compensation and benefits provided under all applicable employee benefits plans and programs, and fringe benefit arrangements (other than each of the Performance Plans relating to the Ginna divestiture and the severance agreements listed on Schedule 6.10(o) hereto) (collectively, "Total Compensation") which in the aggregate is comparable in value and nature to the Transferred Employee's annualized Total Compensation received from Seller immediately prior to Closing. Buyer shall also: (i) pay the reasonable relocation costs of any Transferred Employee who shall relocate at Buyer's request during such 18 month period and (ii) maintain the defined benefit plan described in Section 6.10(h) for the period specified in that Section. Seller shall fully vest or shall cause to be fully vested no later than the Closing Date any benefit accrued by Transferred Employees or granted by Seller to Transferred Employees under the Non-Qualified Top-Hat Plans listed in Schedule 4.12(a) other than the Energy East Corporation 2000 Stock Option Plan and the Energy East Corporation Restricted Stock Plan. Buyer shall provide top-hat, non-qualified and equity benefits to Transferred Employees that Buyer determines are eligible under Buyer's applicable plans.

(d) As of the Closing Date, all Transferred Employees shall cease to participate in the employee welfare benefit plans (as such term is defined in ERISA) maintained or sponsored by Seller or its Affiliates and shall commence participation (if applicable eligibility requirements are satisfied) in the employee welfare benefit plans of Buyer or its Affiliates (the "Replacement Welfare Plans") that for Transferred Employees will provide benefits and coverage that are comparable in the aggregate to the benefits and coverage provided to the Transferred Employees in the aggregate under Seller's, or its Affiliate's, as the case may be, welfare benefit plans in effect for the Transferred Employees immediately prior to the Closing Date. Buyer shall (i) waive all limitations as to pre-existing condition exclusions and waiting periods with respect to the Transferred Employees under the Replacement Welfare Plans, other than, but only to the extent of, limitations or waiting periods that were in effect with respect to such employees under the welfare plans maintained by Seller or its Affiliates and that have not been satisfied as of the Closing Date, and (ii) provide each Transferred Employee with credit for any co-payments and deductibles paid prior to the Closing Date during a plan year under Seller's or its Affiliates' plans that have not ended as of the Closing Date, in satisfying any deductible or out-of-pocket requirements under the Replacement Welfare Plans (on a pro-rata basis in the event of a difference in plan years).

(e) Buyer shall give all Transferred Employees credit for all service with Seller and its Affiliates under all employee welfare benefit plans and arrangements and all fringe benefit plans, programs, and arrangements of Buyer ("Replacement Benefit Plans") in which they become participants. The service credit given is for purposes of eligibility, vesting and service related level of benefits, but not benefit accrual (except as provided in the following sentence). For purposes of benefit

accrual, Buyer shall give Transferred Employees credit for all service with Seller and its Affiliates under all Replacement Benefit Plans, but the ultimate benefits provided under Replacement Benefit Plans may be offset by the corresponding benefits previously provided by Seller or its Affiliates or benefit plans of Seller or its Affiliates, or by the corresponding benefits accrued under the benefit plans of Seller or its Affiliates or otherwise committed to be provided by Seller or its Affiliates in the future; provided, however, that such an offset shall not be permitted with respect to the Replacement Defined Benefit Plan described in Section 6.10(h).

(f) Not less than four (4) weeks prior to the Closing Date, Seller shall provide Buyer with such pertinent data or information as Buyer shall reasonably require to comply with Sections 6.10 (c), (d), (e), (h), (l) and (m) including each Transferred Employee's service, accrued but unused paid time off, satisfaction of limitations or waiting periods, amounts of co-payments and deductibles, accrued benefits available for offset under Section 6.10(e), each as of the Closing Date, as well as such other information as Buyer shall reasonably request for such purpose. To the extent the consent of a Transferred Employee is required in order for Seller to deliver any such pertinent data or information, Seller agrees to secure such consent. In the event that Seller is unable to obtain such consent, Buyer may treat the refusal of consent as declination of its employment offer and such employees shall be treated as if they had never accepted the employment offer of Buyer and shall not be entitled to any severance or other benefits to be provided to Transferred Employees hereunder. Seller agrees to provide Buyer not less than four (4) weeks prior to the Closing Date with a list of Ginna Employee participants in each non-qualified or supplemental Benefit Plan, and also to disclose any outstanding Ginna Employee equity grants.

