available to eligible Ginna Employees who retire from Seller immediately prior to the Closing Date (the "RG&E Retiree Coverages"). Buyer shall (i) waive all limitations as to pre-existing condition exclusions and waiting periods with respect to the Transferred Employees under the Replacement Retiree Coverages, other than, but only to the extent of limitations or waiting periods that were in effect with respect to such employees under the RG&E Retiree Coverages and that have not been satisfied as of the Closing Date, and (ii) provide each Transferred Employee with credit for any co-payments and deductibles paid prior to the Closing Date during a plan year under each applicable Seller's plan that has not ended as of the Closing Date, in satisfying any deductible or out-of-pocket requirements under the Replacement Retiree Coverages (on a pro-rata basis in the event of a difference in plan years). Effective as of the Closing Date, Seller shall have no responsibility to provide retiree medical, mental health, prescription drug or life insurance coverages for any Transferred Employee.

(n) Buyer shall pay to each Transferred Employee whose employment is terminated without cause by Buyer or one of its Affiliates within eighteen (18) months of the Closing Date a severance benefit package equal to or greater than the following:

- Severance Pay: A lump sum equal to two (2) weeks of base pay for each full year of service (including service with both Buyer and Seller), less applicable taxes and withholdings.
- Transition Allowance: $7,500, less applicable taxes and withholdings.
- Insurance Benefits: Health and Life Insurance comparable to coverage received by retirees (who were employed by Seller on or after January 1, 1983) on the Closing Date for one (1) year from the date of termination.
- EAP Benefits: Benefits in accordance with the provisions of the Seller's Employee Assistance Program for one (1) year.
- Outplacement Benefits: Employer paid retraining and/or outplacement allowance of up to $5,000, less applicable taxes and withholdings, for twelve (12) months after termination.

For purposes of calculating the level of any of the foregoing severance benefits to which a terminated Transferred Employee is entitled, such calculation shall be made as though the Transferred Employee's termination date is the eighteenth (18th) month anniversary of the Closing Date, regardless of the actual date of termination. A Transferred Employee's entitlement to the foregoing severance benefits shall be contingent on the Transferred Employee's execution of an agreement releasing Buyer, Seller and their respective Affiliates from any legal claims. Nothing contained herein shall alter the at-will employment relationship of any Transferred Employee.

(o) Notwithstanding any other provision of this Agreement, Buyer shall assume the Liabilities for the obligations of Seller under the Performance Plans relating to Ginna Divestiture listed on Schedule 6.10(o) hereto. Seller shall retain any and all Liability for the obligations of Seller under the severance agreements listed on Schedule 6.10(o) hereto.

Section 6.11 Risk of Loss.

(a) Prior to the Closing, Buyer shall not bear any risk of loss or damage to the property included in the Purchased Assets. Seller shall replace or repair any damage to the Purchased Assets in accordance with Good Utility Practices, except as otherwise provided in paragraphs (b) or (c) below.

(b) If, before the Closing, all or any portion of the Purchased Assets is taken by eminent domain or is the subject of a pending or (to the Knowledge of Seller) contemplated taking which has not been consummated, Seller shall notify Buyer promptly in writing of such fact. If such taking would create a Material Adverse Effect, Buyer and Seller shall negotiate in good faith to settle the loss resulting from such taking (including, without limitation, by making a fair and equitable adjustment to the Purchase Price) and, upon such settlement, consummate the transactions contemplated by this Agreement pursuant to the terms of this Agreement. If no such settlement is reached within sixty (60) days after Seller has notified Buyer of such taking, then Buyer or Seller may terminate this Agreement pursuant to Section 9.1(g).

(c) If, before the Closing, all or any portion of the Purchased Assets is damaged or destroyed by fire or other casualty, Seller shall notify Buyer promptly in writing of such fact. If such damage or destruction would create a Material Adverse Effect and Seller have not notified Buyer of their intention to cure such damage or destruction within fifteen (15) days after its occurrence (such cure to be reasonably satisfactory to Buyer), Buyer and Seller shall negotiate in good faith to settle the loss resulting from such casualty (including, without limitation, by making a fair and equitable adjustment to the Purchase Price) and, upon such settlement, consummate the transactions contemplated by this Agreement pursuant to the terms of this Agreement. If no such settlement is reached within sixty (60) days after Seller have notified Buyer of such casualty, then Buyer may terminate this Agreement pursuant to Section 9.1(g).

(d) The provisions of Section 5-1311 of the New York General Obligations Law shall not apply to this Agreement.

Section 6.12 Decommissioning Funds.

(a) On the Closing Date, Seller shall cause to be transferred to the Trustee under the Post-Closing Decommissioning Trust Agreement (1) all of the assets of the Seller's Qualified Decommissioning Fund and (2) to the extent necessary to comply with Seller's Required Regulatory Approvals, all or a portion of the assets of the

Seller's Nonqualified Decommissioning Fund, in each case, consisting solely of cash or cash equivalents; provided that in no event shall the aggregate amount of the transferred assets of the Seller's Decommissioning Funds be less than the Decommissioning Target. Seller shall retain all assets of the Seller's Nonqualified Decommissioning Fund not required to be transferred under clause (2) above.

(b) In the event that the NRC requires the Buyer to provide Decommissioning funding assurance in an amount in excess of the Decommissioning Target (the "Excess Decommissioning Funds"), Buyer agrees to cause Buyer's Parent to post a Buyer's Parent Guaranty in an amount sufficient to cover the Excess Decommissioning Funds and in such form as required by the NRC. If Buyer's Parent Guaranty is not accepted by the NRC, or in all events if Seller is required to transfer Excess Decommissioning Funds to the Buyer, the Buyer shall earmark such Excess Decommissioning Funds and, upon completion of Decommissioning and termination or conversion of the NRC License by the NRC, pay to Seller an amount in dollars equal to the Excess Decommissioning Funds, together with allocated earnings on such Excess Decommissioning Funds from the Closing Date through the date such payment is made.

