EXHIBIT C

# RECIPROCAL EASEMENT AGREEMENT

**THIS RECIPROCAL EASEMENT AGREEMENT** ("Agreement") is made and entered into as of ________________, 200__, by and between **ROCHESTER GAS AND ELECTRIC CORPORATION**, a New York corporation having an office at 89 East Avenue, Rochester, New York 14649 ("Transmission Owner"), and ________________________________, a ________________________ having an address at ________________________________ ("Interconnection Customer") (the Transmission Owner and the Interconnection Customer being each referred to herein individually as a "Party", and collectively as the "Parties").

## Background

A. The Transmission Owner and the Interconnection Customer have entered into a certain Asset Purchase Agreement pursuant to which the Transmission Owner has agreed to sell to the Interconnection Customer, and the Interconnection Customer has agreed to purchase from the Transmission Owner, all of the Transmission Owner's interests in certain assets identified therein with respect to an electric energy generation station which is commonly known as the Robert E. Ginna Nuclear Power Plant. The sale of the Generating Facility is to include the conveyance of all of the interests of the Transmission Owner in certain real property, a description of which is set forth on Exhibit A to this Agreement (the "Generation Land"), together with all of the Transmission Owner's interests in certain Improvements located both on and off the Generation Land.

B. On and after the Closing Date, the Transmission Owner will retain its fee title ownership to certain real property on which its Station 13A is located, which real property is described on Exhibit B to this Agreement ("Station 13A Parcel"), together with certain Improvements located on the Station 13A Parcel (the "Station 13A Facilities").

C. The Transmission Owner utilizes the Station 13A Parcel, the Station 13A Facilities and the Transmission System for the purpose of transmitting and distributing the Electricity generated by the Generating Facility, and for the purpose of providing Off-Site Power Service to the Generating Facility.

D. In connection with the APA, The Transmission Owner and the Interconnection Customer have entered into a certain Interconnection Agreement pursuant to which, among other things, the Generating Facility will continue to be interconnected, directly or indirectly, with the Station 13A Facilities and the Transmission System by means of the Interconnection Customer's Easement Equipment, for the purpose of enabling the Interconnection Customer to (i) sell and deliver Electricity, and (ii) purchase and receive delivery of Off-Site Power Service.

E. The Parties desire to enter into this Agreement for the purposes of (i) the Transmission Owner's granting to the Interconnection Customer certain easements over the Station 13A Parcel, and (ii) the Interconnection Customer's granting to the Transmission Owner certain easements over the Generation Land.

**NOW, THEREFORE**, in consideration of the mutual terms, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE 1.**

**DEFINITIONS AND RULES OF CONSTRUCTION**

**1.1 Defined Terms.** The following terms, when used herein with initial capitalization, shall have the meanings specified in this section. Except as may be otherwise expressly provided in this Agreement, capitalized terms not defined in this Agreement shall have the meanings assigned to them in the Interconnection Agreement.

**1.1.1** "Access" shall mean, subject to the conditions set forth in this Agreement and a Party's right to impose reasonable security and safety restrictions protecting its Permittees, employees, agents, consultants, contractors, subcontractors, invitees, property and Confidential Information, full and unimpeded access and a right-of-way, in common with the Grantor, over and through such roads, paths, walkways, corridors, hallways, doorways and other means of entry or exit as exist now and from time to time on the Grantor's property, or, where no such means of entry or exit exist, over and through those areas of the Grantor's property which are (a) reasonably necessary for achieving the underlying purpose of the Grantee, and (b) least likely to impede or damage the Grantor's property or operations; it shall also include access and a right-of-way for the Grantee's employees, agents, consultants, contractors, subcontractors, invitees, Permitees, cars, vehicles, trucks, trailers, heavy machinery, equipment, materials, and all other

apparatus and items reasonably necessary for achieving the Grantee's underlying purpose. This term is as defined whether or not capitalized in this Agreement.

**1.1.2** "Affiliate" shall mean, with respect to a person or entity, any individual, corporation, partnership, firm, joint venture, association, joint stock company, trust or other unincorporated organization, directly or indirectly controlling, controlled by, or under common control with, such person or entity. The term "control" shall mean the possession, directly or indirectly, of the power to direct the management or policies of a person or an entity. A voting interest of ten per cent or more shall create a rebuttable presumption of control.

**1.1.3** "Agreement" shall mean this Reciprocal Easement Agreement, including all exhibits and appendices attached hereto and any amendments hereto.

**1.1.4** "Applicable Laws and Regulations" shall mean all duly promulgated applicable federal, state and local laws, regulations, rules, ordinances, codes, decrees, judgments, directives, or judicial or administrative orders, permits and other duly authorized actions of any Governmental Authority.

**1.1.5** "Applicable Reliability Council" shall mean the reliability council applicable to the Transmission System to which the Generating Facility is directly interconnected.

**1.1.6** "Applicable Reliability Standards" shall mean the requirements and guidelines of the NRC, NERC, the Applicable Reliability Council, and the Control Area of the Transmission System to which the Generating Facility is directly interconnected.

**1.1.7** "Asset Purchase Agreement" or "APA" shall mean the asset purchase agreement entered into by the Transmission Owner and the Interconnection Customer, dated as of ________________, 2003, as amended or superseded.

**1.1.8** "Breach" shall mean the failure of a Party to perform or observe any material term or condition of this Agreement.

**1.1.9** "Breaching Party" shall mean a Party that is in Breach of this Agreement.

**1.1.10** "Bulletin" shall mean the Transmission Owner's Bulletin 86-01 "Requirements For Independent Power Producers of Electricity", as amended or superseded. The Bulletin is hereby incorporated into this Agreement by reference and is made a part of this Agreement.

