Transmission System to their normal operating state as soon as practicable consistent with Good Utility Practice.

**13.5** **Interconnection Customer Authority.** Consistent with Good Utility Practice and this IA, the Interconnection Customer may take whatever actions or inactions with regard to the Generating Facility or the Interconnection Customer's Interconnection Facilities during an Emergency Condition in order to (i) preserve public health and safety, (ii) preserve the reliability of the Generating Facility or the Interconnection Customer's Interconnection Facilities, (iii) limit or prevent damage, and (iv) expedite restoration of service. Interconnection Customer shall use Reasonable Efforts to minimize the effect of such actions or inactions on the Transmission System and the Transmission Owner's Interconnection Facilities. Transmission Owner shall use Reasonable Efforts to assist Interconnection Customer in such actions.

**13.6** **Limited Liability.** Except as otherwise provided in Article 11.6.1 of this IA, neither Party shall be liable to the other for any action it takes in responding to an Emergency Condition so long as such action is made in good faith and is consistent with Good Utility Practice.

## ARTICLE 14. REGULATORY REQUIREMENTS AND GOVERNING LAW

**14.1** **Regulatory Requirements.** Each Party's obligations under this IA shall be subject to its receipt of any required approval or certificate from one or more Governmental Authorities in the form and substance satisfactory to the applying Party, or the Party making any required filings with, or providing notice to, such Governmental Authorities, and the expiration of any time period associated therewith. Each Party shall in good faith seek and use its Reasonable Efforts to obtain such other approvals. If an obligation under this IA requires Interconnection Customer to take any action that is imminently likely to jeopardize its status under the Federal Power Act or the Public Utility Holding Company Act of 1935, as amended, Interconnection Customer and Transmission Provider shall negotiate in good faith an equitable amendment to this Agreement which protects both Parties' interests.

**14.2** **Governing Law.**

**14.2.1** This Agreement and all rights, obligations, and performances of the Parties hereunder are subject to all applicable federal and state laws, and to all duly-promulgated orders and other duly-authorized action of any Governmental Authority.

**14.2.2** When not in conflict with or preempted by federal law, this Agreement, and the rights and obligations of the Parties to this Agreement, shall be governed by and construed in accordance with the law of the State of New York, without giving effect to the conflict

of laws of the State of New York, without giving effect to the conflict of laws principles thereof.

**14.2.3** Except as expressly provided in this Agreement, each Party expressly reserves the right to seek changes in appeal, or otherwise contest any laws, orders, rules, or regulations, of a Governmental Authority relating to this Agreement. Except for those matters that are jurisdictional to FERC or the appellate courts having jurisdiction over FERC matters, any action arising out of or concerning this Agreement must be brought in the federal or state courts of the State of New York. The Parties agree to submit to the exclusive jurisdiction of the courts in the State of New York for the purposes of hearing and determining any action not preempted by federal law and not within the jurisdiction of FERC.

## ARTICLE 15. NOTICES

**15.1** **General**. Unless otherwise provided in this IA, any notice, demand or request required or permitted to be given by either Party to the other and any instrument required or permitted to be tendered or delivered by either Party in writing to the other shall be effective when delivered and may be so given, tendered or delivered, by facsimile transmission, by recognized national courier, or by depositing the same with the United States Postal Service with postage prepaid, for delivery by certified or registered mail, addressed to the Party, or personally delivered to the Party, at the address set out in Appendix F to this Agreement, Addresses for Delivery of Notices and Billings.

Either Party may change the notice information in this IA by giving five (5) Business Days written notice prior to the effective date of the change.

**15.2** **Billings and Payments.** Billings and payments shall be sent to the addresses set out in Appendix F to this Agreement.

**15.3** **Alternative Forms of Notice.** Any notice or request required or permitted to be given by either Party to the other and not required by this Agreement to be given in writing may be so given by telephone, facsimile or email to the telephone numbers and email addresses set out in Appendix F to this Agreement.

**15.4** **Operations and Maintenance Notice**. Each Party shall notify the other Party in writing of the identity of the person(s) that it designates as the point(s) of contact with respect to the implementation of Articles 9 and 10.

## ARTICLE 16. FORCE MAJEURE

**16.1** **Force Majeure.**

**16.1.1** Economic hardship is not considered a Force Majeure event.

16.1.2 Neither Party shall be considered to be in Breach or Default with respect to any obligation hereunder, (including obligations under Article 4), other than the obligation to pay money when due, if prevented from fulfilling such obligation by Force Majeure. A Party unable to fulfill any obligation hereunder (other than an obligation to pay money when due) by reason of Force Majeure shall give notice and the full particulars of such Force Majeure to the other Party in writing or by telephone as soon as reasonably possible after the occurrence of the cause relied upon. Telephone notices given pursuant to this Article shall be confirmed in writing as soon as reasonably possible and shall specifically state full particulars of the Force Majeure, the time and date when the Force Majeure occurred and when the Force Majeure is reasonably expected to cease. The Party affected shall use Reasonable Efforts to continue to perform its obligations under this Agreement despite the Force Majeure, exercise due diligence to remove the event or condition giving rise to the Force Majeure with reasonable dispatch, and provide notice to the other Party of the cessation of the Force Majeure, but shall not be required to accede or agree to any provision not satisfactory to it in order to settle and terminate a strike or other labor disturbance.

## ARTICLE 17. DEFAULT

**17.1 Default.**

17.1.1 **General**. No Breach or Default shall exist where such failure to discharge an obligation (other than the payment of money) is the result of Force Majeure as defined in this IA or the result of an act or omission of the other Party. Upon a Breach, the non-breaching Party shall give written notice of such Breach to the Breaching Party. Except as provided in Article 17.1.2, the Breaching Party shall have thirty (30) Calendar Days from receipt of the Breach notice within which to cure such Breach; provided however, that, if such Breach is not capable of cure within thirty (30) Calendar Days, the Breaching Party shall commence such cure within thirty (30) Calendar Days after notice and continuously and diligently complete such cure within ninety (90) Calendar Days from receipt of the Breach notice; and, if cured within such time, the Breach specified in such notice shall cease to exist.

