**H**

Re Rochester Gas and Electric Corporation
Case 03-E-1231

New York Public Service Commission
May 20, 2004

Before Flynn, chairman and Dunleavy, Weiss and Galvin, commissioners.

BY THE COMMISSION:

INTRODUCTION

***1** By petition filed August 29, 2003, and revised petition filed December 18, 2003, Rochester Gas and Electric Corporation (RG&E), Constellation Energy Group, Inc. (CEG), Constellation Generation Group, LLC (CGG), and R.E. Ginna Nuclear Power Plant, LLC (GNPP) (collectively, Constellation) jointly request authority to transfer RG&E's Robert E. Ginna Nuclear Power Plant and related assets (Ginna) to GNPP for approximately $423 million, subject to adjustments at closing. Constellation was the winning bidder in the auction of Ginna conducted by RG&E.

Generation divestiture has been a key element of our vision for competitive electric markets for the last six years, and the transfer of Ginna to GNPP is consistent with our goals and objectives. It is one of the last utility-owned large generating facilities in the State, and its sale constitutes a significant step in eliminating generation-related competitive concerns in RG&E's service territory. The proposed transaction preserves the safety and reliability of both Ginna and the bulk transmission grid, and maintains the provision of safe and adequate service to RG&E's customers at just and reasonable rates. Additionally, CGG and GNPP intend to offer employment to all Ginna employees. For the reasons set forth herein, and with the modification discussed below, we approve the proposed transaction because it is in the public interest and authorize RG&E to sell Ginna to GNPP.

BACKGROUND

In the spring of 2003, RG&E decided to explore whether it could obtain a reasonable price for Ginna. RG&E retained the services of JP Morgan Securities, Inc. and Concentric Energy Advisors, Inc. (the Auction Managers) to assist it in marketing and auctioning Ginna. From the beginning, RG&E committed to selling the plant via a competitive auction process open to all interested and eligible bidders. RG&E was not required to obtain pre-approval of its divestiture plan; however, it consulted with Department of Public Service Staff (Staff) throughout the process. RG&E and Staff agreed that Staff should participate in the auction process in a similar manner as it had in the sale of RG&E's and its Co-Tenants' interests in the Nine Mile Nuclear Generating Facilities (i.e., reviewing auction and transaction documents, participating in meetings with bidders, analyzing bids, and monitoring contract negotiations with the bidders). [FN1]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Auction Process

In June 2003, the Auction Managers compiled a list of prospective bidders for Ginna and developed marketing information on the plant. In July 2003, letters and preliminary marketing information were sent to all potential bidders, soliciting their interest in Ginna and inviting them to participate in the auction process. Upon receipt of executed confidentiality agreements from interested companies, the Auction Managers sent out detailed information on the plant. They also gave the prospective bidders access to a restricted web site on which the company had placed extensive engineering, financial, operational and other information on Ginna. Every bidder was invited to conduct due diligence at the plant and meet with RG&E management and plant employees.

***2** Binding bids were received on November 13, 2003. Pursuant to RG&E's bidding instructions, bidders were encouraged to be creative in developing their bids. While a preferred bid structure was specified, bidders were permitted to deviate from that structure in order to maximize their offers. [FN2] Additionally, bidders were allowed to propose changes to the transaction documents. RG&E, its Auction Managers, and Staff reviewed and analyzed the bids received, and all agreed that Constellation provided the highest value bid. Negotiations with Constellation began shortly thereafter. On November 24, 2003, RG&E and Constellation executed the transaction documents and announced the proposed sale.

The Petitions

On August 29, 2003, before it had completed the auction process, RG&E filed a petition pursuant to Public Service Law (PSL) § 70 seeking approval of the sale of Ginna. That petition did not identify a purchaser or specify a purchase price, and it provided only RG&E's proposed terms of sale and general statements regarding the possible benefits of the transfer, if it were to occur. By letter dated October 15, 2003, the Secretary to the Commission advised RG&E that the August 29 filing was premature and would not be processed until the company concluded the auction process, executed a contract with the winning bidder, and filed a complete and fully substantiated petition under PSL § 70.

On December 18, 2003, RG&E, CGG, and GNPP filed a revised petition containing the information specified in October 15 letter. The petition describes the assets to be transferred, the ability of GNPP to operate and manage Ginna, the auction process, the transaction documents executed between parties, and the reasons that the transfer is in the public interest. Petitioners request us to approve the transaction documents, find that the sale is in the public interest, authorize RG&E to recover all of its costs under the Power Purchase Agreement (PPA), allow RG&E recovery of its auctionrelated expenses, and make certain other specified findings. On April 9, 2004, Petitioners supplemented the revised petition by filing three Assignment and Assumption Agreements, two leases, and a Purchase and Sale Agreement, all of which were contemplated by the original transaction documents. These contracts are discussed below.

