**C**

FEDERAL ENERGY REGULATORY COMMISSION
****1** Commission Opinions, Orders and Notices

Before Commissioners: Pat Wood, III, Chairman; Nora Mead Brownell, Joseph T. Kelliher, and Suedeen G. Kelly.

Rochester Gas and Electric Corporation

R.E. Ginna Nuclear Power Plant

Docket No. EC04-79-000

ORDER AUTHORIZING DISPOSITION OF JURISDICTIONAL FACILITIES

(Issued May 24, 2004)

***61744** 1. On March 23, 2004, Rochester Gas and Electric Corporation (RG&E) and R.E. Ginna Nuclear Power Plant, LLC (GNPP) (collectively, the Applicants) filed an application pursuant to section 203 of the Federal Power Act (FPA) [FN1] for Commission authorization for the sale of jurisdictional facilities owned by RG&E. Those facilities are interconnection and transmission facilities related to the approximately 495 MW Robert E. Ginna Nuclear Power Plant (Ginna Facility) located in Ontario County, New York. The sale is to GNNP, an indirect subsidiary of Constellation Energy Group, Inc. (Constellation Energy). The Commission has reviewed the transaction under its Merger Policy Statement [FN2] and will authorize the transaction as consistent with the public interest.

I. Background

2. RG&E is a wholly-owned public utility subsidiary of RGS Energy Group, Inc. (RGS) and a wholly-owned indirect subsidiary of Energy East Corporation (Energy East). RG&E is principally engaged in the production, purchase, transmission, distribution, and sale of electricity and the purchase, distribution, sale, and transportation of natural gas in New York State. RGS is an exempt public utility holding company under the Public Utility Holding Company Act of 1935 (PUHCA).

3. GNNP is a wholly-owned, indirect subsidiary of Constellation Energy. Constellation Energy also wholly owns Nine Mile Point Nuclear Station LLC (Nine Mile LLC). Nine Mile LLC owns the Nine Mile Point Nuclear Station (NMP) in Scriba, New York, with total capacity of 1,757 MW. Constellation Generation Group, LLC (CGG) is a direct subsidiary of Constellation Energy. Constellation Power Sources, Inc. (CPS), an affiliate of GNNP, is a power marketer authorized by the Commission to sell power at market-based rates. Baltimore Gas and Electric (BGE), a combination gas and electric utility, is an affiliate of GNNP that owns transmission and distribution facilities and transmits and distributes electricity and provides retail natural gas services in Maryland.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4. On November 24, 2003, RG&E and CGG entered into an agreement whereby RG&E would sell the Ginna Facility and its related jurisdictional facilities to CGG and for CGG to assign the rights to an affiliate (the Transaction). Applicants state that upon the closing of the Transaction, CGG will assign the rights to the Ginna Facility to GNNP. On November 24, 2003, RG&E also entered into a Power Purchase Agreement (PPA) with CPS, whereby RG&E would purchase 90 percent of the output of the Ginna Facility from CPS. Applicants note that all Transaction-related agreements were entered into pursuant to a competitive auction process conducted in consultation with the staff of the New York Public Service Commission (NYPSC).

****2** 5. Notice of the application was published on March 25, 2004, 69 Fed. Reg. 17,138 (2003), with comments, protests or interventions due on or before April 19, 2004. None was filed.

II. Discussion

A. Section 203 Analysis

6. Section 203(a) of the FPA provides that the Commission must approve a disposition of jurisdictional facilities if it finds that the disposition "will be consistent with the public interest." [FN3] Under the Merger Policy Statement, the Commission's analysis of whether a disposition of facilities is consistent with the public interest generally involves the consideration of three factors: (1) the effect on competition; (2) the effect on rates; and (3) the effect on regulation. [FN4] As discussed below, we will approve the proposed disposition of jurisdictional facilities as consistent with the public interest.