(g) Buyer agrees to allow the Transferred Employees, as of the Closing Date, to be eligible to commence participation in a tax-qualified 401(k) plan sponsored by Buyer or its Affiliates that will provide benefits which in the aggregate are comparable in value and nature to the benefits provided to the Transferred Employees under the tax-qualified 401(k) plan sponsored by the Seller or its Affiliates in effect for Transferred Employees immediately prior to the Closing Date ("RG&E Savings Plan").

To the extent allowable by law and by the applicable Seller plan, Buyer shall take any and all necessary action to cause the trustee of any tax-qualified 401(k) plan of Buyer or its Affiliates in which any Transferred Employee becomes a participant to accept a direct "rollover" in cash of all or a portion of said employee's "eligible rollover distribution" within the meaning of Section 402 of the Code from the RG&E Savings Plan if requested to do so by the Transferred Employee. However, any tax-qualified 401(k) plan of Buyer or its Affiliates accepting such a rollover shall not be required to permit any investment to be made in Energy East Corporation common stock on behalf of any Transferred Employee after the Closing Date. Notwithstanding anything in this paragraph to the contrary, if Transferred Employees are not entitled to distributions from the RG&E Savings Plan as a result of being employed by Buyer, then either (i) the parties may negotiate a direct transfer from the RG&E Savings Plan

trust to Buyer's tax-qualified plan trust under such terms and conditions as are agreeable to both parties or (ii) if the parties are unable to negotiate such an agreement, then Buyer agrees to provide Seller, in a timely manner, with such information as Seller reasonably needs about the Transferred Employees in order for Seller to administer the Transferred Employees' benefits under the RG&E Savings Plan (e.g., information about when the Transferred Employees retire, die, terminate employment).

(h) Effective as of the Closing Date, Buyer shall cause to be provided a defined benefit pension plan for the benefit of the Transferred Employees ("Replacement Defined Benefit Plan"). The Replacement Defined Benefit Plan shall provide benefit formulas that are identical to the benefit plan formulas in Article IV of the Rochester Gas and Electric Corporation Retirement Plan ("RG&E Defined Benefit Plan") as of the Closing Date. For the purposes of this Section 6.10(h), except as required by Law or as required by the IRS in connection with Seller's application for a determination letter for the RG&E Defined Benefit Plan, no improvements shall be made to such benefit formulas referenced above in the RG&E Defined Benefit Plan for the Transferred Employees after the date hereof and prior to the Closing Date without the written consent of Buyer, which consent shall not be unreasonably withheld. Buyer agrees to maintain such benefit formulas for Transferred Employees for a period of at least eighteen (18) months after the Closing Date (and for an additional period of at least thirty-six (36) months after the end of such eighteen (18) month period, Buyer agrees to provide benefit formulas that are identical to the benefit plan formulas in Sections 4.1 through 4.11 and Sections 4.13 through 4.15 of the RG&E Defined Benefit Plan (as such formulas are in effect on the Closing Date)), (provided, however, that if changes in the Law require any such terms to be modified or if any such terms are required by the IRS to be modified in connection with Buyer's application for a determination letter for the Replacement Defined Benefit Plan, Buyer may modify such terms to the extent necessary to comply with such laws).

The Transferred Employees shall be given credit in the Replacement Defined Benefit Plan for all service with and compensation from Seller and its Affiliates as if it were service with and compensation from Buyer for purposes of determining eligibility for benefits, the amount of any benefits or benefit accruals, vesting and service related levels of benefits under the Replacement Defined Benefit Plan.

At least thirty (30) days prior to the Closing Date, Seller and Buyer shall file or cause to be filed any forms 5310-A that may be required to be submitted to the IRS in connection with the transfers described in this Section 6.10(h). The transfers and payments described in this Section 6.10(h) shall in no event be made prior to the thirtieth (30th) day following the filing of such form 5310-A with the IRS. In the event that the IRS, the PBGC or any other Governmental Authority raises any objections to the transfer, the Seller and Buyer shall cooperate in good faith to resolve any such objections.

On the Closing Date, the Seller shall cause to be transferred from the RG&E Defined Benefit Plan to the corresponding Replacement Defined Benefit Plan, assets equal to Seller's good faith estimate of the amount that Seller is permitted to transfer in compliance with the requirements of Section 414(l) of the Code and Treasury Regulation Section 1.414(l)-1 (determined under assumptions used by the PBGC as of the Closing Date) multiplied by .80 (the "Initial Transfer").