(c) To the extent (i) requested by Buyer, (ii) permitted by Law and (iii) that no adverse consequences result to the Seller, immediately prior to Closing, Seller shall cause to be transferred into Seller's Qualified Decommissioning Fund either (1) all of the assets in Seller's Nonqualified Decommissioning Fund, or (2) if Seller is permitted to transfer to the Trustee under the Post-Closing Decommissioning Trust Agreement only that portion of the assets of Seller's Decommissioning Funds such that the aggregate amount of the transferred assets of Seller's Decommissioning Funds equals the Decommissioning Target, that portion of the assets in Seller's Nonqualified Decommissioning Fund necessary so that the assets of Seller's Qualified Decommissioning Fund equals the Decommissioning Target. All fees in connection with implementing this Section 6.12(c), including all fees and external costs incurred for Seller to obtain a revised schedule of ruling amounts in a private letter ruling from the IRS to permit such transfer, shall be borne by Buyer.

(d) The Parties shall not take any actions that would cause the actual Tax consequences of the transactions contemplated by this Agreement to differ from or be inconsistent with the Requested Rulings set forth in Section 6.18.

Section 6.13 Spent Nuclear Fuel Fees.

(a) Except as provided in the third sentence of this paragraph and Sections 2.1(b) and 2.3(h), between the date hereof and the Closing Date, and at all times thereafter, Seller will remain liable for all Spent Nuclear Fuel Fees and any other fees associated with electricity generated at Ginna and sold prior to the Closing Date, and the One-Time DOE Pre-1983 Fee, and Buyer shall have no Liability or responsibility therefore. Buyer shall pay and discharge all Spent Nuclear Fuel Fees and any other fees associated with electricity generated at Ginna and sold from and after the Closing Date, and Seller shall have no Liability or responsibility therefore. On the

Closing Date, Buyer shall assume title to, and responsibility for the management, storage, removal, transportation and disposal of all Spent Nuclear Fuel and High Level Waste of Ginna as of the Closing Date. Seller shall assign to Buyer its undivided right, title and interest in and to the Standard Spent Fuel Disposal Contract, including, without limitation, any and all damage claims arising under such contract subject to Sections 2.1(p), 2.2(k), 6.13(b) and 6.13(d) hereof concerning the rights of Seller with respect to the One-Time DOE Pre-1983 Fee, and shall provide the required notice to the Department of Energy of the assignment of the Standard Spent Fuel Disposal Contract to Buyer within ninety (90) days of Closing, such notice to be in a form reasonably acceptable to Seller and Buyer.

(b) Prior to January 31, 2004, Seller shall commence an action in the United States Court of Federal Claims for damages resulting from the Department of Energy's failure to commence the removal, transportation, acceptance or any delay in accepting Spent Nuclear Fuel and High Level Waste for disposal pursuant to the Standard Spent Fuel Disposal Contract (the "DOE Litigation"). All rights relating to the DOE Litigation shall be exercised in good faith and such claims shall be preserved for the benefit of the Buyer. Buyer shall assume all of the rights and obligations under the Standard Spent Fuel Disposal Contract as of the Closing Date, including but not limited to the right to pursue and recover damages resulting from the DOE Litigation, subject to Seller's rights relating to the One-Time DOE Pre-1983 Fee, and provided that, in the event that Buyer shall recover any form of monetary relief (including but not limited to monetary damages or relief which is reasonably calculable from economic obligations, as a direct or indirect result of the DOE Litigation) Buyer shall pay to Seller an amount equal to the amount of the economic value received by Buyer as a result of such litigation up to a maximum payment to Seller of Ten Million Dollars ($10,000,000). Seller shall submit the complaint to be filed in the action to Buyer for prompt review, comment and approval (such approval to be in Buyer's reasonable discretion). Consistent with the obligations of this Section 6.13, Seller shall take no additional actions with respect to the DOE Litigation that may affect Buyer's interests in the suit, including but not limited to filing damages estimates or entering into any settlement discussions, without Buyer's express prior written consent; provided that Seller may take any action necessary to preserve the rights of Seller and Buyer in the DOE Litigation, or to respond to an order or request of the court or other procedural requirement, if expeditious action is required and Seller has been unable to contact or obtain a response from Buyer despite reasonable efforts to do so.

(c) Buyer agrees to provide Seller with a copy within two (2) Business Days of receipt of all notices provided to Buyer from the Department of Energy regarding the date on which the One-Time DOE Pre-1983 Fee is due and payable in accordance with the terms of the Standard Spent Fuel Disposal Contract.

(d) Seller agrees to cause the One-Time DOE Pre-1983 Fee to be duly paid when due, subject to any rights to which Seller may be entitled by reason of the Department of Energy's defaults (or alleged defaults) under the Standard Spent Fuel Disposal Contract.

Section 6.14 Department of Energy Decontamination and Decommissioning Fees.

Seller will continue to pay all Department of Energy Decontamination and Decommissioning Fees relating to Nuclear Fuel purchased and consumed at Ginna prior to the Closing Date, including but not limited to all annual Special Assessment invoices to be issued after the Closing Date by the Department of Energy, as contemplated by its regulations at 10 C.F.R. Part 766 implementing Sections 1801, 1802, and 1803 of the Atomic Energy Act.

Section 6.15 Cooperation Relating to Insurance and Price-Anderson Act. Until the Closing, Seller will maintain in effect (a) insurance in amounts and against such risks and losses as is customary in the commercial nuclear power industry and (b) not less than the level of property damage and liability insurance for the Facilities as in effect on the date hereof. Seller shall cooperate with Buyer's efforts to obtain insurance, including insurance required under the Price-Anderson Act or other Nuclear Laws with respect to the Purchased Assets. In addition, subject to Buyer's written commitment to satisfy its indemnification obligations under Section 8.1(a), Seller agrees to use Commercially Reasonable Efforts to assist Buyer in making any claims against pre-Closing insurance policies of Seller that may provide coverage related to Assumed Liabilities and Obligations. Buyer agrees to indemnify Seller for its reasonable out-of-pocket expenses incurred in providing such assistance and cooperation and not to take any action which shall adversely affect any residual rights of Seller in such insurance policies.