**1.1.11** "Business Day" shall mean Monday through Friday, excluding federal holidays.

**1.1.12** "Calendar Day" shall mean any day including Saturday, Sunday or a federal holiday.

**1.1.13** "Closing Date" shall mean the date as defined in the APA, on which all of the Transmission Owner's interests with respect to the Generating Facility are transferred from the Transmission Owner to the Interconnection Customer pursuant to the APA.

**1.1.14** "Commission" shall mean the Federal Energy Regulatory Commission ("FERC"), or its successor.

**1.1.15** "Confidential Information" shall mean any confidential, proprietary or trade secret information with respect to a plan, specification, pattern, procedure, design, device, list, concept, policy or compilation relating to the present or planned business of a Party, which is designated as confidential by the Party supplying the information, whether conveyed orally, electronically, in writing, through inspection, or otherwise. Confidential Information shall not include information that the receiving Party can demonstrate: (1) is generally available to the public other than as a result of a disclosure by the receiving Party; (2) was in the lawful possession of the receiving Party on a non-confidential basis before receiving it from the disclosing Party; (3) was supplied to the receiving Party without restriction by a third party, who, to the knowledge of the receiving Party after due inquiry, was under no obligation to the disclosing Party to keep such information confidential; (4) was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; (5) is, or becomes, publicly known, through no wrongful act or omission of the receiving Party or Breach of this Agreement; or (6) is required to be disclosed by law or subpoena, or is necessary in any legal proceeding establishing rights and obligations under this Agreement. Information designated as Confidential Information will no

longer be deemed confidential if the Party that designated the information as confidential notifies the other Party that it no longer is confidential.

**1.1.16** "Control Area" shall mean an electrical system or systems bounded by interconnection metering and telemetry, capable of controlling generation to maintain its interchange schedule with other Control Areas and contributing to frequency regulation of the interconnection. A Control Area must be certified by NERC.

**1.1.17** "Default" shall mean the failure of a Breaching Party to cure its Breach in accordance with Article 9 of this Agreement.

**1.1.18** "Delivery Point(s)" shall mean the point(s) at which Electricity is delivered from the Generating Facility to the Transmission System, as indicated on the one-line diagram attached hereto as Appendix A.

**1.1.19** "Distribution System" shall mean the Transmission Owner's facilities and equipment used to transmit electricity to ultimate usage points such as homes and industries directly from nearby generators or from interchanges with higher voltage transmission networks which transport bulk power over longer distances. The voltage levels at which distribution systems operate differ among areas.

**1.1.20** "Distribution Upgrades" shall mean the additions, modifications, and upgrades to the Transmission Owner's Distribution System at or beyond the Points of Interconnection to

facilitate interconnection of the Generating Facility and render the transmission service necessary to effect Interconnection Customer's wholesale sale of electricity in interstate commerce. Distribution Upgrades do not include Interconnection Facilities.

**1.1.21** "Electricity" shall mean electric capacity as measured in MW or kW, energy as measured in MWh or kWh, and ancillary services.

**1.1.22** [Reserved.]

**1.1.23** "Energy System Operating Rules" or "ESOR" means the Energy System Operating Rules of the Transmission Owner, as amended or superseded. The ESOR are hereby incorporated into this Agreement by reference and are made a part of this Agreement.

**1.1.24** "Environmental Law" shall mean Applicable Laws and Regulations relating to pollution or protection of the environment or natural resources.

**1.1.25** "FERC" or "Commission" shall mean the Federal Energy Regulatory Commission, or its successor.

**1.1.26** "Force Majeure" shall mean any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, breakage or accident to machinery or equipment, any order, regulation or restriction imposed by governmental, military or lawfully

established civilian authorities, or any other cause beyond a Party's control. A Force Majeure event does not include an act of negligence or intentional wrongdoing.

**1.1.27** "Generating Facility" shall mean the Robert E. Ginna Nuclear Power Plant, excluding the Interconnection Customer's Interconnection Facilities.

**1.1.28** "Generation Land" is defined in the recitals to this Agreement.

**1.1.29** "Good Utility Practice" shall mean any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, including those set forth in the Bulletin, the NRC Requirements and Commitments, ESOR, and Appendix H to the Interconnection Agreement, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region.

**1.1.30** "Governmental Authority" shall mean any federal, state, local or other governmental regulatory or administrative agency, court, commission, department, board, or other governmental subdivision, legislature, rulemaking board, tribunal, or other governmental authority having jurisdiction over the Parties, their respective facilities, their respective Land, or the respective services they provide, and exercising or entitled to exercise any administrative,

executive, police, or taxing authority or power; provided, however, that such term does not include Interconnection Customer, Transmission Owner, or any Affiliate of either of them.

**1.1.31** "Grantee" shall mean the Party that enjoys the benefit of the referenced easement, license, right, privilege or right-of-way granted and conveyed under this Agreement.

**1.1.32** "Grantor" shall mean the owner of the Land and/or Improvements burdened by the referenced easement, license, right, privilege or right-of-way granted and conveyed under this Agreement.

**1.1.33** "Hazardous Substances" shall mean any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "radioactive substances," "contaminants," "pollutants," "toxic pollutants" or terms of similar meaning and regulatory effect under any applicable Environmental Law, or any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any applicable Environmental Law.

**1.1.34** "Improvements" shall mean all structures, improvements, facilities, systems, appurtenances, property, fixtures and equipment of any kind now or hereafter located on the Land, whether above or below the land surface, whether real or personal property, and whether permanent or temporary, including (a) all buildings, sheds, energy plants, remote terminal units, tanks, pipelines (including meters, connections, valves and other associated equipment), cables,

wires, conduits, cable trays, trenches, mains, lines, ducts, fences, towers, antennae, tunnels, driveways, streets, alleys, paved parking areas, pathways, screening walls, awnings, retaining walls, plantings, shrubs and other landscaping, irrigation and drainage pipes and facilities, lighting fixtures and signs and (b) all future upgrades, modifications, alterations and replacements of such structures, improvements, facilities, appurtenances, property, systems, fixtures and equipment.