17.1.2 **Right to Terminate**. If a Breach is not cured as provided in this Article, or if a Breach is not capable of being cured within the period provided for herein, a Default shall have occurred and the non-defaulting Party shall have the right to terminate this IA by written notice at any time until cure occurs, and be relieved of any further obligation hereunder and, whether or not that Party terminates this IA, to recover from the defaulting Party all amounts due hereunder,

plus all other damages and remedies to which it is entitled at law or in equity. The provisions of this Article shall survive termination of this IA.

## ARTICLE 18. INDEMNITY, CONSEQUENTIAL DAMAGES AND INSURANCE

18.1 **Indemnity**. Each Party shall at all times indemnify, defend, and save the other Party harmless from, any and all liabilities, damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demand, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the indemnifying Party's performance (or nonperformance) of its obligations under this IA, except to the extent of any negligence or intentional wrongdoing by the indemnified Party (collectively, for the purposes of Article 18.1.2 below, the "Loss.").

18.1.1 **Indemnified Party**. If an indemnified Party is entitled to indemnification under this Article 18 as a result of a claim by a third party, and the indemnifying Party fails, after notice and reasonable opportunity to proceed under Article 18.1, to assume the defense of such claim, such indemnified Party may at the expense of the indemnifying Party contest, settle or consent to the entry of any judgment with respect to, or pay in full, such claim.

18.1.2 **Indemnifying Party**. If an indemnifying Party is obligated to indemnify and hold any indemnified Party harmless under this Article 18, the amount owing to the indemnified Party shall be the amount of such indemnified Party's actual Loss.

18.1.3 **Indemnity Procedures**. Promptly, but in no event later than twenty (20) Calendar Days, after receipt by an indemnified Party of any claim or notice of the commencement of any action or administrative or legal proceeding or investigation as to which the indemnity provided for in Article 18.1 may apply, the indemnified Party shall notify the indemnifying Party of such fact. Any failure of or delay in such notification shall not affect a Party's indemnification obligation unless such failure or delay is materially prejudicial to the indemnifying Party.

The indemnifying Party shall have the right to assume the defense thereof with counsel designated by such indemnifying Party and reasonably satisfactory to the indemnified Party. If the defendants in any such action include one or more indemnified parties and the indemnifying Party and if the indemnified Party reasonably concludes that there may be legal defenses available to it and/or another indemnified party which are different from or additional to those available to the indemnifying Party, the indemnified Party shall have

the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on its own behalf. In such instances, the indemnifying Party shall only be required to pay the fees and expenses of one additional law firm to represent the indemnified Party or indemnified parties having such differing or additional legal defenses.

The indemnified Party shall be entitled, at its expense, to participate in any such action, suit or proceeding, the defense of which has been assumed by the indemnifying Party. Notwithstanding the foregoing, the indemnifying Party (i) shall not be entitled to assume and control the defense of any such action, suit or proceedings if and to the extent that, in the opinion of the indemnified Party and its counsel, such action, suit or proceeding involves the potential imposition of criminal liability on the indemnified Party, or there exists a conflict or adversity of interest between the indemnified Party and the indemnifying Party, in such event the indemnifying Party shall pay the reasonable expenses of the indemnified Party, and (ii) shall not settle or consent to the entry of any judgment in any action, suit or proceeding without the consent of the indemnified Party, which consent shall not be reasonably withheld, conditioned or delayed.

18.1.4 **Consequential Damages.** Other than the Liquidated Damages heretofore described and indemnity obligations arising under Article 5.2(7), Article 5.17.3 (to the extent that tax-related interest and penalties may be deemed to be consequential damages), and the payment for liabilities and costs incurred as a result of third-party claims , in no event shall either Party be liable under any provision of this IA for any liabilities, losses, damages, costs or expenses for any special, indirect, incidental, consequential, or punitive damages, including but not limited to loss of profit or revenue, loss of the use of equipment, cost of capital, cost of temporary equipment or services, whether based in whole or in part in contract, in tort, including negligence, and strict liability, or any other theory of liability; provided, however, that damages for which a Party may be liable to the other Party under another agreement will not be considered to be special, indirect, incidental, or consequential damages hereunder. The provisions of this Section 18.1.4 shall survive termination of this IA.

18.2 **Insurance.** Each Party shall, at its own expense, maintain in force throughout the period of this IA, and until released by the other Party, the following minimum insurance coverages, with insurers authorized to do business in the state where the Points of Interconnection are located:

18.2.1 Employers' Liability and Workers' Compensation Insurance providing statutory benefits in accordance with the laws and regulations of the

state in which the Points of Interconnection are located. The minimum limits for the Employers' Liability insurance shall be One Million Dollars ($1,000,000) each accident bodily injury by accident, One Million Dollars ($1,000,000) each employee bodily injury by disease, and One Million Dollars ($1,000,000) policy limit bodily injury by disease.

**18.2.2** Commercial General Liability Insurance, including premises and operations, personal injury, broad form property damage, broad form blanket contractual liability coverage (including coverage for the contractual indemnification) products and completed operations coverage, coverage for explosion, collapse and underground hazards, independent contractors coverage, coverage for pollution to the extent normally available and punitive damages to the extent normally available and a cross liability endorsement, with minimum limits of One Million Dollars ($1,000,000) per occurrence/Ten Million Dollars ($10,000,000) aggregate combined single limit for personal injury, bodily injury, including death and property damage.

**18.2.3** Comprehensive Automobile Liability Insurance for coverage of owned and non-owned and hired vehicles, trailers or semi-trailers designed for travel on public roads, with a minimum, combined single limit of One Million Dollars ($1,000,000) per occurrence for bodily injury, including death, and property damage.

**18.2.4** Excess Public Liability Insurance over and above the Employers' Liability Commercial General Liability and Comprehensive Automobile Liability Insurance coverage, with a minimum combined single limit of Twenty Million Dollars ($20,000,000) per occurrence/Twenty Million Dollars ($20,000,000) aggregate.