The Purchaser

CEG is a Fortune 500 company engaged in many facets of the energy industry. It has approximately $15 billion in assets and over 11,000 MW of generating capacity,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

including about 3,200 MW in nuclear power plant capacity. CGG is a subsidiary of CEG and the holding company for its nuclear and other generating facilities, which have a value of about $3 billion. GNPP is an indirect, wholly-owned subsidiary of CGG formed for the purpose of owning and operating Ginna. CGG and its affiliates are considered above average nuclear operators; in peer reviews and industry rankings, CGG's Calvert Cliffs Nuclear Generating Facility typically ranks among the best nuclear plants in the country.

The Public Interest

***3** Petitioners generally maintain that the proposed sale is in the public interest. They assert that this filing is in accordance with Opinion No. 96-12 [FN3] and consistent with our vision of a competitive market for electricity in New York State. They conclude that, because of RG&E's use of an open, competitive auction process, the price offered by Constellation constitutes a fair reflection of the market value of the plant. Petitioners contend that GNPP is qualified and competent to assume control of Ginna and safely own and operate it. They state that the plant and its owners will continue to be subject to state and federal regulation, while the risks of owning, operating, and decommissioning the plant will be transferred from RG&E's customers to GNPP, its affiliates, and shareholders. At the same time, GNPP is subject to the same obligation as RG&E to fully remediate the Ginna site at the end of its useful life and return it to a 'greenfield' condition, thereby allowing it to be productively used for other purposes.

Petitioners further claim that Ginna's work force has been suitably protected and will not be adversely impacted by the sale, and that the local community will also benefit. Because the sale is conditioned on the receipt of life extension approval from the Nuclear Regulatory Commission (NRC), they explain, the revenues and jobs generated by the plant should continue for many years and provide long-term stability to the community. Finally, they assert that there are no adverse environmental impacts associated with this transaction.

The Transaction Documents

There are a number of agreements and contracts between RG&E and Constellation that together constitute the terms and conditions of the proposed transaction. The principal contracts are the Asset Purchase Agreement (APA), PPA, Interconnection Agreement (IA), and Reciprocal Easement Agreement (REA). Others include assignment agreements, leases, and secondary asset purchase agreements.

A. Assignment and Assumption Agreements

In virtually all generation transactions, the buyer forms one or more wholly-owned, special purpose entities, such as limited liability corporations, to own and operate the acquired facility(ies). This transaction is no different, but at the time the parties negotiated the principal transaction documents, Constellation had not yet formed a special purpose entity for this purpose. Therefore, the APA and IA were entered into between CGG and RG&E; the REA, although in final form, has not yet been executed. At the time the PPA was executed, Constellation had expressed a preference that it be executed by its marketing affiliate, Constellation Power Source, Inc (CPS), rather than by CGG or the special purpose entity. Shortly after

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the transaction documents were executed, Constellation incorporated GNPP as the special purpose entity that would own and operate Ginna.

On April 8, 2004, CGG and GNPP entered into Assignment and Assumption Agreements that reflect the assignment of CGG's rights and interests in the APA and IA to GNPP. Pursuant to a third Assignment and Assumption Agreement executed on the same date, CPS assigned its rights and interests in the PPA to GNPP.

B. Asset Purchase Agreement

***4** The APA delineates most of the terms and conditions of the sale and the specific actions to be taken by the parties prior to and after closing. Key areas of the APA include:

1. Purchase Price -- The APA specifies a purchase price of $422.6 million subject to various adjustments, including actual nuclear fuel and spare parts inventories as of the date of closing, specified work items that may or may not be completed by closing, the volume of low-level radioactive waste on site, taxes, rents, and permits. The projected closing date is June 30, 2004, and the terms provide for daily adjustments to the purchase price in the event the closing occurs before or after that date.

2. Assets and Liabilities -- The APA specifies the assets to be sold to GNPP and those to be retained by RG&E. Similarly, it specifies the liabilities and obligations to be assigned to or assumed by the buyers and those to be retained by RG&E. Generally, these provisions are similar to those in the APA for the Nine Mile Point transaction and in other generation transactions.

3. Decommissioning Provisions -- The APA requires RG&E to transfer to GNPP its Qualified Decommissioning Trust Fund and a portion of its Non-Qualified Decommissioning Trust Fund. Because the APA requires the receipt of life extension approval from the NRC as a condition of closing, RG&E has calculated the amount needed for decommissioning based upon a decommissioning date of 2029 instead of 2009. As a result, the Decommissioning Trust Funds are over-funded-- they contain amounts that, in total, are greater than currently estimated by NRC regulations as necessary to completely decommission Ginna and remediate the site. Therefore, the APA provides that RG&E will transfer an amount equal to the NRC requirement for decommissioning the plant (approximately $201.6 million) and retain the excess funds (approximately $60 million) for the benefit of its customers. It also provides that GNPP will assume responsibility for decommissioning Ginna and restoring it to its original, pre-Ginna condition at the end of the useful life of the property.

4. Environmental Liabilities -- The APA provides that GNPP will assume, with certain limitations, all known and unknown environmental liabilities arising from ownership of the site and operation of Ginna, including all spent fuel storage and disposal obligations. There are limitations on these liabilities related to pre-closing offsite transportation, storage, and handling of hazardous substances.