B. Effect on Competition

1. Applicants' Analysis

7. Applicants analyze the effect of the Transaction on relevant wholesale energy, capacity and installed capacity markets. Applicants analyze three relevant geographic markets: (1) the New York Independent System Operator (NYISO); (2) the PJM Interconnection (PJM); and (3) the American Electric Power Company control area (AEP). [FN5] They define 15 distinct season/load conditions as relevant products and analyze the effect of the transfer on both economic capacity and available economic capacity. [FN6] Applicants analyze the change in concentration under four scenarios: (1) a base case that assumes that GNNP and its affiliates control all of the output of the Ginna Facility and the NMP facility and that uses total transfer capability as the measure of transmission ***61745** availability into PJM; (2) a sensitivity analysis that assumes that GNNP and its affiliates control all of the output of Ginna and NMP but that uses available transfer capability as the measure of transmission availability into PJM; (3) a sensitivity analysis that assumes the completion of an 85 MW expansion of the Ginna facility; and (4) a sensitivity analysis that assumes that GNNP and its affiliates control only their output rights of the Ginna facility and the NMP facility.

8. Applicants report that, for available economic capacity, the Transaction does not exceed the thresholds specified in the Merger Policy Statement for any of the season/load conditions under the base case or any of the sensitivity analyses. The Transaction exceeds the thresholds in the Merger Policy Statement for economic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

capacity in NYISO in the sensitivity analysis that assumes the 85 MW expansion of the Ginna facility. The screen failure occurs in the summer off-peak period, with an increase of 110 Hirschman-Herfindahl Index in a moderately concentrated market. Applicants argue that the screen failure occurs under the conservative assumption that GNNP and its affiliates control the entire output of both the Ginna and NMP facilities, even though 90 percent of the output of the facilities is in fact committed under long term contracts. Moreover, they argue that the screen failure is due to the expansion of the Ginna facility, a pro-competitive event, not the elimination of any competitor. In addition, Applicants note that the screen failure occurs in one season/load level in one market (NYISO). Applicants cite Commission findings that off-peak and non-systematic screen failures raise less concerns about adverse effects on competition. [FN7]

****3** 9. Applicants state that the Transaction will not harm competition in the relevant installed capacity markets (NYISO and PJM). They argue that after accounting for the long-term transition contract (under which 90 percent of the output from the Ginna facility will be sold to RG&E), the transaction will only result in an increase in 49.5 MW of installed capacity for GNNP and its affiliates. They note that the NYISO and PJM markets have approximately 39,000 MW and 81,000 MW of installed capacity, respectively. They conclude that such a small increase in GNNP's and its affiliates' installed capacity would not materially increase market concentration.

10. Applicants argue that the Transaction will not have any vertical competitive effects. Their only natural gas distribution facilities are owned by GNNP's affiliate, BGE. BGE's natural gas distribution facilities are in Maryland, not in New York, where Ginna is located, and none of GNNP's affiliates own any gas transportation facilities within the NYISO market. Applicants note that GNNP affiliates own approximately 157,300 MMBtu/day of firm gas transportation capacity on interstate natural gas pipelines that GNNP affiliates could use to serve the NYISO market. However, (1) the capacity is subject to capacity release when not being used by the GNNP affiliates; (2) the capacity is on a regulated open access pipeline providing unbundled gas transportation service to shippers on a non-discriminatory basis; (3) the GNNP affiliates do not have operational control of the pipelines; and (4) the 157,300 MMBtu/day is a de minimis amount of the total pipeline capacity capable of serving the NYISO market. Applicants conclude that the combination of GNNP's affiliate's control of natural gas transportation and electric generation assets will not adversely affect competition.

11. Regarding the combination of control of generation and transmission facilities, Applicants state that GNNP's transmission-owning affiliate, BGE, turned over operational control of its transmission assets to PJM in 1997. They conclude, therefore, that BGE cannot use its transmission facilities to harm competition.