Within sixty (60) days after the Closing Date, Seller shall calculate the actual amount that Seller is permitted to transfer in compliance with the requirements of Section 414(l) of the Code and Treasury Regulation Section 1.414(l)-1 (determined under assumptions used by the PBGC as of the Closing Date) (the "Actual Amount"). To the extent that the Actual Amount is less than the Initial Transfer, the amount of such differential (including any applicable interest determined in good faith by Buyer) shall be transferred by the Replacement Defined Benefit Plan to the RG&E Defined Benefit Plan. To the extent that the Actual Amount is greater than the Initial Transfer, the Seller shall cause to be transferred from the RG&E Defined Benefit Plan to the Replacement Defined Benefit Plan the amount of such differential (including any applicable interest determined in good faith by Seller).

To the extent that the Actual Amount is less than Thirty Million Dollars ($30,000,000.00), the Purchase Price shall be decreased by the amount of the shortfall. To the extent that the Actual Amount is greater than Thirty Million Dollars ($30,000,000.00), the Purchase Price shall be increased by the amount of the differential.

All assets transferred and payments made under this Section 6.10(h) shall be made in cash, or in marketable securities that are reasonably acceptable to Buyer.

Upon completion of the Initial Transfer under this Section 6.10(h), all benefit payments from the Replacement Defined Benefit Plan shall be the responsibility of Buyer.

In the event that the Closing occurs after June 30, 2004, the Purchase Price shall be decreased by the amount of One Hundred Seventy-Five Thousand Dollars ($175,000.00) per month in each of July, August and September, 2004, prorated to the Closing Date; provided that if the Closing occurs on or after October 1, 2004, the total decrease in the Purchase Price shall be Five Hundred Twenty-Five Thousand Dollars ($525,000.00).

(i) Buyer and Seller do not anticipate the issuance of any notices pursuant to the WARN Act. Notwithstanding the foregoing, Seller agrees to timely perform and discharge all requirements under the WARN Act and under applicable state and local laws and regulations for the notification of employees arising from the sale of the Purchased Assets to Buyer up to the Closing Date for those employees who will not become Transferred Employees effective as of the Closing Date. On or after the Closing Date, Buyer shall be responsible for performing and discharging all requirements under the WARN Act and under applicable state and local laws and

regulations for the notification of Transferred Employees with respect to the Purchased Assets. At Closing, Seller shall provide to Buyer a certificate setting forth the number of employees, if any, who suffered an "employment loss," as defined under the WARN Act, at the Purchase Assets in the ninety (90) days immediately preceding the Closing Date (the "WARN Certificate").

(j) Seller is responsible for extending COBRA continuation coverage to all employees and former employees, and qualified beneficiaries of such employees and former employees, who become or became entitled to such COBRA continuation coverage on or before the Closing Date by reason of the occurrence of a qualifying event on or before the Closing Date, including those for whom the Closing Date occurs during their COBRA election period. Buyer shall be responsible for providing COBRA continuation coverage only to Transferred Employees and qualified beneficiaries of such employees who become entitled to such COBRA continuation coverage on or after the Closing Date by reason of the occurrence of a qualifying event after the Closing Date.

(k) Seller shall remain responsible for paying Transferred Employees for: (a) all salary, wages, and Benefit Plan benefits (excluding to the extent provided in Sections 6.10(h) and 6.10(o)), a pro rata portion of any bonuses or incentive compensation that were earned for time worked for Seller or Seller's Affiliates prior to the Closing Date; and (b) all workers' compensation, disability benefits, or other insurance benefits for which entitlement to payment is based upon events occurring prior to the Closing Date including any incurred but unreported claims under the Benefit Plans. Seller shall pay to Buyer as set forth in Section 3.3, the cash equivalent for all vacation time, floating holidays, sick days, personal days (including, but not limited to, those related to the Personal Day Program of Seller) and bonuses and incentive compensation for Transferred Employees which have accrued as of the Closing Date (holiday time shall not be included in such payment). For purposes hereof, the foregoing calculations shall be determined consistent with Seller's past practices.

(l) Individuals who are otherwise "Transferred Employees" but who on the Closing Date are not actively at work due to a leave of absence covered by the Family and Medical Leave Act or similar state or local Law, or due to any other authorized leave of absence, shall nevertheless be treated as "Transferred Employees" but only if he or she is able to (i) return to work within the protected period under the Family and Medical Leave Act or similar state or local Law, or, in the case of any other type of authorized leave, within the period established by Buyer in Buyer's reasonable discretion, and (ii) perform the essential functions of their job, with or without a reasonable accommodation.

(m) For at least eighteen (18) months following the Closing Date, Buyer shall provide all Transferred Employees with retiree medical, mental health, prescription drug, and life insurance coverages (the "Replacement Retiree Coverages") that are in the aggregate comparable in value and nature to the Seller's retiree medical, mental health, prescription drug, and life insurance coverages