Section 6.16 Tax Clearance Certificates. Seller and Buyer shall cooperate and use their Commercially Reasonable Efforts to cause the Tax clearance certificates described in Schedule 4.20 of this Agreement to be issued by the appropriate taxing authorities prior to the Closing Date or as soon as practicable thereafter. Buyer shall, at least ten (10) days prior to the Closing Date, file Form AU-196.10, Notification of Sale, Transfer or Assignment in Bulk, with the New York State Department of Taxation and Finance.

Section 6.17 Release of Seller. Buyer shall use Commercially Reasonable Efforts to support Seller's efforts to obtain a written release of Seller effective as of the Closing with respect to obligations arising on or after the Closing Date under any of the Seller's Agreements, Fuel Contracts or Non-material Contracts assigned to Buyer hereunder.

Section 6.18 Private Letter Ruling. The Parties agree to cooperate in good faith in the preparation and joint filing of any private letter ruling request(s) to be made by Buyer and Seller in order to obtain the Tax treatment desired by the Parties with respect to the transfer of the Decommissioning Funds pursuant to the terms of this Agreement. Without limiting the generality of the foregoing, Buyer and Seller shall use Commercially Reasonable Efforts to obtain one or more private letter ruling(s) from the IRS determining that (i) the transfer of assets from the Seller's Qualified Decommissioning Fund to the Buyer's Qualified Decommissioning Fund is

a disposition that is treated as satisfying the requirements of Treas. Reg. 1.468A-6(b) pursuant to the IRS's exercise of discretion under Treas. Reg. 1.468A-6(g)(1), and accordingly (a) neither Seller, Buyer nor their respective Qualified Decommissioning Funds will recognize gain or loss upon the transfer of assets from the Seller's Qualified Decommissioning Fund to the Buyer's Qualified Decommissioning Fund, (b) the Buyer's Qualified Decommissioning Fund will be treated as satisfying the requirements of Code Section 468A and (c) the Buyer's Qualified Decommissioning Fund will have a carryover Tax basis in the assets received from the Seller's Qualified Decommissioning Fund, (ii) Buyer will not recognize gain or otherwise take into account any income for U.S. federal income tax purposes by reason of the receipt of all or a portion of the assets of the Seller's Nonqualified Decommissioning Fund, (iii) for the taxable year that includes the Closing Date, Seller shall be entitled to a current deduction equal to the total of any amounts realized by Seller as a result of Buyer's assumption of the decommissioning obligations with regard to the Purchased Assets, (iv) at Closing , Buyer will have a Tax basis in the Purchased Assets (excluding the assets of the Qualified Decommissioning Fund) equal to the sum of the Purchase Price and the Assumed Liabilities and Obligations that will be taken into account as liabilities for federal income Tax purposes, and (v) Seller's net operating loss attributable to the decommissioning obligations assumed by Buyer will qualify for specified liability loss treatment under Section 172 of the Code (the "Requested Rulings"). The Requested Rulings shall be modified, as necessary, to take into account any Legislation or Treasury Regulations enacted on or after the date of this Agreement including, but not limited to, for the Seller to obtain a revised schedule of ruling amounts from the IRS to permit the transfer of assets in Seller's Nonqualified Decommissioning Fund to Seller's Qualified Decommissioning Fund as provided in Section 6.12(c). Neither Buyer nor Seller shall take any action that would cause the transfer of assets from the Seller's Qualified Decommissioning Fund to the Buyer's Qualified Decommissioning Fund to fail to be treated as satisfying the requirements of Treas. Reg. 1.468A-6(b) (assuming solely for purposes of this sentence that the interest acquired by Buyer constitutes a "qualified interest" in a "nuclear power plant" as defined in Treas. Reg. 1.468A-5(b)), or cause Buyer and Seller to fail to obtain such a private letter ruling. The user fee set forth in the applicable IRS Revenue Procedure for substantially identical letter rulings by a common sponsor shall be shared equally by both Parties. Each Party will bear its own legal fees with respect to any requests. The Parties agree to file the private letter ruling request seeking the Requested Rulings within 30 days of the date of this Agreement.

Section 6.19 NRC Commitments. Buyer shall maintain and operate the Facilities in accordance with the NRC Commitments to the extent required by the NRC License, applicable NRC regulations and policies and with applicable Nuclear Laws.

Section 6.20 Decommissioning. Buyer hereby agrees to commit to the NYPSC as part of receiving Buyer's Required Regulatory Approvals that it will complete, at its expense, the Decommissioning of the Facilities and the Site once the Site is no longer utilized either for power generation of any kind or for any storage of

Spent Nuclear Fuel or High Level Waste, and that it will complete all Decommissioning activities in accordance with all Nuclear Laws and Environmental Laws, including applicable requirements of the Atomic Energy Act and the NRC's rules, regulations, orders and pronouncements thereunder in effect on the date hereof.

If Buyer at any time notifies and receives approval from the NRC that it will utilize the entombment (or ENTOMB) method of Decommissioning and subsequently initiates entombment Decommissioning methods, either alone or in combination with any other Decommissioning method or methods, in accordance with then-existing NRC regulations, then Buyer shall cause to be paid to Seller within ninety (90) days following such initiation of entombment Decommissioning methods an amount in dollars equal to the Excess Decommissioning Funds. To the extent permitted by Law and the trust agreements relating to the Buyer's Decommissioning Funds, such payment may be made from the Buyer's Decommissioning Funds. All payments made by Buyer to Seller pursuant to this Section 6.20 shall be flowed through by Seller to its ratepayers as directed by the NYPSC; provided, however, that Seller shall be obligated to flow through benefits to ratepayers only if and to the extent that payments are received from Buyer. In no event shall Seller or its shareholders be financially responsible for flowing through payments to ratepayers based on payments owed to Seller but not received from Buyer. The Parties acknowledge that Seller shall have no obligation to audit, monitor or enforce rights and obligations with respect to this Section 6.20 and anticipate that the NYPSC will assume all such obligations.

Section 6.21 Uprate.