**1.1.35** "Interconnection Agreement" shall mean the interconnection agreement entered into by the Transmission Owner and the Interconnection Customer, in connection with the APA, as amended or superseded.

**1.1.36** "Interconnection Customer" shall mean the entity identified in the first paragraph of this Agreement that is interconnecting the Generating Facility with the Transmission Owner's Transmission System.

**1.1.37** "Interconnection Customer's Easement Equipment" shall mean the portion of the Interconnection Customer's Interconnection Facilities, and the portion of the Interconnection Customer's equipment and Improvements with respect to the Generating Facility, that are located in or on the Station 13A Parcel. Certain major items included in the Interconnection Customer's Easement Equipment are specifically identified in Exhibit C to this Agreement.

**1.1.38** "Interconnection Customer's Interconnection Facilities" shall mean all facilities and equipment, including those identified in Exhibits G and H of this Agreement, that are located

between the Generating Facility and the Points of Interconnection, including any modification, addition, or upgrades to such facilities and equipment necessary to physically and electrically interconnect the Generating Facility to the Transmission Owner's Transmission System. Interconnection Customer's Interconnection Facilities are only those that are owned, operated or leased by Interconnection Customer, and include the portions of the Joint Use Facilities that are owned by Interconnection Customer, as set forth in Exhibit G of this Agreement.

**1.1.39** "Interconnection Facilities" shall mean the Transmission Owner's Interconnection Facilities, the Interconnection Customer's Interconnection Facilities, and the Joint Use Facilities. Collectively, Interconnection Facilities include all facilities and equipment between the Generating Facility and the Points of Interconnection, including any modification, additions or upgrades that are necessary to physically and electrically interconnect the Generating Facility to the Transmission Owner's Transmission System., Interconnection Facilities shall not include Distribution Upgrades, Stand Alone Network Upgrades or Network Upgrades.

**1.1.40** "Interconnection Service" shall mean the service provided by the Transmission Owner associated with interconnecting the Generating Facility to the Transmission Owner's Transmission System and enabling it to receive electric energy and capacity from the Generating Facility at the Points of Interconnection, pursuant to the terms of the Interconnection Agreement and, if applicable, the Tariff.

**1.1.41** "Joint Use Facilities" shall mean facilities and equipment which are identified as Joint Use Facilities in Exhibit G hereto, or in Appendix G to the Interconnection Agreement, as

either of them may be amended from time to time, which are owned by either the Transmission Owner or the Interconnection Customer and which contribute to the operational reliability of the Transmission System and are, therefore, operated jointly by the Transmission Owner and the Interconnection Customer.

**1.1.42** "Land" shall mean the Generation Land, the Station 13A Parcel, and/or any interest in either of them, as the context may require.

**1.1.43** "Metering Equipment" shall mean all metering equipment installed or to be installed at the Generating Facility pursuant to the Interconnection Agreement at the metering points, including, but not limited to, instrument transformers, MWh-meters, data acquisition equipment, transducers, remote terminal unit, communications equipment, phone lines, and fiber optics.

**1.1.44** "NERC" shall mean the North American Electric Reliability Council, or its successor.

**1.1.45** "Network Resource" shall mean that portion of the Generating Facility that is integrated with the Transmission Owner's Transmission System, designated as a Network Resource pursuant to the terms of the Tariff, and subjected to redispatch directives as ordered by the Transmission Owner in accordance with the Tariff.

**1.1.46** "Network Upgrades" shall mean the additions, modifications, and upgrades to the

Transmission Owner's Transmission System required at or beyond the point at which the Interconnection Customer interconnects to the Transmission Owner's Transmission System to accommodate the interconnection of the Generating Facility to the Transmission Owner's Transmission System.

**1.1.47** "New York Independent System Operator" or "NYISO" shall mean the organization formed as an Independent System Operator for the New York State transmission system in accordance with FERC order(s) in Docket Nos. ER97-1523-000, et al., or its successor.

**1.1.48** "NRC" shall mean the Nuclear Regulatory Commission, or its successor.

**1.1.48A** "NRC Maintenance Rule" shall mean the NRC rules and regulations governing the maintenance of the Generating Facility and, as applicable, the Interconnection Facilities, at 10 C.F.R. § 50.65, as amended from time to time, and commitments relating thereto to which Interconnection Customer is subject.

**1.1.49** "NRC Requirements and Commitments" shall mean all the requirements, obligations, duties, and commitments required to be followed and honored by Interconnection Customer pursuant to the Atomic Energy Act of 1954, the regulations of the NRC, the Generating Facility's operating license and nuclear materials licenses, and all other laws, regulations, licenses, and commitments to which Interconnection Customer is or may become subject from time to time, as amended or superseded.

**1.1.50** "Off-Site Power Service" shall mean all services necessary to permit the supply of Electricity (excluding ancillary services) to the Generating Facility in accordance with the terms of the Interconnection Agreement.

**1.1.51** "Off-Site Power Supply Points" shall mean the points at which Off-Site Power Service is supplied to the Interconnection Customer as indicated on the one-line diagram attached hereto as Appendix A.

**1.1.52** "Permittee" shall mean, with respect to a particular Party, all Persons entitled to occupy or use all or any portion of such Party's Land by virtue of a lease, easement, license or other legal relationship with such Party; provided, however, that neither Party shall be deemed to be a "Permittee" of the other Party by virtue of this Agreement or the Interconnection Agreement.

**1.1.53** "Person" shall mean any individual, business trust, corporation, limited liability company, partnership, trust or trustee thereof, estate or executor thereof, unincorporated organization or joint venture, court or governmental unit or any agency or subdivision thereof, or any other legally recognizable entity.

**1.1.54** "Point(s) of Interconnection" shall mean the point(s), as set forth in Exhibit J to this Agreement, where the Interconnection Facilities connect to the Transmission Owner's Transmission System. The Points of Interconnection shall be the Delivery Points and the Off-Site Power Supply Points set forth in Exhibit J to this Agreement.