**18.2.5** The Commercial General Liability Insurance, Comprehensive Automobile Insurance and Excess Public Liability Insurance policies shall name the other Party, its parent, associated and Affiliate companies and their respective directors, officers, agents, servants and employees ("Other Party Group") as additional insured. All policies shall contain provisions whereby the insurers waive all rights of subrogation in accordance with the provisions of this IA against the Other Party Group and provide thirty (30) days advance written notice to the Other Party Group prior to cancellation or any material change in coverage or condition.

**18.2.6** The Commercial General Liability Insurance, Comprehensive Automobile Liability Insurance and Excess Public Liability Insurance policies shall contain provisions that specify that the polices are primary and shall apply to such extent without consideration for other policies separately carried and shall state that each insured is

provided coverage as though a separate policy had been issued to each, except the insurer's liability shall not be increased beyond the amount for which the insurer would have been liable had only one insured been covered. Each Party shall be responsible for its respective deductibles or retentions.

**18.2.7** The Commercial General Liability Insurance, Comprehensive Automobile Liability Insurance and Excess Public Liability Insurance policies, if written on a Claims First Made Basis, shall be maintained in full force and effect for two (2) years after termination of this IA, which coverage may be in the form of tail coverage or extended reporting period coverage if agreed by the Parties.

**18.2.8** The requirements contained herein as to the types and limits of all insurance to be maintained by the Parties are not intended to and shall not in any manner, limit or qualify the liabilities and obligations assumed by the Parties under this IA.

**18.2.9** Within ten (10) days following execution of this IA, and as soon as practicable after the end of each fiscal year or at the renewal of the insurance policy and in any event within ninety (90) days thereafter, each Party shall provide certification of all insurance required in this IA, executed by each insurer or by an authorized representative of each insurer.

**18.2.10** Notwithstanding the foregoing, each Party may self-insure to the extent it maintains a self-insurance program; provided that, such Party's senior secured debt is rated at investment grade, or better, by Standard & Poor's. For any period of time that a Party's senior secured debt is unrated by Standard & Poor's or is rated at less than investment grade by Standard & Poor's, such Party shall comply with the insurance requirements applicable to it under Articles 18.2.1 through 18.2.9. In the event that a Party is permitted to self-insure pursuant to this Article 18.2.10, it shall not be required to comply with the insurance requirements applicable to it under Articles 18.2.1 through 18.2.9.

**18.2.11** The Parties agree to report to each other in writing as soon as practical all accidents or occurrences resulting in injuries to any person, including death, and any property damage arising out of this IA.

**18.2.12** Interconnection Customer covenants, represents and warrants:

A. That it has entered into an agreement of indemnification with the NRC as provided under Section 170 of the Atomic Energy Act of 1954, as amended;

B. That it shall provide and maintain nuclear liability insurance in such amounts and form as required by Section 170 of the Atomic Energy Act of 1954, as amended;

C. That it shall provide and maintain nuclear property insurance in an amount not less than the coverage required by NRC regulations;

D. That it shall extend protection against a Nuclear Incident (as "Nuclear Incident" is defined in the Atomic Energy Act of 1954, as amended), as provided for in (B) and (C) above, for the benefit of Transmission Owner and its consultants, contractors, subcontractors, agents, invitees and employees; and

E. That it shall indemnify, defend and hold harmless, Transmission Owner, its parent, Affiliates, and successors, and their respective officers, directors, employees, agents, contractors, subcontractors, and successors, from and against any and all claims, demands, liabilities, costs, losses, judgments, damages, and expenses (including litigation costs and reasonable attorneys' fees) resulting from any Nuclear Incident (as "Nuclear Incident" is defined in the Atomic Energy Act of 1954, as amended).

In addition, Interconnection Customer covenants, represents and warrants that if the nuclear liability protection system in effect on the effective date of this IA expires or is repealed, changed, or modified, it shall, without cost to Transmission Owner, maintain nuclear liability protection, to the extent that it is reasonably available, for the protection of Transmission Owner, through governmental indemnity, limitation of liability and/or insurance.

## ARTICLE 19. ASSIGNMENT

**19.1 Assignment.** This IA may be assigned by either Party only with the written consent of the other; provided that either Party may assign this IA without the consent of the other Party to any Affiliate of the assigning Party or to an entity that acquires all or substantially all of the assigning Party's assets, which Affiliate or acquiring entity has the legal authority and operational ability to satisfy the obligations of the assigning Party under this IA; and provided further that the Interconnection Customer shall have the right to assign this IA, without the consent of the Transmission Owner, for collateral security purposes to aid in providing financing for the Generating Facility, provided that the Interconnection Customer will require any secured party, trustee or mortgagee to notify the Transmission Owner of any such assignment. Any financing arrangement entered into by the Interconnection Customer pursuant to this Article will provide that prior to or upon the exercise of the secured

party's, trustee's or mortgagee's assignment rights pursuant to said arrangement, the secured creditor, the trustee or mortgagee will notify the Transmission Owner of the date and particulars of any such exercise of assignment right(s). Any attempted assignment that violates this Article is void and ineffective. No assignment under this IA shall relieve a Party (including the assigning Party) of its obligations without the consent of the other Party, nor shall a Party's obligations be enlarged, in whole or in part, by reason thereof. Where required, consent under this Article 19 to assignment will not be unreasonably withheld, conditioned or delayed.

## ARTICLE 20. SEVERABILITY

20.1 **Severability**. If any provision in this IA is finally determined to be invalid, void or unenforceable by any court or other Governmental Authority having jurisdiction, such determination shall not invalidate, void or make unenforceable any other provision, agreement or covenant of this IA; provided that if the Interconnection Customer (or any third party, but only if such third party is not acting at the direction of the Transmission Owner) seeks and obtains such a final determination with respect to any provision of the Alternate Option (Article 5.1.2), or the Negotiated Option (Article 5.1.4), then none of these provisions shall thereafter have any force or effect and the Parties' rights and obligations shall be governed solely by the Standard Option (Article 5.1.1).

## ARTICLE 21. COMPARABILITY

21.1 **Comparability**. The Parties will comply with all applicable comparability and code of conduct laws, rules and regulations, as amended from time to time.

## ARTICLE 22. CONFIDENTIALITY

22.1 **Confidentiality**. Confidential Information shall include, without limitation, all information relating to a Party's technology, research and development, business affairs, and pricing, and any information supplied by either of the Parties to the other prior to the execution of this IA.