5. Labor Provisions -- CGG and GNPP will offer employment to all plant employees under terms and conditions and with benefits similar to those they now receive. The requirement extends for a minimum of 18 months after the closing for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

most benefits, except that identical employee pension benefits must continue for a minimum of 54 months.

6. Litigation and Nuclear Issues -- The APA provides that RG&E will commence an action against the Department of Energy (DOE) related to the delay in the latter's assumption of ownership of Ginna's spent nuclear fuel (SNF). While this litigation will generally be assigned to GNPP, in the event it is successful, the APA requires that RG&E share in any damages award GNPP receives, up to $10 million. The APA also provides that RG&E retains liability for all fees owed to DOE under the Energy Policy Act of 1992. RG&E will maintain its membership in Nuclear Energy Insurance, Ltd. in order to maintain its ability to receive distributions from that entity.

C. Power Purchase Agreement

***5** RG&E will purchase 90% of the output (energy and unforced capacity) of Ginna for a period of 10 years. The PPA is unit contingent, meaning that GNPP's obligation to sell, and RG&E's obligation to buy, the plant's output arises only when the plant is operating. The contract also contains provisions related to default, termination, and damages in the event of breach by either party.

There are two possible modifications to the plant that could increase its output by 5% and 12%, respectively. In the event GNPP undertakes these uprates within specified time frames, the PPA provides that RG&E will purchase 90% of the uprated output for a term that ends when the base PPA expires. The energy price ($41.65/MWh) and capacity prices ($1.50/kW-month -- Winter and $2.20/kW-month -- Summer) are fixed for the term of the PPA but have been shaped to reflect seasonal and on-peak/offpeak pricing differences. GNPP intends to market the remaining 10% of the output of the plant on the wholesale market.

D. Interconnection Agreement

The IA governs GNPP's access to the bulk transmission grid and provides the terms and conditions upon which RG&E will allow Ginna to interconnect with its transmission system. The contract generally follows the form for interconnection agreements adopted by the Federal Energy Regulatory Commission (FERC). It specifies the technical and operating requirements for the interconnection facilities, and the rights and obligations of the parties. It also ensures that transmission and generation plant are properly segregated from each other and will be properly maintained and operated by the responsible party without interference from the other party.

E. Reciprocal Easement Agreement

The REA delineates the easements RG&E and GNPP will grant to each other for access across the other's property for purposes of ingress and egress, maintenance and construction purposes. The easements also permit each party to locate its facilities (e.g., poles and towers, conductors, transformers) on property the other owns, and allow each party sufficient rights of access to modify or expand its facilities as needed.

F. Purchase and Sale Agreement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

RG&E owns a 15-acre parcel immediately adjacent to the Ginna site that was acquired in 1988. [FN4] Although not considered part of the Ginna site, the APA gave GNPP the right of first refusal to acquire it. GNPP decided instead to acquire the property outright and entered into negotiations with RG&E related to price and terms of sale. Ultimately, the companies agreed to a price based upon an appraisal of the property. That appraisal, which was limited in scope, concluded that the property is worth $149,400. [FN5] In addition to price, the Purchase and Sale Agreement specifies the liabilities that are transferred and assumed, the parties' indemnification requirements, and RG&E's environmental representations and warranties.

G. Leases

RG&E and GNPP have entered into two leases related to off-site facilities that support Ginna's operations. The first pertains to the emergency operations facility (EOF) that is used in the event of a emergency at Ginna, currently located in the basement of RG&E's headquarters in Rochester. GNPP intends to secure an alternate location for the EOF but has not yet found suitable space. RG&E has agreed to allow GNPP to continue to use the existing EOF for a period of up to three years (the lease is for one year, with two one year renewal options).

***6** The second lease pertains to labs and other support facilities for the plant. As with the EOF, GNPP intends to secure a separate location for these facilities but has not yet done so. Therefore, RG&E has allowed GNPP to continue to utilize the present location for a period of up to three years. The rental price for both leases is fixed at $13.60 per square foot; GNPP is also permitted to use certain specified conference rooms at RG&E's headquarters at fixed per diem rates. Also, both leases contain provisions regarding use and care of the premises, insurance and liability, default, and other boilerplate terms. RG&E asserts that the lease price is a cost-based blended rate and is the same as that RG&E uses for all of its property leases.

Market Power

Petitioners submitted an analysis of both the energy and capacity markets before and after Constellation's purchase of Ginna. Petitioners affirm that they applied the market power procedures we previously adopted for use in evaluating generation divestitures. [FN6] In evaluating the potential for Constellation to exercise market power by acquiring Ginna, Petitioners' analysis assumes 100% retail access penetration and ignores the mitigation effects of long term transition contracts. Petitioners conclude that this transaction satisfies, or is consistent with, our vertical and horizontal market power guidelines, and that it would not give rise to market power or other competitive concerns.