2. Commission Determination

12. We find that Applicants have shown that the Transaction will not adversely affect competition in the relevant markets. Applicants have analyzed the effect on competition under a wide range of assumptions and found a single screen failure in an off-peak period in one geographic market under one sensitivity analysis. In addition, the screen failure occurred in a moderately concentrated market. We would be more concerned with a screen failure in a highly concentrated market, where the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

likelihood of harm to competition is the greatest. We agree that a single screen failure in one season/load condition does not necessarily demonstrate harm to competition, and we will consider the circumstances of each case. As we stated in Order No. 642:

****4** The facts of each case (e.g., market conditions, such as demand and supply elasticity, ease of entry and market rules, as well as technical conditions, such as the types of generation involved) determine whether the merger would harm competition. When there is a screen failure, applicants must provide evidence of relevant market conditions that indicate a lack of a competitive problem or they should propose mitigation. [FN8]

13. Here, Applicants have provided evidence that there is not a competitive problem: (1) they note the screen failure occurs only under the assumption of an increase in the Ginna capacity and the assumption that GNNP and its affiliates control the entire output of the Ginna and NMP facilities, ignoring the output interest of other parties; and (2) they argue that the GNNP is unlikely to withhold the output of a nuclear facility in order to ***61746** raise market price, due to the operational characteristics of nuclear units. [FN9]

14. We find that the transaction will not harm competition in the relevant installed capacity markets. The increase in the installed capacity of GNNP and its affiliates is de minimis, given amount of installed capacity in the PJM and NYISO markets.

15. In addition, Applicants have shown that the transaction does not create or enhance any vertical market power related to the combination of control of electric generation facilities and control over natural gas or electric transmission facilities. Neither GNNP nor any of its affiliates control any significant natural gas or electric transmission assets in the relevant markets.

C. Effect on Rates

1. Applicants' Analysis

16. Applicants state that the Transaction will not affect the rates for wholesale power sales by RG&E or GNNP or transmission rates for any of RG&E's customers. RG&E has no wholesale full requirements customers, and the rates for RG&E wholesale customers in New York will not be affected because they are either market based rates, or they are at cost-based rates that cannot be changed without Commission approval in a section 205 filing. Transmission service in the New York control area is provided by the NYISO, and the rates will not be affected by the Transaction. Applicants state that GNNP has no wholesale power customers that could be adversely affected by the Transaction. CPS is obligated under a long-term contract to sell capacity and energy from Ginna to RG&E at market-based rates. GNNP will sell 90 percent of the capacity and energy to CPS under a long-term contract at GNNP's market-based rates, and it will sell the remaining 10 percent in the wholesale market. Applicants conclude that the rates of such sales will be set by market forces and that the Transaction will not adversely affect wholesale rates.

2. Commission Determination

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17. Applicants have shown that the Transaction will not adversely affect wholesale power or transmission rates. The rates of RG&E's wholesale customers are either market-based and thus will be determined by market forces or cost-based and thus will not be affected by the Transaction, as RG&E will buy back 90 percent of the output of Ginna from GNNP under a PPA for which there was a competitive auction process. In addition, RG&E's transmission rates are set by the NYISO tariff and will not be affected by the Transaction. Finally, CPS and GNNP will make sales pursuant to their market-based rate tariffs, so the transaction will not affect wholesale rates of GNNP's customers.

D. Effect on Regulation

1. Applicants' Analysis

****5** 18. Applicants state that the Transaction will not impair the ability of the Commission and state authorities to regulate them. Any wholesale power sales and transmission service provided by RG&E and wholesale power sales by GNPP will still be subject to the Commission's jurisdiction. Any retail sales by RG&E will still be under the jurisdiction of the NYPSC. Finally, they state that the proposed transfer would not result in the formation of a new holding company system.

2. Commission Determination

19. Applicants have shown that the proposed transfer will not affect federal or state regulation. The Transaction does not impair the NYPSC's ability to regulate sales from Ginna. We note that no state Commission intervened. As noted in the application, the transfer will not result in the creation of a new holding company system that would shift jurisdiction from the Commission to the SEC.