(a) Between the date hereof and the Closing Date, Seller shall enter into a contract with a technically qualified vendor(s), as required, to complete the necessary nuclear steam supply system and balance of plant licensing and engineering uprate reports (together, the "Uprate Reports"), including but not limited to a sufficient NRC License amendment request ("LAR") with the goal of uprating the licensed thermal output of the Facilities to 1781 MegaWatt thermal (the "Uprate"). Seller shall use its commercially reasonable best efforts to complete the Uprate Reports and prepare the LAR as soon as practicable.

(b) Buyer and Seller agree to cooperate in good faith in the preparation of the Uprate Reports and any related activities. Seller agrees that Buyer approval is required in connection with all material aspects of the preparation of the Uprate Reports, including but not limited to vendor selection, costs, content, deliverables, and schedule. Seller shall accommodate any reasonable request of Buyer with respect to preparation or implementation activities associated with the Uprate to the extent that Seller reasonably determines on the advice of legal counsel that such activity is permitted in accordance with its authority under its NRC License. Such activities may include the design, material procurement, scheduling of, and preparation for, reasonable Uprate related modifications to be performed in the Spring refueling outage, or sooner.

(c) Subject to Seller's compliance with subsection (b), Buyer shall reimburse to the Seller, in accordance with Section 3.3, the vendor costs associated with preparing the Uprate Reports and any other vendor associated with the Uprate that were requested by the Buyer prior to the Closing. In the event that Closing does not occur, Seller and Buyer agree to negotiate in good faith the sharing of vendor costs associated with the preparation of the Uprate Reports and related vendor costs associated with Uprate activities requested by the Buyer.

Section 6.22 Right of First Refusal. Buyer and Seller agree to negotiate in good faith with respect to a right of first refusal agreement from Seller in favor of Buyer containing reasonable terms for the acquisition after the Closing Date of the approximately 15 acre site now or formerly owned by Roxdel Corporation and acquired by Roxdel Corporation from Elizabeth Gates.

## ARTICLE 7

## CONDITIONS

Section 7.1 Conditions to Obligations of Buyer. The obligations of Buyer to purchase the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date (or the waiver by Buyer) of the following conditions:

(a) All applicable waiting periods under the HSR Act relating to the consummation of the transactions contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court or Governmental Authority which restrains or prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect (each Party agreeing to cooperate in all efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any state or federal government or Governmental Authority which prohibits the consummation of the transactions contemplated hereby;

(c) Buyer shall have received all of Buyer's Required Regulatory Approvals, in form and substance reasonably satisfactory (including no materially adverse conditions as described in Section 9.1(c)) to Buyer and such approvals shall be in full force and effect and either (i) shall be final and non-appealable or (ii) if not final and non-appealable, shall not be subject to the possibility of appeal, review or reconsideration which, in the reasonable opinion of Buyer is likely to be successful and, if successful, would have a Material Adverse Effect, or a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Buyer;

(d) Seller shall have received all of Seller's Required Regulatory Approvals (other than those the failure of which to obtain could not reasonably be expected to result in a Material Adverse Effect or a material adverse effect on the

business, assets, operations or condition (financial or otherwise) of Buyer), none of such approvals shall contain any conditions that could reasonably be expected to result in a Material Adverse Effect, or a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Buyer, and such approvals shall be in full force and effect and either (i) shall be final and non-appealable or (ii) if not final and non- appealable, shall not be subject to the possibility of appeal, review or reconsideration which, in the reasonable opinion of Buyer is likely to be successful and, if successful, would have a Material Adverse Effect, or a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Buyer;

(e) Seller shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Seller on or prior to the Closing Date;

(f) The representations and warranties of Seller set forth in this Agreement that are qualified by materiality shall be true and correct as of the Closing Date and all other representations and warranties of Seller shall be true and correct in all material respects as of the Closing Date, in each case as though made at and as of the Closing Date;

(g) Buyer shall have received a certificate from an authorized officer of Seller, dated the Closing Date, to the effect that, to such officer's knowledge, the conditions set forth in Section 7.1(e), (f), (k), (m) and (q) have been satisfied by Seller;

(h) Buyer shall have received an opinion from Seller's counsel and Seller's Parent's counsel reasonably acceptable to Buyer, dated the Closing Date and reasonably satisfactory in form and substance to Buyer and its counsel, substantially in the form of Exhibit "H" hereto;

(i) Seller shall have delivered, or caused to be delivered, to Buyer at the Closing, Seller's closing deliveries described in Sections 3.6 and 3.8;

(j) Buyer shall have received from a title insurance company selected by Buyer (collectively with any co-insurer or re-insurer, as applicable, the "Title Company") an ALTA owner's title insurance policy on the Real Property and the Cooling Tunnel Easement, in form and substance reasonably satisfactory to Buyer, insuring (at the Title Company's regular rates) fee simple title as described in Section 4.7 subject only to Permitted Encumbrances; provided, however, that if any title insurance company selected by Buyer declines to issue such a policy, Buyer shall select another title insurance company (if a title insurance company reasonably acceptable to Buyer is willing to issue such a policy); and further provided, however, that any such policy will not insure fee simple title to the Cooling Tunnel Easement and the Facilities associated therewith. Buyer shall provide Seller with a copy of each title report received by Buyer from the Title Company.

(k) Since the date hereof, no Material Adverse Effect shall have occurred and be continuing;

(l) The lien of the Mortgage Indenture on the Purchased Assets shall have been released and any documents necessary to evidence such release shall have been delivered to Buyer and the Title Company;

(m) The Seller shall have transferred to the Trustee of Post-Closing Decommissioning Trust Agreement a portion or all of the Decommissioning Funds, in accordance with Section 6.12;

(n) Legislation or Treasury Regulations shall have not been enacted or promulgated that, in the opinion of nationally-recognized tax counsel, would have a material adverse effect on the tax consequences to Buyer contemplated in Section 6.18;

(o) The NRC shall have issued a renewed NRC License for Ginna for a period of not less than twenty (20) years beyond its original license term;

(p) The Ancillary Agreements shall be in full force and effect as of the Closing Date; and

(q) The Facilities shall have been operating at an average of not less than 95% of their licensed thermal output for a period of fourteen (14) days immediately preceding the Closing Date.