**1.1.55** "Reasonable Efforts" shall mean, with respect to an action required to be attempted or taken by a Party under this Agreement, efforts that are timely and consistent with Good Utility Practice and are otherwise substantially equivalent to those a Party would use to protect its own interests.

**1.1.56** "Release" shall mean release, spill, leak, discharge, dispose of, pump, emit, empty, inject, leach, dump, or allow to escape into or through the environment.

**1.1.57** "Stand Alone Network Upgrades" shall mean Network Upgrades that an Interconnection Customer may construct without affecting day-to-day operations of the Transmission System during their construction. Pursuant to the Interconnection Agreement, both the Transmission Owner and the Interconnection Customer must agree as to what constitutes Stand Alone Network Upgrades and identify them in Appendix A to the Interconnection Agreement.

**1.1.58** "Station 13A Facilities" is defined in the recitals to this Agreement. The Station 13A Facilities include all Improvements with respect to the Station 13A Parcel, other than Improvements owned by the Interconnection Customer.

**1.1.59** "Station 13A Parcel" is defined in the recitals to this Agreement.

**1.1.60** "System Operator" shall mean any of the following or its successor or equivalent: (a) the Transmission Owner's energy control center staff, or the energy control staff of any

Affiliate of the Transmission Owner with responsibility for the Transmission Owner's Transmission System, (b) the energy control center staff as provided in the Tariff, which staff are responsible for central dispatch, or (c) the energy control staff of a satellite control area operator.

**1.1.61** "Tariff" shall mean the Transmission Provider's NYISO Open Access Transmission Tariff ("OATT") through which open access transmission service and Interconnection Service are offered or, to the extent applicable, the NYISO Market Administration and Control Area Services Tariff, as each is filed with the Commission, and as each may be amended or supplemented from time to time, or any successor tariff to either of them.

**1.1.62** "Transmission Owner" shall mean the entity specified in the first paragraph of this Agreement, that owns the Transmission System at the Points of Interconnection and is a Party to this Agreement.

**1.1.63** "Transmission Owner's Easement Equipment" shall mean the portion of the Transmission Owner's Interconnection Facilities, and the portion of the Transmission Owner's Metering Equipment and associated facilities, located in or on the Generation Land. Certain major items included in the Transmission Owner's Easement Equipment are specifically identified in Exhibit D to this Agreement.

**1.1.64** "Transmission Owner's Interconnection Facilities" shall mean those facilities and equipment owned, controlled or operated by the Transmission Owner located from the Points of

Interconnection as identified in Exhibit J to this Agreement, including any modifications, additions or upgrades to such facilities and equipment. Transmission Owner's Interconnection Facilities shall include the portions of the Joint Use Facilities that are owned by the Transmission Owner as set forth in Exhibit G to this Agreement, but shall exclude Distribution Upgrades, Stand Alone Network Upgrades and Network Upgrades. Certain major items included in the Transmission Owner's Interconnection Facilities are specifically identified in Exhibit I to this Agreement.

**1.1.65** Transmission Provider" shall mean the NYISO, or its successor.

**1.1.66** "Transmission System" shall mean the facilities owned, controlled, or operated by the Transmission Owner that are used to provide transmission service under the Tariff.

1.2 **Interpretation**. With respect to any easement or other right created by this Agreement, (a) the words "in," "upon," "to," "on," "over," "above," "through," and/or "under" shall be interpreted to include all of such terms, and (b) the term "use" shall be interpreted to include "use, operate, maintain, repair, upgrade, clean, install, alter, disconnect, demolish, remove, inspect, test (or witness testing), construct, modify, restore, rebuild, replace, and expand within the defined scope of the easement or other right to meet the current and future needs of a Party hereto."

## ARTICLE 2.

## THE TRANSMISSION OWNER'S EASEMENTS

2.1 **Grant of Easements to the Transmission Owner**. The Interconnection Customer does hereby grant and convey to the Transmission Owner, as an appurtenance to title to the Station 13A Parcel, on the terms and subject to the conditions hereinafter set forth, the following non-exclusive easements and other rights burdening the portions of the Generation Land described below:

**2.1.1** A non-exclusive easement (a) permitting the Transmission Owner's Easement Equipment to remain in its present locations, and (b) to use the Transmission Owner's Easement Equipment in the manner described in this Agreement and the Interconnection Agreement and in the normal conduct of the Transmission Owner's business, both current and future.

**2.1.2** A right of Access at all reasonable times to (a) read and inspect the Transmission Owner's Metering Equipment and to inspect facilities associated therewith, (b) install, operate, maintain, disconnect and remove the Transmission Owner's Easement Equipment, and (c) inspect and operate certain facilities owned by the Interconnection Customer, which facilities are set out in Exhibit E to this Agreement; provided, however, that such right of Access shall be exercised in such a manner as shall minimize disruption to the business and operations of the Interconnection Customer.

**2.1.3** Easements (a) to permit any drainage pipes or systems which serve the Station 13A Parcel to remain in their present locations on the Generation Land, and (b) to allow rainwater and runoff collecting within drainage and collection systems on the Station 13A Parcel to drain into

and through any drainage systems that may be located on the Generation Land now and from time to time.

**2.1.4** [Reserved.]

**2.1.5** For purposes of ultimate Access to and use of the Transmission Owner's Easement Equipment, a non-exclusive easement over the roads, paths and walkways located from time to time on the Generation Land.

**2.1.6** Easements to use on a temporary basis such portions of the parking facilities of the Interconnection Customer as are reasonably necessary, for the purpose of parking or storing cars, trucks, vehicles, trailers, heavy machinery, equipment, materials or other apparatus or items belonging to the Transmission Owner, in the exercise of any easement or other right under this Agreement; provided, however, that any such parking and storage shall be undertaken in such a manner as shall minimize disruption to the business and operations of the Interconnection Customer and shall be in accordance with reasonable security and safety rules established by the Interconnection Customer.