Unless otherwise set forth in this Agreement, information is Confidential Information only if it is clearly designated or marked in writing as confidential on the face of the document, or, if the information is conveyed orally or by inspection, if the Party providing the information orally informs the Party receiving the information that the information is confidential.

If requested by either Party, the other Party shall provide in writing, the basis for asserting that the information referred to in this Article warrants confidential treatment, and the requesting Party may disclose such writing to the appropriate Governmental Authority. Each Party shall be responsible for the costs associated with affording confidential treatment to its information.

22.1.1 **Term.** During the term of this IA, and for a period of three (3) years after the expiration or termination of this IA, except as otherwise provided in this Article 22, each Party shall hold in confidence and shall not disclose to any person Confidential Information.

22.1.2 **Scope.** Confidential Information shall not include information that the receiving Party can demonstrate: (1) is generally available to the public other than as a result of a disclosure by the receiving Party; (2) was in the lawful possession of the receiving Party on a non-confidential basis before receiving it from the disclosing Party; (3) was supplied to the receiving Party without restriction by a third party, who, to the knowledge of the receiving Party after due inquiry, was under no obligation to the disclosing Party to keep such information confidential; (4) was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; (5) is, or becomes, publicly known, through no wrongful act or omission of the receiving Party or Breach of this IA; or (6) is required, in accordance with Article 22.1.7 of this IA, Order of Disclosure, to be disclosed by any Governmental Authority or is otherwise required to be disclosed by law or subpoena, or is necessary in any legal proceeding establishing rights and obligations under this IA. Information designated as Confidential Information will no longer be deemed confidential if the Party that designated the information as confidential notifies the other Party that it no longer is confidential.

22.1.3 **Release of Confidential Information**. Neither Party shall release or disclose Confidential Information to any other person, except to its employees, consultants, or to parties who may be or considering providing financing to or equity participation with Interconnection Customer, or to potential purchasers or assignees of Interconnection Customer, on a need-to-know basis in connection with this IA, unless such person has first been advised of the confidentiality provisions of this Article 22 and has agreed to comply with such provisions. Notwithstanding the foregoing, a Party providing Confidential Information to any person shall remain primarily responsible for any release of Confidential Information in contravention of this Article 22.

22.1.4 **Rights**. Each Party retains all rights, title, and interest in the Confidential Information that each Party discloses to the other Party. The disclosure by each Party to the other Party of Confidential Information shall not be deemed a waiver by either Party or any other person or entity of the right to protect the Confidential Information from public disclosure.

22.1.5 **No Warranties**. By providing Confidential Information, neither Party makes any warranties or representations as to its accuracy or

completeness. In addition, by supplying Confidential Information, neither Party obligates itself to provide any particular information or Confidential Information to the other Party nor to enter into any further agreements or proceed with any other relationship or joint venture.

22.1.6 **Standard of Care.** Each Party shall use at least the same standard of care to protect Confidential Information it receives as it uses to protect its own Confidential Information from unauthorized disclosure, publication or dissemination. Each Party may use Confidential Information solely to fulfill its obligations to the other Party under this IA or its regulatory requirements.

22.1.7 **Order of Disclosure.** If a court or a Government Authority or entity with the right, power, and apparent authority to do so requests or requires either Party, by subpoena, oral deposition, interrogatories, requests for production of documents, administrative order, or otherwise, to disclose Confidential Information, that Party shall provide the other Party with prompt notice of such request(s) or requirement(s) so that the other Party may seek an appropriate protective order or waive compliance with the terms of this IA. Notwithstanding the absence of a protective order or waiver, the Party may disclose such Confidential Information which, in the opinion of its counsel, the Party is legally compelled to disclose. Each Party will use Reasonable Efforts to obtain reliable assurance that confidential treatment will be afforded any Confidential Information so furnished.

22.1.8 **Termination of Agreement.** Upon termination of this IA for any reason, and to the extent consistent with applicable laws and regulations, each Party shall, within ten (10) Calendar Days of receipt of a written request from the other Party, use Reasonable Efforts to destroy, erase, or delete (with such destruction, erasure, and deletion certified in writing to the other Party) or return to the other Party, without retaining copies thereof, any and all written or electronic Confidential Information received from the other Party.

22.1.9 **Remedies.** The Parties agree that monetary damages would be inadequate to compensate a Party for the other Party's Breach of its obligations under this Article 22. Each Party accordingly agrees that the other Party shall be entitled to equitable relief, by way of injunction or otherwise, if the first Party Breaches or threatens to Breach its obligations under this Article 22, which equitable relief shall be granted without bond or proof of damages, and the receiving Party shall not plead in defense that there would be an adequate remedy at law. Such remedy shall not be deemed an exclusive remedy for the Breach of this Article 22, but shall be in addition to all

other remedies available at law or in equity. The Parties further acknowledge and agree that the covenants contained herein are necessary for the protection of legitimate business interests and are reasonable in scope. No Party, however, shall be liable for indirect, incidental, or consequential or punitive damages of any nature or kind resulting from or arising in connection with this Article 22.

22.1.10 **Disclosure to FERC or its Staff.** Notwithstanding anything in this Article 22 to the contrary, and pursuant to 18 C.F.R. § 1b.20, if FERC or its staff, during the course of an investigation or otherwise, requests information from one of the Parties that is otherwise required to be maintained in confidence pursuant to this IA, the Party shall provide the requested information to FERC or its staff, within the time provided for in the request for information. In providing the information to FERC or its staff, the Party must, consistent with 18 C.F.R. § 388.112, request that the information be treated as confidential and non-public by FERC and its staff and that the information be withheld from public disclosure. Parties are prohibited from notifying the other Party to this IA prior to the release of the Confidential Information to the Commission or its staff. The Party shall notify the other Party to this IA when it is notified by FERC or its staff that a request to release Confidential Information has been received by FERC, at which time either of the Parties may respond before such information would be made public, pursuant to 18 C.F.R. § 388.112.