Exempt Wholesale Generator Status

Petitioners interpret federal law as requiring that we find that new ownership of a generating facility will benefit customers, is in the public interest and does not violate state law, before FERC will accord GNPP exempt wholesale generator (EWG) status for Ginna. They state that GNPP seeks EWG status so that it may operate Ginna based on free market principles rather than government regulation intended for monopoly utilities.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Petitioners assert that divestiture of Ginna is consistent with a competitive generation market, a basic tenet of Opinion No. 96-12 and our competitive agenda. They point to our statement in Opinion No. 95-7 that competitive generation sources will promote economic development and reduce environmental impacts, two purposes designed to benefit customers and the public interest. [FN7] As for the third element, they contend that granting Ginna eligible status would not violate any provision of New York law.

Accounting and Rate Treatment

RG&E submitted the details of the accounting and rate treatment sought by the company as part of its request for approval of this transaction. By Order issued December 22, 2003, [FN8] we transferred consideration of the bulk of RG&E's requests to its pending rate cases. [FN9] Given that Order, and inasmuch as those issues are being addressed in our Order approving the parties' Joint Proposals in those proceedings, [FN10] they need not and will not be addressed in this Order. However, there is one accounting issue that still must be decided in this proceeding--the reasonableness and recoverable amount of RG&E's transaction costs. The company estimates that these costs will total approximately $16 million.

PUBLIC NOTICE

***7** Notice of the revised petition was published in the State Register on February 18, 2004. On March 17, 2004, the Secretary to the Commission issued a Notice of Technical Conference that advised interested persons to submit their comments on the proposed transaction by April 5, 2004. [FN11] No comments have been received.

STATE ENVIRONMENTAL QUALITY REVIEW ACT FINDINGS

On May 3, 1996, we issued a final generic environmental impact statement (FGEIS) in Case 94-E-0952 that addressed the state-wide environmental, social, and economic impacts of a policy opening New York's electric markets to competition. It was acknowledged in the FGEIS that localized impacts could arise as a result of specific divestiture proposals presented by individual companies.

The approval of the sale of Ginna constitutes a subsequent action to the policy determinations issued in Opinion No. 96-12 in Case 94-E-0952. Under the State Environmental Quality Review Act (SEQRA), we are required to analyze the potential impacts associated with this transaction and determine whether the impacts identified are within the conditions and thresholds of the FGEIS. To do so, we issued a Final Supplemental Environmental Impact Statement (FSEIS) in this proceeding on May 5, 2004. [FN12] The FSEIS analyzes the detailed, site-specific information provided in the draft SEIS submitted by RG&E and Constellation as part of their PSL § 70 filings and other factual information referenced therein. It identifies and addresses the environmental, social and economic impacts found to arise as a result of the transaction. Determinations were made as to whether the impacts identified are within the conditions and thresholds of the FGEIS. Additionally, a comparison was made to the no-action alternative to gauge the extent to which impacts actually arose as a result of the proposed action.

There were no comments by the public on the draft SEIS. No potentially

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

significant, adverse, site-specific impacts were identified. Based on the FSEIS analysis and the overall benefits to be derived from the proposed transfer, which are addressed in the body of this Order, it is clear that RG&E's customers, and the State as a whole, will benefit from the approval of this transaction. The separation of generation from transmission and distribution should help promote and strengthen our competitive generation market, with its concomitant effects on economic growth and development. Given Constellation's focus on nuclear power, this transaction should also contribute to the continued safe operation of Ginna and to preservation of system reliability.

Pursuant to 6 NYCRR § 617.11, we certify that, consistent with environmental, social and economic considerations from among the reasonable alternatives available, the approval of the sale of Ginna avoids or minimizes adverse impacts to the maximum extent practicable and satisfies the requirement of SEQRA. The action is also consistent with applicable policies set forth in Article 42 of the Executive Law (Local Waterfront Revitalization and Coastal Resources), as implemented by 19 NYCRR § 600, and will achieve a balance between the protection of the environment and the need to accommodate social and economic considerations.

DISCUSSION

***8** While RG&E was not required to sell Ginna under its Rate and Restructuring Plan, [FN13] it is correct that generation divestiture is consistent with our competitive agenda. We have encouraged the separation of generation from transmission and distribution because of its beneficial impact on the promotion of the competitive energy market in New York State. However, each case must be considered on its own merits, and, pursuant to PSL § 70, we must determine whether each proposed sale is in the public interest.

Among the factors we consider are the purchase price and terms of sale, preservation of system reliability, technical competence and financial strength of the buyer, impacts on customers, employees and the environment, efficacy of the sale process, and the potential exercise of market power. Based on our evaluation of these factors, as discussed below, we find that the sale is in the public interest.

Auction Process

We have consistently concluded that an open, competitive auction process yields the maximum value for an asset and is the most appropriate approach for generation divestiture. In this case, RG&E utilized this type of approach. In considering the sale of the Nine Mile nuclear facilities, we determined that the use of a competitive, single-phase, binding bid auction process was fair and reasonable, and there is no reason to make any other finding here. Based on the confidential information provided to us by Staff, we find that all interested entities had an equal opportunity to participate in the process, and all prospective purchasers were given the same ability to ask questions, tour the facilities, meet with RG&E representatives, and make creative offers to maximize their bids for the assets.