3. Accounting Discussion

20. RG&E submitted its proposed journal entries to account for the sale and transfer of the Ginna Facility to GNPP. RG&E intends to remove its capital investment in the facility, along with other related assets and liabilities, from its books and records and recognize a gain on the transaction as a regulatory liability in Account 254, Other Regulatory Liabilities, except for $60 million that it intends to refund to customers immediately. In addition, RG&E will transfer the Ginna Plant Nuclear Decommissioning Trust Funds to GNPP, except for a portion of the non-qualifying funds, which will be retained for the benefit of its customers and included in Account 254.

21. RG&E's proposed accounting for the sale and transfer appears consistent with the requirements of the Uniform System of Accounts. However, since this transfer of assets is a sale and acquisition of an operating unit or system, Applicants must use Account 102, Electric Plant Purchased or Sold, and file their proposed journal entries with the Commission to clear Account 102 within six months of the date the transfer is consummated.

The Commission orders:

(A) The proposed transaction is authorized upon the terms and conditions and for the purposes set forth in the application;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(B) The foregoing authorization is without prejudice to the authority of the Commission or ***61747** any other regulatory body with respect to rates, service, accounts, valuation, estimates, or determinations of cost, or any other matter whatsoever now pending or which may come before the Commission;

(C) Nothing in this order shall be construed to imply acquiescence in any estimate or determination of cost or any valuation of property claimed or asserted;

(D) The Commission retains authority under sections 203(b) and 309 of the FPA to issue supplemental orders as appropriate;

(E) Applicants shall notify the Commission within 10 days of the date that the disposition of jurisdictional facilities is consummated.

(F) Applicants shall account for the transfer of the facilities in accordance with the instructions to Account 102 of the Uniform System of Accounts and file, within six months of the date of the transfer, detailed journal entries, with narrative statements explaining the proposed accounting, including related income tax consequences.

By the Commission.

(SEAL)

****6** Magalie R. Salas

Secretary

FN1. 16 U.S.C. § 824b (2000).

FN2. Inquiry Concerning the Commission's Merger Policy Under the Federal Power Act: Policy Statement, Order No. 592, 61 Fed. Reg. 68,595 (1996), FERC Stats. & Regs., Regulations Preambles July 1996-December 2000 ¶ 31,044 (1996), reconsideration denied, Order No. 592-A, 62 Fed. Reg. 33,341 (1997), 79 FERC ¶ 61,321 (1997) (Merger Policy Statement); see also Revised Filing Requirements Under Part 33 of the Commission's Regulations, Order No. 642, 65 Fed. Reg. 70,983 (2000), FERC Stats. & Regs., Regulations Preambles July 1996-December 2000 ¶ 31,111 (2000), order on reh'g, Order No. 642-A, 66 Fed. Reg. 16,121 (2001), 94 FERC ¶ 61,289 (2001).

FN3. Supra note 1.

FN4. See generally Merger Policy Statement at ¶ 30,111.

FN5. Applicants do not analyze the effect of the transfer on installed capacity in the AEP market because GNNP and its affiliates do not control any capacity in AEP and Ginna is outside the AEP control area.

FN6. The 15 season/load conditions are five load levels for the Summer, Winter and Spring/Fall seasons.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN7. See Application at p. 34, citing CP&L Holdings, Inc., 92 FERC ¶ 61,023 at 61,054 (2000) and Jersey Central Power & Light Co., et al., 87 FERC ¶ 61,014 at 61,039 (1999).

FN8. Order No. 642, FERC Stats. & Regs., Regulations Preambles July 1996-December 2000 ¶ 31,111 at 31,897 (footnote omitted).

FN9. See Commonwealth Edison Company and PECO Energy Company, 91 FERC ¶ 61,036 (2000) (Commission found that ComEd would not be able to influence market price since most of its capacity was nuclear, which is difficult to ramp up or down in order to withhold output).

107 FERC P 61,180, 2004 WL 1158685 (F.E.R.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.