Section 7.2 <u>Conditions to Obligations of Seller</u>. The obligation of Seller to sell the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date (or the waiver by Seller) of the following conditions:

(a) All applicable waiting periods under the HSR Act relating to the consummation of the transactions contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court or Governmental Authority which restrains or prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect (each Party agreeing to use its Commercially Reasonable Efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any state or federal government or Governmental Authority in the United States which prohibits the transactions contemplated hereby;

(c) Seller shall have received all of the Seller's Required Regulatory Approvals, in form and substance reasonably satisfactory (including no materially adverse conditions as described in Section 9.1(d)) to Seller and such approvals shall be in full force and effect and either (i) shall be final and non-appealable or (ii) if not final and non-appealable, shall not be subject to the possibility of appeal, review or

reconsideration which, in the reasonable opinion of the Seller (A) is likely to be successful and (B), if successful, would have a material adverse effect on the operations or conditions (financial or otherwise) of the Seller;

(d) Buyer shall have received all Buyer's Required Regulatory Approvals (other than those the failure of which to obtain could not reasonably be expected to result in a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Seller), none of such approvals shall contain any conditions that could reasonably be expected to result in a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Seller, and such approvals shall be in full force and effect and either (i) shall be final and non-appealable or (ii) if not final and non-appealable, shall not be subject to the possibility of appeal, review or reconsideration which, in the reasonable opinion of Seller (A) is likely to be successful and (B) if successful, would have a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Seller;

(e) Buyer shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which are required to be performed and complied with by Buyer on or prior to the Closing Date;

(f) The representations and warranties of Buyer set forth in this Agreement that are qualified by materiality shall be true and correct as of the Closing Date and all other representations and warranties of Buyer shall be true and correct in all material respects as of the Closing Date, in each case as though made at and as of the Closing Date;

(g) Seller shall have received certificates from an authorized officer of Buyer, dated the Closing Date, to the effect that, to the knowledge of such officer the conditions set forth in Sections 7.2(e) and (f) have been satisfied by Buyer;

(h) Seller shall have received an opinion from Buyer's counsel and Buyer's Parent's counsel reasonably acceptable to Seller, dated the Closing Date and reasonably satisfactory in form and substance to Seller and its counsel, substantially in the form of Exhibit "I" hereto;

(i) Buyer shall have delivered, or caused to be delivered, to Seller at the Closing, Buyer's closing deliveries described in Section 3.7;

(j) The lien of the Mortgage Indenture on the Purchased Assets shall have been released and any documents necessary to evidence such release shall have been delivered to the title company;

(k) Legislation or Treasury Regulations shall have not been enacted or promulgated that, in the opinion of nationally-recognized tax counsel, would have a material adverse effect on the tax consequences to Seller contemplated in Section 6.18; and

(l) The NRC shall have issued a renewed NRC License for Ginna for a period of not less than twenty (20) years beyond its original license term.

ARTICLE 8

INDEMNIFICATION

Section 8.1 Indemnification.

(a) Following the Closing, Buyer shall indemnify, defend and hold harmless Seller, its officers, directors, employees, shareholders, Affiliates and agents (each, a "Seller Indemnitee") from and against any and all claims, demands, suits, losses, liabilities, damages, obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) (each, an "Indemnifiable Loss"), asserted against or suffered by any Seller Indemnitee relating to, resulting from or arising out of (i) any breach by Buyer of the representations and warranties which survive the Closing or any covenants contained in this Agreement; provided, however, that in the case of breaches of representations, warranties or covenants contained in Article V, only to the extent that such Indemnifiable Loss in the aggregate exceed One Million Dollars ($1,000,000), and provided further that in no event shall Buyer have liability for indemnification for an Indemnifiable Loss relating to, resulting from or arising out of matters set forth in this clause (i) of Section 8.1(a) that individually is less than Two Hundred and Fifty Thousand Dollars ($250,000), (ii) the Assumed Liabilities and Obligations, (iii) any Third Party Claims against a Seller Indemnitee arising out of or in connection with Buyer's ownership or operation of the Purchased Assets on or after the Closing Date, (iv) any actions taken by Buyer which shall result in tax consequences to the Seller or Seller's Qualified Decommissioning Fund which are different for Seller or Seller's Qualified Decommissioning Fund from those contemplated in Section 6.18, and (v) all Transfer Taxes for which Buyer is liable under Section 6.8.

(b) Following the Closing, Seller shall indemnify, defend and hold harmless Buyer, its officers, directors, members, employees, shareholders, Affiliates and agents (each, a "Buyer Indemnitee") from and against any and all Indemnifiable Losses asserted against or suffered by any Buyer Indemnitee relating to, resulting from or arising out of (i) any breach by Seller of the representations and warranties which survive the Closing or any covenants contained in this Agreement provided, however, in the case of breaches of representations, warranties or covenants contained in Article IV, only to the extent that such Indemnifiable Losses in the aggregate exceed One Million Dollars ($1,000,000), and provided further that in no event shall Seller have any liability for indemnification for an Indemnifiable Loss relating to, resulting from or arising out of matters set forth in this clause (i) of Section 8.1(b) that individually is less than Two Hundred and Fifty Thousand Dollars ($250,000), (ii) the Excluded Liabilities, (iii) noncompliance by Seller with any bulk sales or transfer laws as provided in Section 10.11, (iv) any Third Party Claims

against a Buyer Indemnitee arising out of or in connection with Seller's ownership or operation of the Purchased Assets on or prior to the Closing Date (other than any Third Party Claims that are Assumed Liabilities), (v) any Third Party Claims against a Buyer Indemnitee arising out of or in connection with Seller's ownership or operation of the Excluded Assets, (vi) all Taxes incurred by reason of any act of Seller that either constitutes an act of "self-dealing" as defined in Treas. Reg. § 1.468A-5(b)(2) or results in the disqualification of the Qualified Decommissioning Funds under Treas. Reg. § 1.468A-5 other than as a result of any action required or contemplated by this Agreement including, without limitation, the transfer contemplated by Section 5.7 hereof, or (vii) any claims or attachments of Seller or Seller's creditor against the Decommissioning Funds after the Closing Date.