## ARTICLE 3.

## GENERATION OWNER'S EASEMENTS

**3.1** **Grant of Easements to the Interconnection Customer**. The Transmission Owner does hereby grant and convey to the Interconnection Customer, as an appurtenance to title to the Generation Land, on the terms and subject to the conditions hereinafter set forth, the following

non-exclusive easements and other rights burdening the portions of the Station 13A Parcel described below:

**3.1.1** An easement (a) permitting the Interconnection Customer's Easement Equipment to remain in its present locations, and (b) to use the Interconnection Customer's Easement Equipment in the manner described in this Agreement and the Interconnection Agreement and in the normal conduct of the Interconnection Customer's business, both current and future.

**3.1.2** For purposes of ultimate Access to and use of the Interconnection Customer's Easement Equipment, a non-exclusive easement over the roads, paths and walkways at any time located from time to time on the Station 13A Parcel.

**3.1.3** Easements (a) to permit any drainage pipes or systems which serve the Generation Land to remain in their present locations on the Station 13A Parcel, and (b) to allow rainwater and runoff collecting within drainage and collection systems on the Generation Land to drain into and through any drainage systems that may be located on the Station 13A Parcel now and from time to time.

**3.1.4** [Reserved.]

**3.1.5** Easements to use on a temporary basis such portions of the parking facilities of the Transmission Owner as are reasonably necessary, for the purpose of parking or storing cars, trucks, vehicles, trailers, heavy machinery, equipment, materials or other apparatus or items

belonging to the Interconnection Customer, in the exercise of any easement or other right under this Agreement; provided, however, that any such parking and storage shall be undertaken in such a manner as shall minimize disruption to the business and operations of the Transmission Owner and shall be in accordance with reasonable security and safety rules established by the Transmission Owner.

## ARTICLE 4.

## USE OF PROPERTY AND EASEMENTS

**4.1 Performance Standards**. Each Party shall perform all of its obligations under this Agreement, and shall exercise all of its easements and other rights under this Agreement, in accordance with Applicable Laws and Regulations, Applicable Reliability Standards, and Good Utility Practice, and to the extent a Party is required to take or prevented from taking or limited in taking any action by such Applicable Laws and Regulations, Applicable Reliability Standards, and Good Utility Practice, such Party shall not be deemed to be in Breach of this Agreement for its compliance therewith. In addition, the Parties shall, by separate writing(s) executed by each of them, establish such access, control, safety, security and evacuation protocols with respect to each Party's Land as may be necessary to comply with any Applicable Laws and Regulations duly promulgated by the NRC or with NRC Requirements and Commitments.

**4.2 Restrictions on Access**. In exercising its easements and other rights hereunder, the Grantee shall (a) comply with such reasonable rules of safety and security as the Grantor may from time to time adopt and publish by written notice given to Grantee, and (b) notify its Permittees, consultants, contractors, subcontractors, agents, invitees and employees who make

use of the easements and other rights granted to it hereunder of the existence of such rules and the need to comply therewith.

4.3 **Subject to Existing Matters**. The easements and other rights in this Agreement are granted subject to (a) liens for taxes and assessments not yet due and payable; (b) all agreements, contracts, covenants, conditions, restrictions, reservations, rights, rights-of-way, easements, encumbrances, licenses, leases, liens and other title matters of record; (c) all agreements, contracts, easements, leases, licenses, covenants, conditions, restrictions, reservations, liens, rights, rights-of-way and other matters affecting title which are not of record, but which have been disclosed by one Party to the other Party in writing; and (d) all other matters which would be disclosed by an inspection, examination of title or accurate survey.

4.4 **Interpretation**. The following shall apply in interpreting any easement or other right granted pursuant to this Agreement: (a) each easement and other right granted herein shall be permanent and non-exclusive and may be enjoyed without charge or fee, except as may be otherwise expressly provided herein; and (b) any easement granted herein includes the right to cut, trim, burn, treat and/or remove by mechanical and/or chemical means any or all trees, shrubs and/or other similar vegetative obstructions within the easement area to the extent reasonably necessary for achieving the underlying purpose of the Grantee with respect to such easement.

4.5 **Cooperation**. Pursuant to Article 2, the Transmission Owner has easements and other rights over the Generation Land for, among other things, the purpose of using the Transmission Owner's Easement Equipment and other property of the Transmission Owner. The

Parties acknowledge that the Transmission Owner's Easement Equipment and other property of the Transmission Owner are or will be, in many cases, located in areas of the Generation Land on which Improvements and other property of the Interconnection Customer are located. Pursuant to Article 3, the Interconnection Customer has easements and other rights over the Station 13A Parcel for, among other things, the purpose of using the Interconnection Customer's Easement Equipment and other property of the Interconnection Customer. The Parties acknowledge that the Interconnection Customer's Easement Equipment and other property of the Interconnection Customer are or will be, in many cases, located in areas of the Station 13A Parcel on which Improvements and other property of the Transmission Owner are located. No grant of an easement or other right in this Agreement shall be deemed to require any Party to remove its Improvements or other property from the present location(s) thereof on Land owned by such Party and burdened by such easement or other right. Each Party agrees to cooperate with the other Party so as not to interfere with or obstruct the use by such other Party of such other Party's Improvements and other property. Such duty of cooperation shall include the obligation of the Parties to mutually agree upon reasonable rules and procedures for the use by the Parties of those areas of the Land in which the Parties' shared use is required as a result of the easements and other rights granted in this Agreement.

**4.6** **<u>Change in Ground Surface Elevations</u>**. No Grantee shall materially increase or decrease the ground surface elevations, or allow the ground surface elevations to be materially increased or decreased in any manner, within the easements granted to it herein, nor shall the ground subject to such easements be penetrated by or on behalf of the Grantee of such easements

in any manner to a depth in excess of eighteen (18) inches without the prior written consent of the Grantor of such easements, which consent shall not be unreasonably withheld.