22.1.11 Subject to the exception in Article 22.1.10, any information that a Party claims is competitively sensitive, commercial or financial information under this IA ("Confidential Information") shall not be disclosed by the other Party to any person not employed or retained by the other Party, except to the extent disclosure is (i) required by law; (ii) reasonably deemed by the disclosing Party to be required to be disclosed in connection with a dispute between or among the Parties, or the defense of litigation or dispute; (iii) otherwise permitted by consent of the other Party, such consent not to be unreasonably withheld; or (iv) necessary to fulfill its obligations under this IA or as a transmission service provider or a Control Area operator including disclosing the Confidential Information to an RTO or ISO or to a regional or national reliability organization. The Party asserting confidentiality shall notify the other Party in writing of the information it claims is confidential. Prior to any disclosures of the other Party's Confidential Information under this subparagraph, or if any third party or Governmental Authority makes any request or demand for any of the information described in this subparagraph, the disclosing Party agrees to promptly notify the other Party in writing and agrees to assert confidentiality and cooperate with the other Party in seeking to protect the Confidential Information from

public disclosure by confidentiality agreement, protective order or other reasonable measures.

**22.1.12** This provision shall not apply to any information that was or is hereafter in the public domain (except as a result of a Breach of this provision).

## ARTICLE 23. ENVIRONMENTAL RELEASES

**23.1** Each Party shall notify the other Party, first orally and then in writing, of the release of any Hazardous Substances, any asbestos or lead abatement activities, or any type of remediation activities related to the Generating Facility or the Interconnection Facilities, each of which may reasonably be expected to affect the other Party. The notifying Party shall: (i) provide the notice as soon as practicable, provided such Party makes a good faith effort to provide the notice no later than twenty-four (24) hours after such Party becomes aware of the occurrence or, in the event of planned asbestos or lead abatement activities or remediation activities, at least seven (7) Calendar Days prior to commencement of such activities; and (ii) promptly furnish to the other Party copies of any publicly available reports filed with any Governmental Authorities addressing such events.

## ARTICLE 24. INFORMATION REQUIREMENTS

**24.1** **Information Acquisition**. Transmission Owner and the Interconnection Customer shall submit specific information regarding the electrical characteristics of their respective facilities to each other as described below and in accordance with Applicable Reliability Standards.

**24.2** **Information Submission by Transmission Owner**. The initial information submission by Transmission Owner shall occur no later than thirty (30) Calendar Days after the Effective Date and shall include Transmission System information necessary to allow the Interconnection Customer to meet any system protection and stability requirements, unless otherwise mutually agreed to by both Parties. On a monthly basis Transmission Owner shall provide Interconnection Customer a status report on the construction and installation of Transmission Owner's Interconnection Facilities and Network Upgrades, including, but not limited to, the following information: (1) progress to date; (2) a description of the activities since the last report; (3) a description of the action items for the next period; and (4) the delivery status of equipment ordered.

**24.3** **Updated Information Submission by Interconnection Customer.** The updated information submission by the Interconnection Customer, including manufacturer information, shall occur no later than one hundred eighty (180) Calendar Days prior to the Trial Operation. Interconnection Customer shall submit a completed copy of the Generating Facility data requirements

contained in Appendix 1 to the LGIP. It shall also include any additional information provided to Transmission Owner for the Feasibility and Facilities Study. Information in this submission shall be the most current Generating Facility design or expected performance data. Information submitted for stability models shall be compatible with Transmission Owner standard models. If there is no compatible model, the Interconnection Customer will work with a consultant mutually agreed to by the Parties to develop and supply a standard model and associated information.

If the Interconnection Customer's data is materially different from what was originally provided to Transmission Owner pursuant to the Interconnection Study Agreement between Transmission Owner and Interconnection Customer, then Transmission Owner will conduct appropriate studies to determine the impact on the Transmission Owner Transmission System based on the actual data submitted pursuant to this Article 24.3. The Interconnection Customer shall not begin Trial Operation until such studies are completed.

**24.4** **Information Supplementation**. Prior to the Operation Date, the Parties shall supplement their information submissions described above in this Article 24 with any and all "as-built" Generating Facility information or "as-tested" performance information that differs from the initial submissions or, alternatively, written confirmation that no such differences exist. The Interconnection Customer shall conduct tests on the Generating Facility as required by Good Utility Practice such as an open circuit "step voltage" test on the Generating Facility to verify proper operation of the Generating Facility's automatic voltage regulator.

**24.5** Unless otherwise agreed, the test conditions shall include: (1) Generating Facility at synchronous speed; (2) automatic voltage regulator on and in voltage control mode; and (3) a five percent (5 percent) change in Generating Facility terminal voltage initiated by a change in the voltage regulators reference voltage. Interconnection Customer shall provide validated test recordings showing the responses of Generating Facility terminal and field voltages. In the event that direct recordings of these voltages is impractical, recordings of other voltages or currents that mirror the response of the Generating Facility's terminal or field voltage are acceptable if information necessary to translate these alternate quantities to actual Generating Facility terminal or field voltages is provided. Generating Facility testing shall be conducted and results provided to the Transmission Owner for each individual generating unit in a station.

Subsequent to the Effective Date, the Interconnection Customer shall provide Transmission Owner with any information changes due to equipment replacement, repair, or adjustment and Transmission Owner shall provide the Interconnection Customer with any information changes due to equipment replacement, repair or adjustment in the directly connected substation or with any adjacent Transmission Owner-owned substation that may affect the

Interconnection Customer's Interconnection Facilities equipment ratings, protection or operating requirements. The Parties shall provide such information no later than thirty (30) Calendar Days after the date of the equipment replacement, repair or adjustment.

## ARTICLE 25. INFORMATION ACCESS AND AUDIT RIGHTS

25.1 **Information Access.** Upon the reasonable request of the other Party, a Party (the "disclosing Party") shall make available to the other Party information that is in the possession of the disclosing Party and is necessary in order for the other Party to: (i) verify the costs incurred by the disclosing Party for which the other Party is responsible under this IA; and (ii) carry out its obligations and responsibilities under this IA. The Parties shall not use such information for purposes other than those set forth in this Article 25.1 and to enforce their rights under this IA.