As in the other nuclear auctions, our Staff closely monitored the auction process to ensure that ratepayers' interests were protected and the value of the facility was maximized. While we will not address the details of the bids or of the bid

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

review process, we understand that all bids were objectively evaluated and considered. Based on this evaluation, which Staff confirmed independently from the company and its Auction Managers, we are satisfied that Constellation's bid provided the most value. As discussed below, the purchase price of about $423 million compares very favorably with the prices paid for other nuclear facilities; also, the robust auction adequately establishes the market value of Ginna.

Price Terms

Pursuant to the APA, Constellation will pay about $423 million for Ginna, subject to a number of adjustments related to the date of closing, allocation of taxes and fees, inventories of nuclear fuel, spare parts and low level waste, decommissioning, and other enumerated factors. Given RG&E's use of an auction process to establish the market value of Ginna, we find the purchase price is reasonable. In addition, GNPP will pay $149,400 for an approximate 15- acre parcel of land adjacent to Ginna and rent of $13.60 per square foot for space it will lease from RG&E on a short-term basis. We will discuss these transfers separately.

***9** According to RG&E, Energetix paid approximately $162,000 for the property in 1988, and RG&E paid Energetix the same amount for the property in November 2003. While the scope of and analysis in the appraisal upon which the purchase price was based raises some concerns, these concerns do not dictate rejection of the Purchase and Sale Agreement. Constellation's primary purpose for acquiring the property is to enhance its ability to secure the Ginna site, not to use it for commercial development or other purposes. Maintaining an adequate buffer around the site and taking steps to maximize the security of and at the plant is appropriate, and the sale of this site is consistent with such purposes. Further, inasmuch as RG&E does not need the property for its regulated operations, the transfer will not adversely impact RG&E's ratepayers. [FN14]

RG&E and GNPP also entered into two short-term leases for space currently used by RG&E for activities related to Ginna. RG&E explains that the rental rate is cost-based and is the same as that it charges to its affiliates. While we typically prefer that utilities base leases on market rates, in this instance the cost-based and marketbased rates appear comparable. According to information provided by the company justifying the proposed rental rate, lease rates in Rochester vary from about $4 per square foot for lesser quality buildings to $25 per square foot for premium office space. The property at issue consists primarily of basement and laboratory space, which would fall in the lower end of the range. Thus, RG&E's use of a cost-based rate in the proposed leases is acceptable.

The Transaction Agreements

The APA and other transaction documents properly describe the terms and conditions of the parties' agreement. They are similar in form and scope to the agreements we approved in other generation divestitures, and they fairly allocate the benefits and liabilities transferred and retained. The APA, REA, Purchase and Sale Agreement, and leases properly capture the real property and assets that will be transferred to GNPP. Appropriate reservations have been made for excluded assets, and the rights of access provided in the REA appear to be reasonable and adequate.

A. Environmental Provisions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As in other nuclear transactions, the APA in this transaction carefully delineates the environmental, including nuclear, liabilities that are transferred to GNPP and those that remain with RG&E. This delineation appears fair, reasonable, and an appropriate allocation of the environmental liabilities and potential risks between the parties. It also relieves RG&E and its customers from virtually all of the risks and potential liabilities associated with owning and operating a nuclear power plant and from the risks associated with disposing spent nuclear fuel and decommissioning the plant.

B. Labor Provisions

In reviewing this proposed sale, we have examined whether the provisions pertaining to plant employees would cause any adverse impacts. Because RG&E's work force is not unionized, there was no need for RG&E to negotiate separate provisions for employees in different bargaining units. It appears that the labor and employment terms set forth in the APA provide similar levels of protection and benefits that the workers would have received from RG&E. From a pension and retirement benefits standpoint, the specified term for continuation of identical benefits is reasonable. Moreover, our understanding of the APA is that its protections and benefits will apply no matter which Constellation affiliate hires the employees. It is with that understanding that we find the provisions fair and reasonable.

***10** We have also been advised that offers of employment have been or will be extended to every current Ginna employee and that GNPP and CGG have no plans to reduce the size of the work force. We further understand that because of CGG's size, nuclear fleet, and mix of generation assets, the Ginna employees will have greater opportunities for professional development and advancement than they have with RG&E. These are positive, albeit somewhat intangible, attributes of the transaction and bolster our determination that the Ginna employees will benefit from this sale.

C. Decommissioning

The decommissioning trust funds maintained by RG&E contain more than the amount estimated under NRC regulations as needed to decommission the plant at the end of its extended life. The APA directly addresses this issue by limiting the amount of decommissioning funds to be transferred. We find the treatment of this issue is fair, balanced, and in RG&E's ratepayers' best interests. [FN15]

D. Power Purchase Agreement

The terms and conditions of the PPA are reasonable and provide adequate protections to RG&E's customers while allowing the company to shed the risks of owning and operating a nuclear power plant. Based on currently available information, the PPA pricing and shaping appear fair and are, on a present value basis over the term of the agreement, comparable to market pricing. Moreover, the unit contingent nature of the agreement, which imposes no greater burden on GNPP than RG&E currently has, is fair and equitable.