(c) The expiration or termination of any representation or warranty shall not affect the Parties' obligations under this Section 8.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the "Indemnifying Party") with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

(d) Except to the extent otherwise provided in Article 9 or in Section 6.8(e), the rights and remedies of Seller and Buyer under this Article 8 are exclusive and in lieu of any and all other rights and remedies which Seller and Buyer may have under this Agreement or otherwise for monetary relief, with respect to (i) any breach of or failure to perform any covenant, agreement, or representation or warranty set forth in this Agreement, after the occurrence of the Closing, or (ii) the Assumed Liabilities and Obligations or the Excluded Liabilities, as the case may be. The indemnification obligations of the Parties set forth in this Article 8 apply only to matters arising out of this Agreement, excluding the Ancillary Agreements. Any Indemnifiable Loss arising under or pursuant to an Ancillary Agreement shall be governed by the indemnification obligations, if any, contained in the Ancillary Agreement under which the Indemnifiable Loss arises. The maximum aggregate exposure for indemnity by Seller or Buyer for any and all claims of breaches of representations or warranties made hereunder and indemnification of claims relating thereto shall be Twenty Million Dollars ($20,000,000).

(e) Notwithstanding anything to the contrary herein except for Section 6.8(e), no Party (including an Indemnitee) shall be entitled to recover from any other Party (including an Indemnifying Party) for any liabilities, damages, obligations, payments, losses, costs or expenses under this Agreement any amount in excess of the actual compensatory damages, court costs and reasonable attorney's and other advisor fees suffered by such Party. Buyer and Seller waive any right to recover punitive, incidental, special, exemplary and consequential damages arising in connection with or with respect to this Agreement including, but not limited to, losses or damages caused by reason of unavailability of Ginna, plant shutdowns or service interruptions, loss of use, profits or revenue, inventory or use charges, cost of purchased or replacement power, interest charges or cost of capital. The provisions of this Section 8.1(e) shall not apply to indemnification for a Third Party Claim.

(f) The Parties agree to treat all payments relating to indemnifications as adjustments to the Purchase Price to the extent allowed by law.

Section 8.2 Defense of Claims.

(a) If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a Party to this Agreement or any Affiliate of a Party to this Agreement (a "Third Party Claim"), including but not limited to an information document request or a notice of proposed disallowance issued by the Internal Revenue Service relating to a matter covered by Section 5.7, with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee shall give such Indemnifying Party reasonably prompt written notice thereof, but in any event such notice shall not be given later than twenty (20) calendar days after the Indemnitee's receipt of notice of such Third Party Claim. Such notice shall describe the nature of the Third Party Claim in reasonable detail and shall indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's expense and by such Indemnifying Party's own counsel, provided that the counsel for the Indemnifying Party who shall conduct the defense of such Third Party Claim shall be reasonably satisfactory to the Indemnitee. The Indemnitee shall cooperate in good faith in such defense at such Indemnitee's own expense. If an Indemnifying Party elects not to assume the defense of any Third Party Claim, the Indemnitee may compromise or settle such Third Party Claim over the objection of the Indemnifying Party, which settlement or compromise shall conclusively establish the Indemnifying Party's Liability pursuant to this Agreement; provided, however, the Indemnitee provides written notice to the Indemnifying Party of its intent to settle and such notice reasonably describes the terms of such settlement at least ten (10) Business Days prior to entering into any settlement.

(b) (i) If, within twenty (20) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claims, the Indemnitee receives written notice from the Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in Section 8.2 (a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnifying Party shall fail to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense and the Indemnifying Party shall be liable for all reasonable expenses thereof.

(ii) Without the prior written consent of the Indemnitee, which consent shall not be unreasonably withheld or delayed, the Indemnifying Party shall

not enter into any settlement of any Third Party Claim which would lead to Liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to Liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within twenty (20) calendar days after its receipt of such notice, the Indemnifying Party shall be relieved of its obligations to defend such Third Party Claim and the Indemnitee may contest or defend such Third Party Claim. In such event, the maximum Liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer plus reasonable costs and expenses paid or incurred by Indemnitee up to the date of said notice.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a "Direct Claim") shall be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event such notice shall not be given later than twenty (20) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party shall have a period of twenty (20) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such twenty (20) calendar day period, the Indemnifying Party shall be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its right to indemnification under this Agreement.

(d) The amount of any Indemnifiable Loss shall be reduced to the extent that the Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss. If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by, from or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof to the date or repayment at the "prime rate" as published in The Wall Street Journal) shall promptly be repaid by the Indemnitee to the Indemnifying Party.

(e) A failure to give timely notice as provided in this Section 8.2 shall not affect the rights or obligations of any Party hereunder except if, and only to the extent that, as a result of such failure, the Party which was entitled to receive such notice was actually prejudiced as a result of such failure.

ARTICLE 9

TERMINATION

Section 9.1 Termination.

(a) This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of Seller and Buyer.

(b) This Agreement may be terminated by Seller or Buyer, if (i) any federal or state court of competent jurisdiction shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the Closing, and such order, judgment or decree shall have become final and nonappealable; (ii) any statute, rule, order or regulation shall have been enacted or issued by any Governmental Authority which, directly or indirectly, prohibits the consummation of the Closing; or (iii) the Closing contemplated hereby shall have not occurred on or before December 31, 2004 (the "Termination Date"); provided that the right to terminate this Agreement under this Section 9.1(b)(iii) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and provided, further, that if on the Termination Date the conditions to the Closing set forth in Sections 7.1(c), 7.1(d), 7.2(c) or 7.2(d) shall not have been fulfilled but all other conditions to the Closing shall be fulfilled or shall have been capable of being fulfilled, then the Termination Date shall be June 30, 2005.