## ARTICLE 5.

## REQUIREMENTS REGARDING MAINTENANCE AND CONSTRUCTION WORK

The requirements of this Article shall apply to all relocation, installation, upgrade, replacement, restoration, alteration, modification, construction, demolition, repair, maintenance and other work and activities with respect to the Land (a) performed by or on behalf of a Party as the holder of an easement or other right granted hereunder and in connection with such easement or other right, or (b) performed by or on behalf of a Party as an owner of a portion of the Land in an instance in which such work or activities affect an easement or other right granted hereunder.

**5.1** **No Unreasonable Interference; Compliance with Requirements of Law**. No work or activity performed by or on behalf of any Party with respect to the Land shall unreasonably interfere with the use, occupancy or enjoyment of any portion of the Land by the owner thereof, with the use or enjoyment of an easement or other right granted hereunder by the holder thereof, or with the Parties' respective rights and obligations under the Interconnection Agreement, except in each case for temporary minor inconveniences, the scope and duration of which are minimized to the extent reasonably possible. Except as may be otherwise provided herein, no work or activity performed by or on behalf of any Party with respect to the Land shall cause any other Party to be in violation of any Law.

5.2 **Repair of Defects**. All work and activities performed by or on behalf of either Party with respect to the Land shall be performed in such a manner as shall not damage the Land, Improvements or operations of the other Party. Notwithstanding the foregoing sentence, it is understood and agreed that work and activities performed by or on behalf of either Party with respect to the Land may cause minor damage to the other Party's Land, which damage shall be promptly and diligently repaired by the Party by or on behalf of whom the work or activity is performed. In addition, the Party responsible for any work or activity performed with respect to the Land shall promptly remedy any aspects of the work or activity which have a material adverse effect on the other Party's Land, Improvements or operations, or which subject the other Party to material risk of liability.

5.3 **Standard of Work**. All work and activities performed by or on behalf of a Party with respect to this Agreement shall be performed in accordance with (a) all Applicable Laws and Regulations (including, without limitation, the Occupational Safety and Health Act of 1970), (b) the National Electric Safety Code, and (c) Good Utility Practice.

5.4 **Safety**. Each Party shall be solely responsible for the safety and supervision of its own employees, agents, representatives, and contractors. To the extent permissible under Applicable Laws and Regulations, each Grantor shall have the right to exclude from Grantor's Land any of Grantee's employees or contractors reasonably deemed by Grantor to present a risk of harm to themselves, any other person or any property located on Grantor's Land that is owned by Grantor or a third party.

**5.5 Notice of Work**. Except for normal and periodic maintenance work performed in the ordinary course, no construction, relocation, alteration, modification, demolition, installation, upgrade, replacement , repair or restoration work shall be performed by or on behalf of either Party with respect to the Land of the other Party without the Party by or on behalf of whom the work is to be performed first giving the other Party reasonable prior written notice of such work.

**5.6 Notice Regarding Labor and Materials**. Notice is hereby given that neither the Transmission Owner nor the Interconnection Customer shall be liable for any work, labor, services, or materials furnished or to be furnished on credit to the other Party, or to any other persons or entities claiming under the other Party, and that no mechanics' or other lien for any such work, labor, services, or materials furnished to the other Party, or to such other persons or entities, shall attach to or affect any interest of the Transmission Owner or the Interconnection Customer, as the context may require, in and to its Land or Improvements.

**5.7 Disposition of Liens**. The Transmission Owner shall forthwith take such action as is necessary to discharge, remove, or satisfy any lien filed against the Generation Land or any portion thereof for any work, labor, services, or materials claimed to have been performed or furnished for or on behalf of the Transmission Owner or any Person holding any portion thereof through or under the Transmission Owner. The Interconnection Customer shall forthwith take such action as is necessary to discharge, remove, or satisfy any lien filed against all or any portion of the Station 13A Parcel or the Transmission System for any work, labor, services, or materials claimed to have been performed or furnished for or on behalf of the Interconnection Customer or any Person holding any portion thereof through or under the Interconnection

Customer. Notwithstanding any other provision of this Agreement, if the Transmission Owner or the Interconnection Customer shall default hereunder by failing to discharge, remove, or satisfy any lien which it is obligated to discharge, remove, or satisfy hereunder within thirty (30) days after notice of the existence of the lien has been given to it, the Party whose Land is subject to such lien may cure such default by paying the amount of such lien, or discharging the same by deposit or bonding, and the amount so paid or deposited, or the premium paid for such bond, with interest at the prime rate, shall be paid by the defaulting Party upon demand to the Party which effected such cure.

**5.8 Relocation**. Either Party ("Requiring Party") may, at the Requiring Party's expense, require the other Party ("Required Party") to relocate any Easement Equipment owned by the Required Party and located on the Requiring Party's Land; provided, however, that such relocation shall not unreasonably interfere with the operations of the Required Party or be contrary to Good Utility Practice.

**5.9 Transmission Owner Maintenance Obligations.** Transmission Owner shall maintain the Transmission System, the Transmission Owner's Easement Equipment, and the Transmission Owner's Interconnection Facilities in a safe and reliable manner and in accordance with Good Utility Practice, the Interconnection Agreement and this Agreement. Transmission Owner shall maintain these facilities in a manner that supports Interconnection Customer's compliance with the NRC Maintenance Rule or NRC Requirements and Commitments and will take no action that would result in non-compliance with the NRC Maintenance Rule or NRC Requirements and Commitments. Interconnection Customer shall be responsible for the incremental costs incurred by Transmission Owner in ensuring that the maintenance of these

facilities complies with the immediately preceding sentence beyond those costs that otherwise are customary and reasonable for a non-nuclear facility.