25.2 **Reporting of Non-Force Majeure Events.** Each Party (the "notifying Party") shall notify the other Party when the notifying Party becomes aware of its inability to comply with the provisions of this IA for a reason other than a Force Majeure event. The Parties agree to cooperate with each other and provide necessary information regarding such inability to comply, including the date, duration, reason for the inability to comply, and corrective actions taken or planned to be taken with respect to such inability to comply. Notwithstanding the foregoing, notification, cooperation or information provided under this Article shall not entitle the Party receiving such notification to allege a cause for anticipatory breach of this IA.

25.3 **Audit Rights.** Subject to the requirements of confidentiality under Article 22 of this IA, each Party shall have the right, during normal business hours, and upon prior reasonable notice to the other Party, to audit at its own expense the other Party's accounts and records pertaining to either Party's performance or either Party's satisfaction of obligations under this IA. Such audit rights shall include audits of the other Party's costs, calculation of invoiced amounts, the Transmission Owner's efforts to allocate responsibility for the provision of reactive support to the Transmission System, the Transmission Owner's efforts to allocate responsibility for interruption or reduction of generation on the Transmission System, and each Party's actions in an Emergency Condition. Any audit authorized by this Article shall be performed at the offices where such accounts and records are maintained and shall be limited to those portions of such accounts and records that relate to each Party's performance and satisfaction of obligations under this IA. Each Party shall keep such accounts and records for a period equivalent to the audit rights periods described in Article 25.4.

**25.4 Audit Rights Periods.**

**25.4.1 Audit Rights Period for Construction-Related Accounts and Records.** Accounts and records related to the design, engineering, procurement, and construction of Transmission Owner's Interconnection Facilities and Network Upgrades shall be subject to audit for a period of twenty-four months following Transmission Owner's issuance of a final invoice in accordance with Article 12.2.

**25.4.2 Audit Rights Period for All Other Accounts and Records.** Accounts and records related to either Party's performance or satisfaction of all obligations under this IA other than those described in Article 25.4.1 shall be subject to audit as follows: (i) for an audit relating to cost obligations, the applicable audit rights period shall be twenty-four (24) months after the auditing Party's receipt of an invoice giving rise to such cost obligations; and (ii) for an audit relating to all other obligations, the applicable audit rights period shall be twenty-four (24) months after the event for which the audit is sought.

**25.4.3 Audit Parameters.** The Party seeking to audit pursuant to Article 25.4 (the "Auditing Party") shall provide the other Party fifteen (15) days prior written notice of a request to audit. Any data collection for such audit shall be performed continuously until complete and the Auditing Party shall utilize Reasonable Efforts to complete the data collection for such audit within thirty (30) Calendar Days, however, in no event shall any data collection for such audit continue for more than sixty (60) Calendar Days. Each Party reserves the right to assess a reasonable fee to compensate for the use of its personnel in assisting any inspection or audit of its books, records or accounts by the Auditing Party.

**25.5 Audit Results.** If an audit by a Party determines that an overpayment or an underpayment has occurred, a notice of such overpayment or underpayment shall be given to the other Party together with those records from the audit which support such determination.

## ARTICLE 26. SUBCONTRACTORS

**26.1 General.** Nothing in this IA shall prevent a Party from utilizing the services of any subcontractor as it deems appropriate to perform its obligations under this IA; provided, however, that each Party shall require its subcontractors to comply with all applicable terms and conditions of this IA in providing such services and each Party shall remain primarily liable to the other Party for the performance of such subcontractor.

26.2 **Responsibility of Principal.** The creation of any subcontract relationship shall not relieve the hiring Party of any of its obligations under this IA. The hiring Party shall be fully responsible to the other Party for the acts or omissions of any subcontractor the hiring Party hires as if no subcontract had been made; provided, however, that in no event shall the Transmission Owner be liable for the actions or inactions of the Interconnection Customer or its subcontractors with respect to obligations of the Interconnection Customer under Article 5 of this IA. Any applicable obligation imposed by this IA upon the hiring Party shall be equally binding upon, and shall be construed as having application to, any subcontractor of such Party.

26.3 **No Limitation by Insurance.** The obligations under this Article 26 will not be limited in any way by any limitation of subcontractor's insurance.

## ARTICLE 27. DISPUTES

27.1 **Submission.** In the event either Party has a dispute, or asserts a claim, that arises out of or in connection with this IA or its performance, such Party (the "disputing Party") shall provide the other Party with written notice of the dispute or claim ("Notice of Dispute"). Such dispute or claim shall be referred to a designated senior representative of each Party for resolution on an informal basis as promptly as practicable after receipt of the Notice of Dispute by the other Party. In the event the designated representatives are unable to resolve the claim or dispute through unassisted or assisted negotiations within thirty (30) Calendar Days of the other Party's receipt of the Notice of Dispute, such claim or dispute may, upon mutual agreement of the Parties, be submitted to arbitration and resolved in accordance with the arbitration procedures set forth below. In the event the Parties do not agree to submit such claim or dispute to arbitration, each Party may exercise whatever rights and remedies it may have in equity or at law consistent with the terms of this IA.

27.2 **External Arbitration Procedures.** Any arbitration initiated under this IA shall be conducted before a single neutral arbitrator appointed by the Parties. If the Parties fail to agree upon a single arbitrator within ten (10) Calendar Days of the submission of the dispute to arbitration, each Party shall choose one arbitrator who shall sit on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) Calendar Days select a third arbitrator to chair the arbitration panel. In either case, the arbitrators shall be knowledgeable in electric utility matters, including electric transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any party to the arbitration (except prior arbitration). The arbitrator(s) shall provide each of the Parties an opportunity to be heard and, except as otherwise provided herein, shall conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("Arbitration Rules") and any applicable FERC regulations or ISO/RTO rules; provided, however, in the event of a

conflict between the Arbitration Rules and the terms of this Article 27, the terms of this Article 27 shall prevail.

27.3 **Arbitration Decisions**. Unless otherwise agreed by the Parties, the arbitrator(s) shall render a decision within ninety (90) Calendar Days of appointment and shall notify the Parties in writing of such decision and the reasons therefor. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this IA and shall have no power to modify or change any provision of this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards set forth in the Federal Arbitration Act or the Administrative Dispute Resolution Act. The final decision of the arbitrator must also be filed with FERC if it affects jurisdictional rates, terms and conditions of service, Interconnection Facilities, or Network Upgrades.