E. Reliability

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

With the modification discussed below, this transaction should not result in any adverse impact on power system reliability. The IA provides that GNPP will operate and maintain Ginna to meet or exceed RG&E's existing procedures for generators that operate in parallel with its transmission system. GNPP must also meet all New York Independent System Operator (NYISO) requirements for operation of a generating facility. Future additions or modifications to the plant, including the uprate projects, must also comply with RG&E's and the NYISO's procedures and requirements. The REA affords RG&E sufficient access to its facilities, and, should the need arise, RG&E will be able to expand those facilities to satisfy the needs of its customers. We have one concern with the terms and provisions of the IA. Section 2.3.1 provides that the agreement may be terminated by GNPP upon 90 days' notice. Because Ginna provides certain ancillary services to the load area that would need to be replaced in the event GNPP disconnects the plant from RG&E's transmission system, we are concerned that 90 days may not be a sufficient period for RG&E to design and install or implement the necessary alternate equipment or measures. To rectify this concern and avoid the potential for this transaction to create a reliability problem for RG&E's customers, the notice provision shall be changed from 90 to 180 days.

Market Power

A. Horizontal Market Power

***11** Horizontal market power occurs if one, or a small number, of generation entities own a percentage share of generation supply large enough to allow them to profitably and improperly raise prices above competitive market levels. Constellation owns Nine Mile Point Unit 1 (NMP1) and 82% of Nine Mile Point Unit 2 (NMP2), located in the Town of Scriba, New York. Via those facilities, Constellation owns approximately 1,560 MW of summer capacity in the New York market. Ginna's capacity is currently 495 MW; possible uprates that could be undertaken over the next few years could increase the plant's capacity to about 580 MW. For purposes of our market power analysis, the potential capacity of Ginna must be summed with Constellation's other holdings, yielding a total of 2,140 MW of capacity in New York.

In determining whether Constellation could profitably exercise horizontal market power in the energy or capacity markets, we consider the following factors. First, Constellation's New York holdings consist entirely of nuclear power plants which, by themselves, are poorly suited for exercising market power in energy markets. The output from such plants is difficult to withhold for short periods due to the plants' inability to easily and expeditiously ramp up and down. Second, a large portion of the output from the plants will be sold pursuant to long term contracts entered into as part of the plant sales. For NMP1, 90% of the plant's energy and capacity is committed to Niagara Mohawk Power Corporation (NMPC) at specified prices through August 2009. Similarly, 90% of CEG's subsidiary's share of the energy and capacity from NMP2 is committed to RG&E, NMPC and the other selling Co-Tenants at specified prices through 2011. From 2011 to 2021, the selling Co-Tenants will receive 80% of the proceeds from the sale of NMP2's output, above a contractually set reference price. For Ginna, the PPA commits 90% of the plant's energy and capacity, including the additional output attributable to the two plant upgrades, to RG&E at specified prices for 10 years.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

While it is very difficult, if not impossible, to predict the future actions that Constellation may take that might increase its ability to exercise market power, the above-described long-term contracts serve as strong mitigators against the potential that it could profitably exercise market power. To the extent that Constellation withholds other output from the market, these contracts prevent the vast majority of the nuclear output from receiving any related price increases. Moreover, the PPAs create financial disincentives for Constellation to withhold the plants' output. Further, such market manipulation would likely be discernible and would subject Constellation to significant legal liability.

For the foregoing reasons, and based upon the market power analysis submitted by Petitioners in support of the revised petition, we find that this transaction is not likely to provide Constellation with the ability to profitably manipulate the output of Ginna or its other generation assets in New York State. [FN16] Therefore, this transaction does not raise horizontal market power concerns.

B. Vertical Market Power

***12** Vertical market power occurs when an entity exercises market power at one stage of a production process and leverages that power to gain advantage over its competition in a different stage of the production process. Here, Constellation does not own, control, or operate any electric transmission and distribution assets, or essential facilities for gas, oil, or coal supply, in New York State. For these reasons, we find that there are no vertical market power concerns related to this transaction.

Safety

Compliance with safety provisions of state and federal law is mandated. Equipment switching and tagging rules are included for the safety of all employees. Moreover, since GNPP will be an electric corporation under the Public Service Law, it must continue to meet the safety requirements in our regulations, including 16 NYCRR Part 125.