(c) This Agreement may be terminated by Buyer if any of Seller's Required Regulatory Approvals or Buyer's Required Regulatory Approvals, the receipt of which is a condition to the obligation of Buyer to consummate the Closing as set forth in Sections 7.1(c) and 7.1(d), shall have been denied or shall have been granted but are not in form and substance reasonably satisfactory to Buyer because one of such approvals contains a condition that would have a Material Adverse Effect or a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Buyer.

(d) This Agreement may be terminated by Seller if any of the Seller's Required Regulatory Approvals or Buyer's Regulatory Approvals, the receipt of which are a condition to the obligation of Seller to consummate the Closing as set forth in Section 7.2(c) and Section 7.2(d), shall have been denied or shall have been granted but are not in form and substance reasonably satisfactory to Seller, because one of such approvals contains a condition that would have a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Seller.

(e) This Agreement may be terminated by Buyer if there has been a material violation or breach by Seller of any applicable covenant, representation or warranty contained in this Agreement and such violation or breach (i) is not cured by the earlier of the Closing Date or thirty (30) days after receipt by Seller (or by Buyer in the case of notice by Seller pursuant to Section 6.9) of written notice specifying

particularly such violation or breach (provided that in the event Seller is attempting to cure the violation or breach in good faith, then Buyer may not terminate pursuant to this provision unless the violation or breach is not cured by the earlier of the Closing Date or the Termination Date), and (ii) such violation or breach has not been waived by Buyer.

(f) This Agreement may be terminated by Seller if there has been a material violation or breach by Buyer or Parent of any covenant, representation or warranty contained in this Agreement and such violation or breach (i) is not cured by the earlier of the Closing Date or thirty (30) days after receipt by Buyer or Parent (or by Seller in the case of notice by Buyer or Parent pursuant to Section 6.9) of written notice specifying particularly such violation or breach (provided that in the event Buyer or Parent, as the case may be, is attempting to cure the violation or breach in good faith, then Seller may not terminate pursuant to this provision unless the violation or breach is not cured by the earlier of the Closing Date or the Termination Date), and (ii) such violation or breach has not been waived by Seller.

(g) This Agreement may be terminated by Buyer or Seller in accordance with the provisions of Sections 6.11(b) or (c).

(h) This Agreement may be terminated by Seller if one of the events the non-occurrence of which is a condition to closing in Section 7.2(l) occurs, which is reasonably likely to have a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Seller.

(i) This Agreement may be terminated by Buyer if one of the events the non-occurrence of which is a condition to Closing in Section 7.1(n) occurs, which is reasonably likely to have a material adverse effect on the business, assets, operations or condition (financial or otherwise) of Buyer.

Section 9.2 Procedure and Effect of No Default Termination. In the event of termination of this Agreement by any Party pursuant to this Section 9, written notice thereof shall forthwith be given by the terminating Party to the other Parties, whereupon (but only in the case of termination pursuant to Subsections (e) or (f) of Section 9.1 where a breach of a covenant, representation or warranty by the non-terminating Party is not willful), the liabilities of the Parties hereunder will terminate, except as otherwise expressly provided in this Agreement, and thereafter no Party shall have any recourse against any of the other Parties by reason of this Agreement.

ARTICLE 10

MISCELLANEOUS PROVISIONS

Section 10.1 Amendment and Modification. Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of Seller and Buyer.

Section 10.2 Waiver of Compliance; Consents. Except as otherwise provided in this Agreement, any failure of any of the Parties to comply with any obligation, covenant, agreement or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver of such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent failure to comply therewith.

Section 10.3 Survival of Representations, Warranties, Covenants and Obligations.

(a) The representations and warranties given or made by any Party to this Agreement or in the certificates required by Section 7.1(f) or 7.2(g) shall survive the Closing for a period of twelve (12) months except that (i) all representations and warranties relating to Taxes and Tax Returns and the representations and warranties in Sections 4.10 and 4.12 shall survive the Closing for the period of the applicable statutes of limitation plus any extensions or waivers thereof and (ii) all representations and warranties set forth in Sections 4.1, 4.2, 4.21, 4.22, 5.7 and 6.7 hereof shall survive the Closing indefinitely. Each Party shall be entitled to rely upon the representations and warranties of the other Party or Parties set forth herein, notwithstanding any investigation or audit conducted before or after the Closing Date or the decision of any Party to complete the Closing.

(b) The covenants and obligations of the Parties set forth in this Agreement, including without limitation the indemnification obligations of the Parties under Article 8 hereof, shall survive the Closing indefinitely, and the Parties shall be entitled to the full performance thereof by the other Parties hereto without limitation as to time or amount (except as otherwise specifically set forth herein).

Section 10.4 Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the recipient Party at its address (or at such other address or facsimile number for a Party as shall be specified by like notice; provided, however, that notices of a change of address shall be effective only upon receipt thereof):

(a) If to Seller, to:

Rochester Gas and Electric Corporation
89 East Avenue
Rochester, NY 14649
Attention: President

with a copy to:

Huber Lawrence & Abell
605 Third Avenue
New York, NY 10158
Attention: John D. Draghi, Esq.

and

LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, NY 10019
Attention: Sheri E. Bloomberg, Esq.

(b) if to Buyer, to:

Constellation Generation Group, LLC
750 East Pratt Street
18th Floor
Baltimore, Maryland 21202
Attention: President

with a copy to:

Constellation Energy Group, Inc.
750 East Pratt Street
18th Floor
Baltimore, Maryland 21202
Attention: General Counsel

(c) if to Buyer's Parent, to:

Constellation Energy Group, Inc.
750 East Pratt Street
18th Floor
Baltimore, Maryland 21202
Attention: Vice President - Corporate Strategy and Development

with a copy to:

Constellation Energy Group, Inc.
750 East Pratt Street
18th Floor
Baltimore, Maryland 21202
Attention: General Counsel