**5.10 <u>Interconnection Customer Maintenance Obligations</u>**. Interconnection Customer shall maintain the Generating Facility, the Interconnection Customer's Easement Equipment, and the Interconnection Customer's Interconnection Facilities in a safe and reliable manner and in accordance with Good Utility Practice, the Interconnection Agreement and this Agreement.

## ARTICLE 6.

## ENVIRONMENTAL RELEASES

**6.1 <u>General</u>**. Each Party shall notify the other Party, first orally and then in writing, of the release of any Hazardous Substances, any asbestos or lead abatement activities, or any type of remediation activities related to the Generating Facility or the Interconnection Facilities, each of which may reasonably be expected to affect the other Party. The notifying Party shall: (i) provide the notice as soon as practicable, provided such Party makes a good faith effort to provide the notice no later than twenty-four (24) hours after such Party becomes aware of the occurrence or, in the event of planned asbestos or lead abatement activities or remediation activities, at least seven (7) Calendar Days prior to commencement of such activities; and (ii) promptly furnish to the other Party copies of any publicly available reports filed with any Governmental Authorities addressing such events.

## ARTICLE 7.

## NOTICES

**7.1 General.** Unless otherwise provided in this Agreement, any notice, demand or request required or permitted to be given by either Party to the other and any instrument required or permitted to be tendered or delivered by either Party in writing to the other shall be effective when delivered and may be so given, tendered or delivered, by facsimile transmission, by recognized national courier, or by depositing the same with the United States Postal Service with postage prepaid, for delivery by certified or registered mail, addressed to the Party, or personally delivered to the Party, at the address set out in Exhibit F to this Agreement, Addresses for Delivery of Notices. Either Party may change the notice information in this Agreement by giving five (5) Business Days written notice prior to the effective date of the change.

**7.2 Alternative Forms of Notice.** Any notice or request required or permitted to be given by either Party to the other and not required by this Agreement to be given in writing may be so given by telephone, facsimile or email to the telephone numbers and email addresses set out in Exhibit F to this Agreement.

## ARTICLE 8.

## FORCE MAJEURE

**8.1 Scope.** Economic hardship is not considered a Force Majeure event.

**8.2 General.** Neither Party shall be considered to be in Breach or Default with respect to

any obligation hereunder, other than the obligation to pay money when due, if prevented from fulfilling such obligation by Force Majeure. A Party unable to fulfill any obligation hereunder (other than an obligation to pay money when due) by reason of Force Majeure shall give notice and the full particulars of such Force Majeure to the other Party in writing or by telephone as soon as reasonably possible after the occurrence of the cause relied upon. Telephone notices given pursuant to this Article shall be confirmed in writing as soon as reasonably possible and shall specifically state full particulars of the Force Majeure, the time and date when the Force Majeure occurred and when the Force Majeure is reasonably expected to cease. The Party affected shall use Reasonable Efforts to continue to perform its obligations under this Agreement despite the Force Majeure, exercise due diligence to remove the event or condition giving rise to the Force Majeure with reasonable dispatch, and provide notice to the other Party of the cessation of the Force Majeure, but shall not be required to accede or agree to any provision not satisfactory to it in order to settle and terminate a strike or other labor disturbance.

## ARTICLE 9.

## DEFAULT

**9.1 General**. No Breach or Default shall exist where such failure to discharge an obligation (other than the payment of money) is the result of Force Majeure as defined in this Agreement or the result of an act or omission of the other Party. Upon a Breach, the non-breaching Party shall give written notice of such Breach to the Breaching Party. Except as provided in Section 9.2 of this Article, the Breaching Party shall have thirty (30) Calendar Days from receipt of the Breach notice within which to cure such Breach; provided however, that, if such Breach is not capable of cure within thirty (30) Calendar Days, the Breaching Party shall

commence such cure within thirty (30) Calendar Days after notice and continuously and diligently complete such cure within ninety (90) Calendar Days from receipt of the Breach notice; and, if cured within such time, the Breach specified in such notice shall cease to exist.

**9.2 Right to Terminate**. If a Breach is not cured as provided in this Article, or if a Breach is not capable of being cured within the period provided for herein, a Default shall have occurred and the non-defaulting Party shall have the right to terminate this Agreement by written notice at any time until cure occurs, and be relieved of any further obligation hereunder and, whether or not that Party terminates this Agreement, to recover from the defaulting Party all amounts due hereunder, plus all other damages and remedies to which it is entitled at law or in equity; provided, however, that no such termination shall be effective until the Interconnection Agreement is terminated (with any regulatory approvals necessary to the termination of the Interconnection Agreement having been obtained).. The provisions of this Article shall survive termination of this Agreement.

## ARTICLE 10.

## INDEMNITY, CONSEQUENTIAL DAMAGES AND INSURANCE

**10.1 Indemnity**. Each Party shall at all times indemnify, defend, and save the other Party harmless from, any and all liabilities, damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demand, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the indemnifying Party's performance (or nonperformance) of its obligations under this Agreement, except to the extent of any negligence or intentional wrongdoing by the

indemnified Party (collectively, for the purposes of Section 10.1.2 of this Article, the "Loss").

**10.1.1** **Indemnified Party**. If an indemnified Party is entitled to indemnification under this Article as a result of a claim by a third party, and the indemnifying Party fails, after notice and reasonable opportunity to proceed under Section 10.1 of this Article, to assume the defense of such claim, such indemnified Party may at the expense of the indemnifying Party contest, settle or consent to the entry of any judgment with respect to, or pay in full, such claim.

**10.1.2** **Indemnifying Party**. If an indemnifying Party is obligated to indemnify and hold any indemnified Party harmless under this Article, the amount owing to the indemnified Party shall be the amount of such indemnified Party's actual Loss.