27.4 **Costs**. Each Party shall be responsible for its own costs incurred during the arbitration process and for the following costs, if applicable: (1) the cost of the arbitrator chosen by the Party to sit on the three member panel and one half of the cost of the third arbitrator chosen; or (2) one half the cost of the single arbitrator jointly chosen by the Parties.

## ARTICLE 28. REPRESENTATIONS, WARRANTIES AND COVENANTS

28.1 **General**. Each Party makes the following representations, warranties and covenants:

28.1.1 **Good Standing**. Such Party is duly organized, validly existing and in good standing under the laws of the state in which it is organized, formed, or incorporated, as applicable; that it is qualified to do business in the state or states in which the Generating Facility, Interconnection Facilities and Network Upgrades owned or operated by such Party, as applicable, are located; and that it has the corporate power and authority to own its properties, to carry on its business as now being conducted and to enter into this IA and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this IA.

28.1.2 **Authority**. Such Party has the right, power and authority to enter into this IA, to become a party hereto and to perform its obligations hereunder. This IA is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting

creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

28.1.3 **No Conflict.** The execution, delivery and performance of this IA does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of such Party, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon such Party or any of its assets.

28.1.4 **Consent and Approval.** Such Party has sought or obtained, or, in accordance with this IA will seek or obtain, each consent, approval, authorization, order, or acceptance by any Governmental Authority in connection with the execution, delivery and performance of this IA, and it will provide to any Governmental Authority notice of any actions under this IA that are required by Applicable Laws and Regulations.

## ARTICLE 29. JOINT OPERATING COMMITTEE

29.1 **Joint Operating Committee.** Transmission Owner shall create a Joint Operating Committee to coordinate operating and technical considerations of Interconnection Service. Within thirty (30) days after the Effective Date, Interconnection Customer and Transmission Owner shall each appoint one representative and one alternate to the Joint Operating Committee. The Interconnection Customer shall notify the Transmission Owner of its appointment in writing. Such appointments may be changed at any time by similar notice. The Joint Operating Committee shall meet as necessary, but not less than once each calendar year, to carry out the duties set forth herein. The Joint Operating Committee shall hold a meeting at the request of either Party, at a time and place agreed upon by the representatives. The Joint Operating Committee shall perform all of its duties consistent with the provisions of this IA. Each Party shall cooperate in providing to the Joint Operating Committee all information required in the performance of the Joint Operating Committee's duties. All decisions and agreements, if any, made by the Joint Operating Committee shall be evidenced in writing. The duties of the Joint Operating Committee shall include the following:

29.1.1 Establish data requirements and operating record requirements.

29.1.2 Review the requirements, standards, and procedures for data acquisition equipment, protective equipment, and any other equipment or software.

29.1.3 Annually review the one (1) year forecast of maintenance and planned outage schedules of Transmission Owner's and Interconnection Customer's facilities at the Point of Interconnection.

**29.1.4** Coordinate the scheduling of maintenance and planned outages on the Interconnection Facilities, the Generating Facility and other facilities that impact the normal operation of the interconnection of the Generating Facility to the Transmission System.

**29.1.5** Ensure that information is being provided by each Party regarding equipment availability.

**29.1.6** Perform such other duties as may be conferred upon it by mutual agreement of the Parties.

## ARTICLE 30. MISCELLANEOUS

**30.1** **Binding Effect**. This IA, and the rights and obligations hereof, shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the Parties hereto.

**30.2** **Conflicts**. In the event of a conflict between the body of this IA and any attachment, appendices or exhibits hereto, the terms and provisions of the body of this IA shall prevail and be deemed the final intent of the Parties.

**30.3** **Rules of Interpretation**. This IA, unless a clear contrary intention appears, shall be construed and interpreted as follows: (1) the singular number includes the plural number and vice versa; (2) reference to any person includes such person's successors and assigns but, in the case of a Party, only if such successors and assigns are permitted by this IA, and reference to a person in a particular capacity excludes such person in any other capacity or individually; (3) reference to any agreement (including this IA), document, instrument or tariff means such agreement, document, instrument, or tariff as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof; (4) reference to any Applicable Laws and Regulations means such Applicable Laws and Regulations as amended, modified, codified, or reenacted, in whole or in part, and in effect from time to time, including, if applicable, rules and regulations promulgated thereunder; (5) unless expressly stated otherwise, reference to any Article, Section or Appendix means such Article or Section of this IA or such Appendix to this IA, or such Section to the LGIP or such Appendix to the LGIP, as the case may be, unless the context requires otherwise; (6) "hereunder", "hereof", "herein", "hereto" and words of similar import shall be deemed references to this IA as a whole and not to any particular Article, Section or other provision hereof or thereof; (7) "including" (and, with correlative meaning, "include") means including without limiting the generality of any description preceding such term; and (8) relative to the determination of any period of time, "from" means "from and including", "to" means "to but excluding" and "through" means "through and including".

30.4 **Entire Agreement**. Except as may be otherwise expressly provided herein, this IA, including all Appendices and Schedules attached hereto, constitutes the entire agreement between the Parties with reference to the subject matter hereof, and supersedes all prior and contemporaneous understandings or agreements, oral or written, between the Parties with respect to the subject matter of this IA. There are no other agreements, representations, warranties, or covenants which constitute any part of the consideration for, or any condition to, either Party's compliance with its obligations under this IA.

30.5 **No Third-Party Beneficiaries**. This IA is not intended to and does not create rights, remedies, or benefits of any character whatsoever in favor of any persons, corporations, associations, or entities other than the Parties, and the obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns.

30.6 **Waiver**. The failure of a Party to this IA to insist, on any occasion, upon strict performance of any provision of this IA will not be considered a waiver of any obligation, right, or duty of, or imposed upon, such Party.