The Public Interest

Under PSL '70, our consent is required before an electric corporation may transfer any of its assets to a new owner. The consent is furnished if the transfer is in the public interest. In determining whether a proposed sale is in the public interest, we review, inter alia, the details of the transaction and the qualifications of the purchaser to provide the utility service. [FN17]

Here, GNPP, by virtue of its affiliation with CGG and its intent to retain the entire Ginna work force, is fully qualified to own and operate Ginna. Constellation has adequate resources to close the proposed transaction and to safely and reliability operate the plant. The proposed purchase price is reasonable because it is the product of a fair and competitive auction process. Based on Staff's review of the bid process and bids, we are satisfied that Constellation's bid was the highest among the bids received. Finally, we find no environmental or other impediments associated with this transaction.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Comparison to Other Sales

Comparisons between transactions do not provide conclusive evidence of the reasonableness of a given asset's purchase price, but they do provide useful information towards that determination. In considering the sales of non-nuclear generating facilities, we have made comparisons on a price per book value basis. In the context of nuclear sales, though, there are substantial differences in book values, in large part due to the date of construction of particular plants, and book value has little relationship to the market value of any particular plant. Therefore, such comparisons do not provide useful information. It is possible to make comparisons based on price per kilowatt, subject to the recognition that each nuclear transaction, and each asset sold, has different characteristics (e.g., age, size, condition, location, regional market prices) and the terms of sale, while generally similar, are not identical.

The sale price for Ginna, $423 million, equates to a price per kilowatt of approximately $860. NMP1 sold for about $380/kW, NMP2 for about $615/kW, and Indian Point Unit 2 for about $510/kW. Outside New York State, Seabrook recently sold for approximately $790/kW and a purchaser has offered about $400/kW for Kewaunee. These comparisons, while not exact, indicate that RG&E received a fair and reasonable price as a result of its auction.

Accounting Matters

***13** As noted above, most of the accounting and rate treatment issues associated with this transaction have been addressed in the RG&E Rate Order. The one open issue relates to the determination of the gross and net proceeds and the reasonableness of the purchase price adjustments and transaction costs. Some of these adjustments and costs are known, but many will not be finalized until the transaction is consummated. Based on the information provided by RG&E to date, we have some concerns with the overall magnitude of the expenses. In order to determine the propriety or reasonableness of these expenses, and of the purchase price adjustments, we require additional information.

We direct RG&E to file, within 90 days of the date of closing of the sale, an accounting of all purchase price adjustments, with explanations of the reason(s) for each adjustment. The company's filing shall also include an itemized, detailed accounting of all costs related to the auction and sale, with appropriate explanations and justifications, supporting documentation, and work papers. The filing shall further include a detailed calculation of the net, after-tax proceeds resulting from the sale and reconcile such amount with the amount added to the Asset Sale Gain Account established in the RG&E Rate Order.

Federal and State Regulation

Petitioners interpret federal law as requiring that we find new ownership of a generating facility will benefit customers, is in the public interest and does not violate state law, before the new owner can be afforded EWG status. GNPP seeks such status so that it may operate Ginna free of federal regulation intended for monopoly utilities. It sees its participation in the wholesale competitive market, which should result in increased competition, as providing the requisite benefit for the public. Therefore, Petitioners request that findings be made that Ginna be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determined to be an 'eligible facility' as that term is defined by Public Utility Holding Company Act § 32, thereby allowing FERC to issue a decision qualifying GNPP for EWG status under federal law.

In conformance with PUHCA and FERC's regulations, [FN18] we find that allowing Ginna to become an eligible facility, with GNPP owning the plant, either directly or indirectly through one or more affiliates as defined under federal law, [FN19] will benefit New York consumers, is in the public interest, and does not violate New York law. These findings are made on the same basis that we find that the transaction is in the public interest pursuant to PSL § 70. We determined in Opinion No. 96-12 that a competitive marketplace for the provision of electricity supply would benefit New York customers and this transaction furthers that goal. Moreover, there is no violation of New York law in transferring the plant to GNPP.

While GNPP will become an electric corporation under the Public Service Law when it assumes ownership of Ginna, it is being accorded lightened regulation. [FN20] This approach to regulation has been previously approved for generators that intend to participate entirely or primarily in the wholesale market. [FN21] GNPP, however, will still be subject to state regulation with respect to such matters as enforcement, investigation, safety (subject to the NRC's jurisdiction over radiological matters), reliability and system improvements.

CONCLUSION

***14** The divestiture of Ginna benefits RG&E's ratepayers and contributes to the creation of a fully-functional wholesale market for electricity where none of the participants should be able to exercise market power. Constellation has the requisite financial backing and technical competence to safely manage and operate Ginna in a competitive environment. We find no market power, reliability, environmental, or other concerns that indicate that this transaction would be adverse or harmful to RG&E's and its customers' interests. Therefore, as required by PSL § 70, we find this transaction is in the public interest and authorize RG&E to proceed with its consummation.

The Commission orders:

1. Rochester Gas and Electric Corporation's sale of its Robert E. Ginna Nuclear Power Plant and related assets to Constellation Generation Group, LLC and R.E. Ginna Nuclear Power Plant, LLC is approved, subject to the modification discussed below.

2. Rochester Gas and Electric Corporation's lease of certain office and laboratory space to R.E. Ginna Nuclear Power Plant, LLC is approved.

3. The Asset Purchase Agreement, Power Purchase Agreement, Reciprocal Easement Agreement, and Purchase and Sale Agreement are approved, as set forth in the body of this Order.