Section 10.5 Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto, including by operation of law, without the prior written consent of each other Party, such consent not to be unreasonably withheld, nor is this Agreement intended (except as specifically provided herein) to confer upon any other Person except the Parties hereto any rights, interests, obligations or remedies hereunder. Any assignment in contravention of the foregoing sentence shall be null and void and without legal effect on the rights and obligations of the Parties hereunder. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Seller (including any beneficiary or dependent thereof) in respect of continued employment or resumed employment, and no provision of this Agreement shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any employee benefit plan or arrangement except as expressly provided for thereunder. Notwithstanding the foregoing, but subject to all applicable legal requirements, (i) Buyer or its permitted assignee may grant a security interest in the rights and interests hereunder to a trustee, lending institution or other party for the purposes of leasing, financing or refinancing the Purchased Assets, (ii) Buyer or its permitted assignee may assign, transfer, pledge or otherwise dispose of (absolutely or as security) its rights and interests hereunder to a directly or indirectly wholly-owned Affiliate of Buyer; provided, however, that no such assignment shall relieve or discharge Buyer from any of its obligations hereunder or shall be made if it would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement or materially increase the costs (to the non-assigning party) of the transactions contemplated by this Agreement. Seller agrees, at Buyer's expense, to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, pledge or other disposition of rights and interests hereunder so long as Seller's rights under this Agreement are not thereby altered, amended, diminished or otherwise impaired. In the event Buyer assigns this agreement pursuant to this Section 10.5, such assignee shall be defined as "Buyer" for all purposes hereunder thereafter.

Section 10.6 Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York (without giving effect to conflict of law principles) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies. THE PARTIES HERETO AGREE THAT VENUE IN ANY AND ALL ACTIONS AND PROCEEDINGS

RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT SHALL BE IN THE STATE AND FEDERAL COURTS FOR MONROE COUNTY, NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION FOR SUCH PURPOSE (EXCEPT WHERE SUCH ACTION OR PROCEEDING IS REQUIRED BY LAW TO BE IN WAYNE COUNTY), AND THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND IRREVOCABLY WAIVE THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY SUCH ACTION OR PROCEEDING. SERVICE OF PROCESS MAY BE MADE IN ANY MANNER RECOGNIZED BY SUCH COURTS. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.7 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.8 Interpretation. The articles, section and schedule headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 10.9 Schedules and Exhibits. Except as otherwise provided in this Agreement, all Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

Section 10.10 Entire Agreement. This Agreement, the Confidentiality Agreement and the Ancillary Agreements, including the Exhibits, Schedules, documents, certificates and instruments referred to herein or therein, and any other documents that specifically reference this Section 10.10, embody the entire agreement and understanding of the Parties hereto in respect of the transactions contemplated by this Agreement and supersedes all prior agreements and understandings between the Parties other than the Confidentiality Agreement with respect to such transactions. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material made available to Buyer pursuant to the terms of the Confidentiality Agreement.

Section 10.11 Bulk-Sales Laws. Buyer acknowledges that, notwithstanding anything in this Agreement to the contrary, Seller will not comply with the provision of the bulk sales laws of any jurisdiction in connection with the transactions contemplated by this Agreement. Buyer hereby waives compliance by Seller with the provisions of the bulk sales laws of all applicable jurisdictions.

Section 10.12 No Joint Venture. Nothing in this Agreement creates or is intended to create an association, trust, partnership, joint venture or other entity or similar legal relationship among the Parties, or impose a trust, partnership or fiduciary duty, obligation, or liability on or with respect to the Parties. Except as expressly provided herein, neither Party is or shall act as or be the agent or representative of the other Party.

Section 10.13 Change in Law. If and to the extent that any Laws or regulations that govern any aspect of this Agreement shall change, so as to make any aspect of this transaction unlawful, then the Parties agree to make such modifications to this Agreement as may be reasonably necessary for this Agreement to accommodate any such legal or regulatory changes, without materially changing the overall benefits or consideration expected hereunder by any Party.

Section 10.14 Buyer's Parent Support. From the date hereof until the effectiveness of the Closing, Buyer's Parent agrees to provide Buyer any and all financial support necessary to permit Buyer to perform its obligations hereunder.

Section 10.15 Severability. Any term or provision of this Agreement that is held invalid or unenforceable in any situation shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation, provided, however, that the remaining terms and provisions of this Agreement may be enforced only to the extent that such enforcement in the absence of any invalid terms and provisions would not result in (a) deprivation of a Party of a material aspect of its original bargain upon execution of this Agreement or any of the Ancillary Agreements, (b) unjust enrichment of a Party, or (c) any other manifestly unfair or inequitable result.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

ROCHESTER GAS AND ELECTRIC CORPORATION

By: /s/ Joseph J. Syta
Name: Joseph J. Syta
Title: Controller and Treasurer

CONSTELLATION GENERATION GROUP, LLC

By: /s/ Michael J. Wallace .
Name: Michael J. Wallace
Title: President

Solely for purposes of Article 5 and Sections 6.12(b) and 10.14:
CONSTELLATION ENERGY GROUP, INC.

By: /s/ Mark P. Huston
Name: Mark. P. Houston
Title: Vice President - Strategy

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

ROCHESTER GAS AND ELECTRIC CORPORATION

By: ______________________
Name: Joseph J. Syta
Title: Controller and Treasurer

CONSTELLATION GENERATION GROUP, LLC

By: ______________________
Name:
Title:

Solely for purposes of Article 5 and Sections 6.12(b) and 10.14:
CONSTELLATION ENERGY GROUP, INC.

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

ROCHESTER GAS AND ELECTRIC CORPORATION

By: ___________________________
Name:
Title:

CONSTELLATION GENERATION GROUP, LLC

By: ___________________________
Name: Michael J. Wallace
Title: President

Solely for purposes of Article 5 and Sections 6.12(b) and 10.14:
CONSTELLATION ENERGY GROUP, INC.

By: ___________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

ROCHESTER GAS AND ELECTRIC CORPORATION

By: ___________________________
Name:
Title:

CONSTELLATION GENERATION GROUP, LLC

By: ___________________________
Name:
Title:

Solely for purposes of Article 5 and Sections 6.12(b) and 10.14:
CONSTELLATION ENERGY GROUP, INC.

By: Mark P. Huston
Name: MARK P. HUSTON
Title: VP - Strategy