**10.1.3** **Indemnity Procedures**. Promptly, but in no event later than twenty (20) Calendar Days after receipt by an indemnified Party of any claim or notice of the commencement of any action or administrative or legal proceeding or investigation as to which the indemnity provided for in Section 10.1 of this Article may apply, the indemnified Party shall notify the indemnifying Party of such fact. Any failure of or delay in such notification shall not affect a Party's indemnification obligation unless such failure or delay is materially prejudicial to the indemnifying Party.

The indemnifying Party shall have the right to assume the defense thereof with counsel designated by such indemnifying Party and reasonably satisfactory to the indemnified Party. If the defendants in any such action include one or more indemnified parties and the indemnifying

Party and if the indemnified Party reasonably concludes that there may be legal defenses available to it and/or another indemnified party which are different from or additional to those available to the indemnifying Party, the indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on its own behalf. In such instances, the indemnifying Party shall only be required to pay the fees and expenses of one additional law firm to represent the indemnified Party or indemnified parties having such differing or additional legal defenses.

The indemnified Party shall be entitled, at its expense, to participate in any such action, suit or proceeding, the defense of which has been assumed by the indemnifying Party. Notwithstanding the foregoing, the indemnifying Party (i) shall not be entitled to assume and control the defense of any such action, suit or proceedings if and to the extent that, in the opinion of the indemnified Party and its counsel, such action, suit or proceeding involves the potential imposition of criminal liability on the indemnified Party, or there exists a conflict or adversity of interest between the indemnified Party and the indemnifying Party, in such event the indemnifying Party shall pay the reasonable expenses of the indemnified Party, and (ii) shall not settle or consent to the entry of any judgment in any action, suit or proceeding without the consent of the indemnified Party, which consent shall not be reasonably withheld, conditioned or delayed.

**10.2 Consequential Damages**. Other than the indemnity obligations arising under Section 10.1 and Section 10.3.12 of this Article, in no event shall either Party be liable under any provision of this Agreement for any liabilities, losses, damages, costs or expenses for any special,

indirect, incidental, consequential, or punitive damages, including, but not limited to, loss of profit or revenue, loss of the use of equipment, cost of capital, cost of temporary equipment or services, whether based in whole or in part in contract, in tort, including negligence, and strict liability, or any other theory of liability; provided, however, that damages for which a Party may be liable to the other Party under another agreement will not be considered to be special, indirect, incidental, or consequential damages hereunder. The provisions of this Section shall survive termination of this Agreement.

**10.3** **Insurance**. Each Party shall, at its own expense, maintain in force throughout the period of this Agreement, and until released by the other Party, the following minimum insurance coverages, with insurers authorized to do business in the state where the Points of Interconnection are located:

**10.3.1** Employers' Liability and Workers' Compensation Insurance providing statutory benefits in accordance with the laws and regulations of the state in which the Points of Interconnection are located. The minimum limits for the Employers' Liability insurance shall be One Million Dollars ($1,000,000) each accident bodily injury by accident, One Million Dollars ($1,000,000) each employee bodily injury by disease, and One Million Dollars ($1,000,000) policy limit bodily injury by disease.

**10.3.2** Commercial General Liability Insurance, including premises and operations, personal injury, broad form property damage, broad form blanket contractual liability coverage (including coverage for the contractual indemnification) products and completed operations

coverage, coverage for explosion, collapse and underground hazards, independent contractors coverage, coverage for pollution to the extent normally available and punitive damages to the extent normally available and a cross liability endorsement, with minimum limits of One Million Dollars ($1,000,000) per occurrence/Ten Million Dollars ($10,000,000) aggregate combined single limit for personal injury, bodily injury, including death and property damage.

**10.3.3** Comprehensive Automobile Liability Insurance for coverage of owned and non-owned and hired vehicles, trailers or semi-trailers designed for travel on public roads, with a minimum, combined single limit of One Million Dollars ($1,000,000) per occurrence for bodily injury, including death, and property damage.

**10.3.4** Excess Public Liability Insurance over and above the Employers' Liability Commercial General Liability and Comprehensive Automobile Liability Insurance coverage, with a minimum combined single limit of Twenty Million Dollars ($20,000,000) per occurrence/Twenty Million Dollars ($20,000,000) aggregate.

**10.3.5** The Commercial General Liability Insurance, Comprehensive Automobile Insurance and Excess Public Liability Insurance policies shall name the other Party, its parent, associated and Affiliate companies and their respective directors, officers, agents, servants and employees ("Other Party Group") as additional insured. All policies shall contain provisions whereby the insurers waive all rights of subrogation in accordance with the provisions of this Agreement against the Other Party Group and provide thirty (30) days advance written notice to the Other Party Group prior to cancellation or any material change in coverage or condition.

**10.3.6** The Commercial General Liability Insurance, Comprehensive Automobile Liability Insurance and Excess Public Liability Insurance policies shall contain provisions that specify that the polices are primary and shall apply to such extent without consideration for other policies separately carried and shall state that each insured is provided coverage as though a separate policy had been issued to each, except the insurer's liability shall not be increased beyond the amount for which the insurer would have been liable had only one insured been covered. Each Party shall be responsible for its respective deductibles or retentions.

**10.3.7** The Commercial General Liability Insurance, Comprehensive Automobile Liability Insurance and Excess Public Liability Insurance policies, if written on a Claims First Made Basis, shall be maintained in full force and effect for two (2) years after termination of this Agreement, which coverage may be in the form of tail coverage or extended reporting period coverage if agreed by the Parties.

**10.3.8** The requirements contained herein as to the types and limits of all insurance to be maintained by the Parties are not intended to and shall not in any manner, limit or qualify the liabilities and obligations assumed by the Parties under this Agreement.

**10.3.9** Within ten (10) days following execution of this Agreement, and as soon as practicable after the end of each fiscal year or at the renewal of the insurance policy and in any event within ninety (90) days thereafter, each Party shall provide certification of all insurance required in this Agreement, executed by each insurer or by an authorized representative of each