Any waiver at any time by either Party of its rights with respect to this IA shall not be deemed a continuing waiver or a waiver with respect to any other failure to comply with any other obligation, right, or duty of this IA. Termination or Default of this IA for any reason by the Interconnection Customer shall not constitute a waiver of the Interconnection Customer's legal rights to obtain an interconnection from the Transmission Owner. Any waiver of this IA shall, if requested, be provided in writing.

30.7 **Headings**. The descriptive headings in this IA have been inserted for convenience of reference only and are of no significance in the interpretation or construction of this IA.

30.8 **Multiple Counterparts**. This IA may be executed in two or more counterparts, each of which is deemed an original but all constitute one and the same instrument.

30.9 **Amendment**. The Parties may by mutual agreement amend this IA, and any such amendment shall only be made through, a written instrument duly executed by both of the Parties.

30.10 **Modification by the Parties**. The Parties may by mutual agreement amend the Appendices to this IA, and any such amendment shall only be made through, a written instrument duly executed by both of the Parties. Such amendment shall become effective and a part of this IA upon satisfaction of all Applicable Laws and Regulations.

30.11 **Reservation of Rights**. Transmission Owner shall have the right to make a unilateral filing with FERC to modify this IA with respect to any rates, terms and conditions, charges, classifications of service, rule or regulation under

Section 205 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder, and Interconnection Customer shall have the right to make a unilateral filing with FERC to modify this IA pursuant to section 206 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder; provided that each Party shall have the right to protest any such filing by the other Party and to participate fully in any proceeding before FERC in which such modifications may be considered. Nothing in this IA shall limit the rights of the Parties or of FERC under sections 205 or 206 of the Federal Power Act and FERC's rules and regulations thereunder, except to the extent that the Parties otherwise mutually agree as provided herein.

**30.12** **No Partnership.** This IA shall not be interpreted or construed to create an association, joint venture, agency relationship, or partnership between the Parties or to impose any partnership obligation or partnership liability upon either Party. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other Party.

**30.13** **Safety**. Each Party shall be solely responsible for the safety and supervision of its own employees, agents, representatives, and contractors. The Parties shall observe all applicable safety standards, procedures and practices of the Occupational Safety and Health Act of 1970 and of the National Electric Safety Code.

**30.14** **Specific Performance.** Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each Party agrees that the other Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States having jurisdiction over the Parties and the matter in addition to any other remedy to which it may be entitled at law or in equity.

**30.15** **Good Faith Covenant.** The Parties agree that their actions and dealings with each other under this Agreement shall be subject to an express covenant of good faith and fair dealing.

**IN WITNESS WHEREOF,** the Parties have executed this IA in duplicate originals, each of which shall constitute and be an original effective Agreement between the Parties.

**ROCHESTER GAS AND ELECTRIC CORPORATION**

By: ____________________________

Joseph J. Syta
Controller and Treasurer

Date:

**CONSTELLATION GENERATION GROUP, LLC**

By: _________________________

Michael J.Wallace
President

Date:

## Appendices to IA


| | |
|---|---|
| **Appendix A** | Interconnection Facilities, Network Upgrades and Distribution Upgrades |
| **Appendix B** | Milestones |
| **Appendix C** | Interconnection Details |
| **Appendix D** | Security Arrangements Details |
| **Appendix E** | Commercial Operation Date |
| **Appendix F** | Addresses for Delivery of Notices and Billings |
| **Appendix G** | Joint Use Facilities |
| **Appendix H** | Operating Parameters |
| **Appendix I** | Substation Components |
| **Appendix J** | Transmission Owner's Bulletin 86-01 |
| **Appendix K** | Energy System Operating Rules |

# Appendix A
# To IA

## Interconnection Facilities, Network Upgrades and Distribution Upgrades

## 1. Interconnection Facilities:

### (a) Interconnection Customer's Interconnection Facilities:

**Station 13A Equipment**

All equipment in Station 13A will be retained by Transmission Owner, as the Transmission Owner's Interconnection Facilities, except the following to be sold with the generating facility:

1. 115kV Oil Pipe cable to the GSU.
2. Control house for 115kV Oil Pipe cable.
3. Disconnect Switch 6T13A74.
4. 3 – 121kV surge arresters on #6 Transformer.
5. #6 Transformer.
6. 3-30kV surge arresters on #6 Transformer.
7. Disconnect Switches 76704, 76705 and 76706.
8. 767 Voltage Regulator.
9. 34kV Power Cable for circuit 767.
10. Motor-operated disconnect switch 1G13A71.
11. 115kV circuit breaker 1G13A72.
12. Disconnect switch 1G13A73.
13. 3 – 96kV surge arresters between disconnect switches 9X13A71 and 1G13A73.
14. Disconnect switch 9X13A71.
15. 115kV circuit breaker 9X13A72.
16. Motor-operated disconnect switch 9X13A73.
17. Duplex panels 1F, 1R and 2F.
18. Dual Unit 1.
19. Tone equipment cabinet.
20. Pilot wire cabinet.
21. Isolation cabinet.
22. 34kV Power cable for circuit 767.
23. Grounding, conduit, foundations, structures, conductor, junction boxes, cable and miscellaneous equipment associated with the equipment listed above.

**Station 204**

Line from new metering pole to be installed in circuit 751 at the south property boundary on Lake Road to the Generating Facility.

**Joint Use Facilities**

Those Joint Use Facilities in Appendix G designated as owned by the Interconnection Customer.

**(b) Transmission Owner's Interconnection Facilities:**

Station 13-A Equipment

All of Station 13-A, except for the Station 13A Interconnection Customer's Interconnection Facilities designated in 1(a) above.

Station 204 Equipment

All equipment will be retained by the Transmission Owner (note, Circuit 751 will be retained by the Transmission Owner up to the Station 13 south boundary at Lake Road where the new revenue metering will be installed). The line from this metering point to the Generating Facility will be sold with the Generating Facility.

**Joint Use Facilities**

Those Joint Use Facilities in Appendix G designated as owned by the Transmission Owner.

**2. Network Upgrades: None**

**3. Distribution Upgrades: None**


NOTES:
1. RED DESIGNATES INTERCONNECTION CUSTOMER
CADD & RASTER FILES
LAKE ROAD
SCHEDULE A
STATION 1A 115KV/34.5KV
PLOT PLAN