4. The Interconnection Agreement is approved, subject to the modification of the notice requirement in Section 2.3.1 from 90 calendar days to 180 calendar days. Rochester Gas and Electric Corporation, Constellation Generation Group, LLC, and R.E. Ginna Nuclear Power Plant, LLC shall submit written statements of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unconditional acceptance of this modification, signed and acknowledged by duly authorized officers of each company, within five business days of the date of this Order. These statements shall be filed with the Secretary of the Commission and served on all parties to this proceeding.

5. The findings related to the Final Supplemental Environmental Impact Statement required under the State Environmental Quality Review Act described in the body of this Order are adopted.

6. The findings on exempt wholesale generator status under the Public Utility Holding Company Act described in the body of this Order are adopted.

7. No later than 90 days following the closing of the transaction that is the subject of this Order, Rochester Gas and Electric Corporation shall make a filing containing the total proceeds received, an itemization and explanation of all purchase price adjustments, an itemization and explanation of all costs proposed to be offset against the proceeds received, proposed journal entries, and other associated accounting and rate treatment information.

8. This proceeding is continued.

FOOTNOTES

FN1 Case 01-E-0011, Sale of Nine Mile Point Nuclear Generating Facilities, Order Authorizing Asset Transfers (issued October 26, 2001).

FN2 Bidders were allowed to submit alternate offers with different bid structures.

FN3 Cases 94-E-0952, et al., Competitive Opportunities Regarding Electric Service, Opinion No. 96-12 (issued May 20, 1996).

FN4 The site was acquired by Roxdel Corporation (now known as Energetix, Inc.), RG&E's energy services company affiliate, in July 1988. It was transferred from Energetix to RG&E in November 2003 for $162,000.

FN5 RG&E is not seeking recovery of the book loss from its customers via the auction proceeds or otherwise.

FN6 Case 96-E-0891, New York State Electric & Gas Corporation -- Electric Rates and Restructuring, Order Authorizing the Process for Auctioning of Generation Plant, Appendix A (issued April 24, 1998); Cases 96-E-0900, et al., Orange & Rockland Utilities, Inc. -- Electric Rates and Restructuring, Statement of Policy Regarding Vertical Market Power. (issued July 17, 1998).

FN7 Case 94-E-0952, supra, Opinion No. 95-7 (issued June 7, 1995).

FN8 Cases 03-E-1231, et al., Petition of Rochester Gas and Electric Corporation, Constellation Generation Group, LLC, and R.E. Ginna Nuclear Power Plant, LLC for Authority under Public Service Law Section 70 to Transfer by Auction Sale the R.E. Ginna Nuclear Generating Plant and Related Assets and for Related Approvals, Procedural Order on Consideration of Rate Issues (issued December 22, 2003).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN9 Cases 03-E-0765 and 03-G-0766, Rochester Gas and Electric Corporation -- Electric and Gas Rates.

FN10 Cases 03-E-0765, et al., supra, Order Adopting Provisions of Joint Proposals with Modifications (issued May 19, 2004) (RG&E Rate Order).

FN11 A technical conference open to the public and all interested persons was conducted on March 30, 2004 at which the auction process, revised petition, and related issues were discussed.

FN12 Case 03-E-1231, supra, Order Adopting And Approving Issuance Of Final Supplemental Environmental Impact Statement (issued May 5, 2004).

FN13 Case 96-E-0898, Rochester Gas and Electric Corporation -- Electric Rates and Restructuring Opinion and Order Adopting Terms of Settlement Subject to Conditions and Changes, Opinion No. 98-1 (issued January 14, 1998).

FN14 The differential between the book value and sale price does not adversely impact RG&E's ratepayers because RG&E is not seeking recovery of the book loss on the property.

FN15 In the Nine Mile and Indian Point transactions, it was unknown at the time of sale whether the plants' licenses could or would be extended. Therefore, the decommissioning terms in those transactions reflected such uncertainty and provided potential benefits to those utilities' ratepayers in the event circumstances changed over time. Essentially, the terms ensured that the purchasers did not receive an unintended and undue windfall. Here, in contrast, the closing is conditioned on the receipt of license extension from the NRC. Thus, the uncertainty present in the former transactions does not exist.

FN16 CPS provided Staff access to confidential information related to CPS' power and financial contracts. The review of that information did not raise any other horizontal market power concerns.

FN17 Springbrook Water Co. v. Village of Hudson Falls, 269 A.D. 515 (3d Dep't 1945), app. den. 269 A.D. 913 (3d Dep't 1945).

FN18 15 USCA § 79z-51; 18 CFR § 365.

FN19 15 USCA § 79b(a)(ii); 18 CFR § 365(a)(1)(i).

FN20 Case 04-E-0030; R.E. Ginna Nuclear Power Plant, LLC, Order Providing For Lightened Regulation of Nuclear Generation Facility (issued May 19, 2004).

FN21 See, e.g., Case 98-E-1670, Carr Street Generating Station, Order Providing for Lightened Regulation (issued April 23, 1999).

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.